# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| LEGENDARY FIELD EXHIBITIONS, LLC; | ) | CASE NO. 19-50900-CAG |
| | ) | |
| AAF PLAYERS, LLC; | ) | CASE NO. 19-50902-CAG |
| | ) | |
| AAF PROPERTIES, LLC; | ) | CASE NO. 19-50903-CAG |
| | ) | |
| EBERSOL SPORTS MEDIA GROUP, INC; | ) | CASE NO. 19-50904-CAG |
| | ) | |
| LFE 2, LLC; | ) | CASE NO. 19-50905-CAG |
| | ) | |
| WE ARE REALTIME, LLC; | ) | CASE NO. 19-50906-CAG |
| | ) | |
| DEBTORS. | ) | (SUBSTANTIVE CONSOLIDATION OF ALL 6 CASES INTO ONE CASE, LEGENDARY FIELD EXHIBITIONS, LLC, CASE NO. 19-50900-CAG) JOINTLY ADMINISTERED UNDER CASE NO. 19-50900-CAG |

**REPLY TO CREDITORS AND PARTIES-IN-INTERESTS COLTON SCHMIDT & REGGIE NORTHUP'S, INDIVIDUALLY, AND ON BEHALF OF OTHERS SIMILARLY SITUATED, OBJECTION TO THE MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT WITH MGM RESORTS INTERNATIONAL AND OPERATIONS, INC.**

Randolph N. Osherow, in his capacity as the Chapter 7 Trustee (the "Trustee") of Ebersol Sports Media Group, Inc., AAF Players, LLC, AAF Properties, LLC, Legendary Field Exhibitions, LLC, LFE 2, LLC, and We Are Realtime, LLC, (collectively, the "Debtors"), hereby respectfully submits his reply (the "Reply") to creditors and parties-in-interests Colton Schmidt & Reggie Northup's, individually, and on behalf of others similarly situated (collectively referred to herein as the "Creditors"), objection (the "Objection") to the Motion for Approval of

1

Settlement Agreement (the "Motion")[1] with MGM Resorts International Operations, Inc. ("MGM"), pursuant to 11 U.S.C. § 105 and Bankruptcy Rule 9019.

**REPLY**

1. Distilled, the Objection argues that the Motion should be denied because: (i) the proposed settlement's terms do not represent fair value for the underlying IP; and (ii) MGM had an unfair advantage during the sale process. In presenting these arguments, the Objection fails to recognize that the Settlement Agreement – which fairly values the IP given its current state - was the product of thoughtful negotiations between the parties. Specifically, the Trustee conducted a diligent and fair process, with the assistance of an able and independent team of professionals. Taken together, the Objection fails to present a valid reason for the Creditors to stymie the Trustee's attempts to enter into an arm's-length settlement with MGM that is in the best interests of these estates.

**The Intellectual Property is Fairly Valued**

2. The Objection primarily argues the Trustee fails to properly evaluate the true value of the Debtors' intellectual property. Objection, 3:2-4. A proper evaluation, the Creditors argue, would include the values of comparable mobile sports betting applications and the market capitalization of the sports betting industry. In reality, however, these figures (even if ascertainable) would not elucidate the value of the IP.[2] First, the Trustee is not aware of (nor do the creditors identify) a comparable mobile sports betting application keyed to a now-defunct semi-professional football league. Second, the total market cap of the sports betting universe does

---

[1] Capitalized terms not expressly defined herein shall have those meanings ascribed to them in the Motion.

[2] The Objection's proffered value range for the intellectual property is also not supported by the documents the Creditor's submitted in support of the Objection. Compare Objection 11:15-18 (noting that the comparable value is between $15,000,000 and $34,000,000) and the Declaration of Jonathon Farahi in Support of Creditrs' Objection to Chapter 7 Trustee's Motion to Compromise and Approve Settlement 2:22-25 (noting that comparable value is $15,000,000, with no mention of how this value could possibly expand to $34,000,000, as argued in the Objection).

not have a correlation to the Debtors' niche IP.

3. Instead, the value of the underlying IP is best described through explanation of the gaming application's key attributes and currently-existing limitations. The application was intended to provide instantaneous in-game data from the Debtors' now-defunct football league to mobile devices, giving bettors biomechanical data that they could use in play-by-play wagering. Critically, however, the application was never fully developed. Instead, to realize the goal the application's current iteration requires extensive, continuing development of its underlying technology.

4. For example, the application's in-game betting feature was often thwarted because it did not sync with the simultaneous TV broadcasts of the Debtors' on-going football games. Moreover, it remains unclear which components of the now-idle application are actually finished. Looking forward, it is similarly unclear whether other operating sports leagues would ever support the technology. Without a sports league partner, the IP may have no realizable value.

5. The application is an ancillary product; without the companion football league, the application is not a high value proposition, as currently constructed. Taken together, the niche, next-play betting application's value does not approach the figures presented in the Objection. See the Declaration of Scott Butera, attached hereto as Exhibit A.

6. Moreover, while the Objection notes that, "[m]ultiple parties have express that the IP is worth at least nine figures,"[3] the Creditors fail to present any admissible evidence. Objection, 8:23-24. The Creditors do not disclose the identity of any of the "multiple third-parties" or their bonafides to opine on this subject. Nor do the Creditors even begin to outline the

---

[3] The Objection's statement that, "Creditors discussion with outside third parties have made it clear that any potential offers to the Estate by Creditors for the subject intellectual property will result in more relief to the Estate than the current proposed settlement agreement," is similarly vague and inadmissible. Objection, 7: 11-14. The Trustee submits that the evidence underlying the Objection is inadmissible as hearsay and should be rejected. See Federal Rule of Evidence 802.

general terms of any purported offer. Put simply, the Creditors failed to submit any evidence (admissible or otherwise) as to the value of the IP.

7. The Creditors' request that they be given more time to put together a venture and perhaps credit bid their claims further reveals the Creditors' failure to understand the value of the IP. If the Creditors have a higher offer which will pay MGM's secured claim in full and leave money for the unsecured creditors, now is the time to bring any offers to the Court or put up a non-refundable deposit of $125,000.00 to protect the BK Estate for the loss of this Agreement. The longer the IP sits idle, the more it ages toward technological obsolescence.

8. As noted in Cajun Electric, however, unsecured creditors simply do not and cannot have a veto right over a settlement that is fair, and where that settlement is indispensable to the efficient administration of the bankruptcy case. Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.), 119 F.3d 349, 358 (5th Cir. 1997); Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.), 68 F.3d 914, 919 (5th Cir. 1995) ("we are creating no per se rule allowing a majority of creditors in interest to veto a settlement"); Plaza Equities LLC v. Pauker (In re Copperfield Invs., LLC), 401 B.R. 87, 96 (Bankr. E.D.N.Y. 2009) (approving settlement over the objection of the largest creditor and noting that a creditor even a creditor holding the overwhelming majority of claims in the case- may not arbitrarily veto a settlement that otherwise satisfies the criteria for approval.); Official Comm. of Unsecured Creditors of Tower Auto. v. Tower Auto., Inc. (In re Tower Auto., Inc.), 241 F.R.D. 162, 171-72 (S.D.N.Y. 2006) (affirming approval of a settlement over the objection of the creditors' committee, wherein retirees gave up significant value to creditors receiving significant value); Vanguard Airlines, Inc. v. Sarah & William Hambrecht Found. (In re Vanguard Airlines, Inc.), 302 B.R. 292, 306-07 (Bankr. W.D. Mo. 2003) (approving settlement despite opposition of unsecured creditors).

9.  No model or estimate can pinpoint the ideal settlement amount. Rather, the Trustee submits that based on a canvassing of all the factual and legal issues before the Court, the proposed settlement that provides guaranteed recovery plus a significant claim reduction is well within the range of reasonableness.

**No Unfair Advantage Exists**

10.  At times the Objection seeks to focus on everything but the settlement itself. In particular, the Creditors assert that the execution by MGM and the Debtors of pre-petition, commercially reasonable agreements, typical of a $7,000,000 investment, taint the settlement. See Objection 6:1-13. The fact that the Debtors and MGM were parties to pre-petition agreements does not render either the Trustee or MGM with unclean hands. Here, MGM was granted a security interest, and its UCC-1 Financing Statement (perfecting its security interest in the IP) was filed with the Delaware Department of State. Moreover, MGM was entitled under its contracts to receive a license from the Debtors. Therefore, neither MGM's decision to enter into a Note and Warrant Purchase Agreement in the Fall of 2018, nor its decision to protect its commercial interests have any bearing on the agreement it negotiated with the Trustee.

11.  Instead, the Trustee, as a fiduciary to the Debtors' estates, has been motivated by several goals: (i) to guide the Debtors through bankruptcy; (ii) to resolve thorny intercreditor issues among all parties-in-interest; and (iii) to the extent possible, obtain a distribution for unsecured creditors. The value of the proposed settlement is that it provides the best available prospect of achieving all three of these goals.

12.  Moreover, the Settlement Agreement was the product of arm's-length negotiations between the Trustee and MGM, as well as both parties' professionals. Following the Petition Date, the Trustee and MGM worked diligently to effectuate the steps necessary to resolve MGM's rights under the Security Agreement and the IP Agreement. As a result of these

combined efforts, the Trustee and MGM prepared the Settlement Agreement, which the Parties agreed is a mutually acceptable resolution of their respective rights.

13. Once effective, the Settlement Agreement will also guarantee mutual certainty to the resolution of the disputes between the Debtors and MGM, which otherwise may be the subject of costly and time consuming litigation with uncertain outcomes. As a result, the Trustee believes that the Settlement Agreement reaches a practical and economically sound resolution to several of the issues presented by these cases. The Trustee, therefore, respectfully submits that the Settlement Agreement is beneficial to the Debtors' estates, their creditors, and all parties-in-interest.

## **CONCLUSION**

The Motion satisfies each of the four prongs for approval of the Settlement Agreement. Litigation with MGM would be costly and there is a reasonable probability MGM will succeed. There is no evidence the IP has any value above MGM's $7,000,000 claim, assuming litigation would be successful, making collection difficult. The litigation surrounding the IP, which is comprised of intricate technology, coupled with the complexity of the highly regulated gaming and gambling industries make approval of the Settlement Agreement and the Motion appropriate here. Last, there is no evidence to overcome the Trustee's business judgement here, nor is there any evidence the Settlement Agreement is not fair and equitable. Based upon the foregoing, the Trustee respectfully requests that the Bankruptcy Court: (a) overrule the Objection; (b) enter an order granting the Motion in its entirety; and (c) grant such other and further relief as the Bankruptcy Court deems just and proper.

## RESERVATION OF RIGHTS

The Trustee reserves his right to supplement this Reply in the event the Opposition produces any new evidence and admissible in advance of the hearing on the Motion.

DATED this 24th day of July, 2019.

Randolph N. Osherow
Texas State Bar No. 15335500
342 West Woodlawn, Suite 100
San Antonio, Texas 78212
(210) 738-3001 – Telephone
(210) 737-6312 – Fax
rosherow@hotmail.com
Chapter 7 Trustee

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| LEGENDARY FIELD EXHIBITIONS, LLC; | ) | CASE NO. 19-50900-CAG |
| | ) | |
| AAF PLAYERS, LLC; | ) | CASE NO. 19-50902-CAG |
| | ) | |
| AAF PROPERTIES, LLC; | ) | CASE NO. 19-50903-CAG |
| | ) | |
| EBERSOL SPORTS MEDIA GROUP, INC; | ) | CASE NO. 19-50904-CAG |
| | ) | |
| LFE 2, LLC; | ) | CASE NO. 19-50905-CAG |
| | ) | |
| WE ARE REALTIME, LLC; | ) | CASE NO. 19-50906-CAG |
| | ) | |
| DEBTORS. | ) | (SUBSTANTIVE CONSOLIDATION OF ALL 6 CASES INTO ONE CASE, LEGENDARY FIELD EXHIBITIONS, LLC, CASE NO. 19-50900-CAG) JOINTLY ADMINISTERED UNDER CASE NO. 19-50900-CAG |

**DECLARATION OF SCOTT BUTERA IN SUPPORT OF THE REPLY TO CREDITORS AND PARTIES-IN-INTERESTS COLTON SCHMIDT & REGGIE NORTHUP'S, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED, OBJECTION TO THE MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT WITH MGM RESORTS INTERNATIONAL AND OPERATIONS, INC.**

Scott C. Butera, being duly sworn, deposes and says:

1.  I am over the age of eighteen, mentally competent, and unless otherwise indicated, I have personal knowledge of the facts set forth herein. I submit this declaration in support of the Reply of Randolph N. Osherow, in his capacity as the Chapter 7 Trustee of Ebersol Sports Media Group, Inc., AAF Players, LLC, AAF Properties, LLC, Legendary Field Exhibitions, LLC, LFE 2, LLC, and We Are Realtime, LLC, (collectively, the "Debtors"), to the objection of the creditors and parties-in-interest, Colton Schmidt & Reggie Northup's, individually, and on behalf

19530155                                    1

of others similarly situated, to the Motion for Approval of Settlement Agreement (the "Motion") with MGM Resorts International Operations, Inc. ("MGM"), pursuant to 11 U.S.C. § 105 and Bankruptcy Rule 9019.

2. I am the President of Interactive Gaming at MGM, with over 25 years of experience in finance and hospitality leadership.

3. I obtained my bachelor's degree in economics at Trinity College and a Master of Business Administration degree from New York University's Leonard N. Stern School of Business.

4. I am employed by MGM and started working with the company in 2018. Prior to working for MGM, I served as the: (i) Commissioner of the Arena Football League; (ii) President & CEO for Foxwoods Resort & Casino; (iii) President and CEO of Tropicana Entertainment; (iv) Chief Operating Officer for Cosmopolitan Hotel & Casino Resort; (v) President of Metroflag Management; and (vi) Chief Operating Officer and Executive Vice President of Trump Entertainment Resorts, Inc.

5. I also have 20 years of experience in investment banking with UBS Investment Bank, Credit Suisse First Boston, Smith Barney and Bear Stearns & Co.

6. In my current role as President of Interactive Gaming at MGM, I provide strategic leadership on the development for interactive gaming – which includes sports betting and skill-based gaming opportunities. I am also responsible for MGM's sports league and team partnerships, as well as its digital media.

7. MGM is recognized as an industry leader in sports betting and cutting-edge interactive gaming offerings as it brings more than 25 years of industry-leading expertise in sports betting and strategic partnership building in the sector.

8. I am familiar with the intellectual property ("IP") that is the subject of the Motion,

as well as MGM's contracts related to the IP.

9. Specifically, at the time the Debtors ceased their operations, the Debtors were still developing the IP pursuant to the parties' contracts. The IP was intended to provide mobile devices with instantaneous in-game data during the Debtors' live football games, which in turn would provide gamblers with biomechanical data they could use when wagering. As of the date of the bankruptcy filings, the IP was not operational.

10. Prior to the Debtors' bankruptcy cases, MGM loaned $7,000,000 to the Debtors (for purposes included the development of the IP), and MGM expects the IP will require several million dollars more of investment to start operating.

11. In addition, once operational, the IP will need a sports league partner or partners to generate revenue, and as of the date hereof, the IP does not have a partner. Similarly, once functioning, MGM will need to market the IP sufficiently to acquire enough users of the technology, such that it would be profitable. Presently, MGM does not know whether these metrics can be achieved or that the IP could or would be profitable.

12. The IP is not the only technology of its kind in the market, and it has several competitors. It is unclear at this time whether the IP can be developed so that it will be competitive. Further, if the IP is not developed going forward, its value will diminish, and it may become obsolete and unusable.

[Signature Page to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 23rd day of July, 2019.

*/s/ Scott C. Butera*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 7 |
| LEGENDARY FIELD EXHIBITIONS, LLC; | § § § | CASE NO. 19-50900-CAG |
| AAF PLAYERS, LLC; | § § § | CASE NO. 19-50902-CAG |
| AAF PROPERTIES, LLC; | § § § | CASE NO. 19-50903-CAG |
| EBERSOL SPORTS MEDIA GROUP, INC.; | § § § | CASE NO. 19-50904-CAG |
| LFE 2, LLC; | § § § | CASE NO. 19-50905-CAG |
| WE ARE REALTIME, LLC | § § | CASE NO. 19-50906-CAG |
| DEBTORS | § | (SUBSTANTIVE CONSOLIDATION OF ALL 6 CASES, INTO ONE CASE, LEGENDARY FIELD EXHIBITIONS, LLC, CASE NO. 19-50900-CAG) SUBSTANTIVELY ADMINISTERED UNDER CASE NO. 19-50900-CAG |

## CERTIFICATE OF MAILING

I certify that copies of the Trustee's Response to Objection Filed by Boris Treyzon & Jonathon S. Farahi for Creditors Reggie Northup, Colton Schmidt, was served via United States first class mail, postage prepaid to the below parties and those parties registered to receive electronic notices in this case, on July 25th, 2019:

Legendary Fields Ex.
4525 Macro
San Antonio, TX 78218

Jonathon Farahi
Boris Treyzon
Abir Cohen Treyzon Salo, LLP
16001 Ventura Blvd, Suite 200
Encino, California 91436

U.S. Trustee
PO Box 1539
San Antonio, TX 78295

William A. (Trey) Wood, III
Bracewell LLP
711 Louisiana Suite 2300
Houston, TX 77002
Attorney for Debtor Company
**Counsel for Debtor(s)**

/s/ Randolph N. Osherow
RANDOLPH N. OSHEROW, Chapter 7 Trustee
342 West Woodlawn, Suite 100
San Antonio, Texas 78212
(210) 738-3001 - Telephone
(210) 737-6312 - Telefax
rosherow@hotmail.com