**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 7** |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | **CASE NO. 19-50900-CAG** |
| **LLC, et al.;** | § | |
| | § | |
| **AAF PLAYERS, LLC;** | § | **CASE NO. 19-50902-CAG** |
| | § | |
| **AAF PROPERTIES, LLC;** | § | **CASE NO. 19-50903-CAG** |
| | § | |
| **EBERSOL SPORTS MEDIA GROUP,** | § | **CASE NO. 19-50904-CAG** |
| **INC.;** | § | |
| | § | |
| **LFE 2, LLC;** | § | **CASE NO. 19-50905-CAG** |
| | § | |
| **WE ARE REALTIME, LLC** | § | **CASE NO. 19-50906-CAG** |
| | § | |
| **DEBTORS.** | § | **(SUBSTANTIVE CONSOLIDATION** |
| | § | **UNDER CASE NO. 19-50900)** |

**MOTION OF THOMAS A. VEIT FOR RELIEF FROM THE**
**AUTOMATIC STAY AS TO FUNDS IN ESCROW ACCOUNT**
**OR ALTERNATIVELY FOR ADEQUATE PROTECTION**

THOMAS A. VEIT ("**Veit**"), by and through his undersigned attorneys, files this Motion

for Relief from the Automatic Stay or Alternatively for Adequate Protection (the "**Motion**")

pursuant to Sections 362(d)(1) of the Bankruptcy Code. This Motion involves funds that were

placed into an escrow account with City National Bank, as escrow agent, established to satisfy

the payment obligations of Legendary Field Exhibitions, LLC ("**LFE**") to Veit under the

employment agreement between Veit and LFE. The funds in the escrow account are not

property of the bankruptcy estate of LFE and the stay should be terminated, if it exists, to permit

Veit to take whatever action he deems necessary and appropriate to obtain the escrow funds from

1

City National Bank.  Alternatively, Veit seeks adequate protection for his interest in the escrow funds.   In support of his Motion, Veit states as follows[1]:

1.     Movant has conferred with the Trustee and the Trustee does not oppose this Motion.

2.     On April 17, 2019, LFE, Ebersol Sport Media Group, Inc. ("**ESMG**") and related entities filed voluntary petitions for relief pursuant to Chapter 7 of the Bankruptcy Code. On July 8, 2019, this Court entered an order substantively consolidating the cases.

3.     On December 5, 2017, ESMG and Veit, along with Veit's wholly owned company Solutions Group Global, Inc. ("**Solutions Group**"), entered into a consulting agreement whereby ESMG hired Solutions Group and Veit to act as consultants for ESMG in connection with the formation of a professional, spring American football league (the "**League**"). In order to satisfy ESMG's obligations to Veit and Solutions Group under the consulting agreement, ESMG and Solutions Group established an escrow account with City National Bank that was funded with $525,000.00. A copy of the Escrow Agreement is attached to the Affidavit of Veit as *Exhibit 1.*

4.     LFE is a wholly owned subsidiary of ESMG that was formed to further the business plan of ESMG and to operate the League. At the time of the Consulting Agreement, LFE had not begun operations.

5.     At all times material hereto, ESMG and Veit contemplated, and the terms of the Consulting Agreement itself provided, that Veit would become an employee of the entity operating the League.   This entity would become LFE.

---

[1] The Affidavit of Thomas A. Veit in support of this Motion is attached hereto as *Exhibit A*.

4846-5585-1164.4/65919/386015/072919

6.	On May 1, 2018, LFE and Veit entered into an employment agreement whereby LFE hired Veit as Head of Business Operations for an initial three-year period commencing May 1, 2018 through April 30, 2021 at a base salary of $250,000.00 (the "**Employment Agreement**")[2]. A copy of the Employment Agreement is attached to the Affidavit of Veit as *Exhibit 2*. Mr. Veit's primary duties were to manage the business operations of the League. Mr. Veit's duties did not include raising capital for the operation of the League but were limited to management of the League's business operations; and he performed those duties faithfully, diligently, and to the best of his abilities.

7.	In order to satisfy LFE's payment obligations to Veit under the Employment Agreement and for the benefit of Veit, LFE agreed to establish an escrow account in the amount of $125,000.00.

8.	Rather than establish a new account, Veit, ESMG and LFE agreed to use the existing Escrow Agreement and escrow account at City National Bank for the Employment Agreement. ESMG and Veit then instructed City National Bank to disregard the escrow termination instruction and to disburse all but $125,000.00 of the Escrow Funds to ESMG. A copy of the instructions to City National Bank and an email between ESMG's and LFE's counsel and Veit regarding the reduction of the Escrow Funds in the existing City National Bank Escrow Agreement for the Employment Agreement are attached to the Affidavit of Veit as *Composite Exhibit 3*. Upon information and belief, the current balance of the escrow account is $126,761.70 (the "**Escrow Funds**"[3]).

---

[2] The Employment Agreement contains an arbitration provision (paragraph 6) that requires that any dispute under or related to the Employment Agreement are to be resolved by arbitration that will occur in the State of Florida. Nothing contained in this Motion shall be deemed or be construed as a waiver by Veit to enforce the arbitration clause. Once the Court terminates the automatic stay, the Trustee should be required to consent to a distribution of the Escrow Funds and any dispute concerning his failure to do so would be subject to arbitration in Florida.

[3] The term Escrow Funds shall also include all interest, appreciation, and proceeds of the funds held in the Escrow Account by City National Bank or its successor.

4846-5585-1164.4/65919/386015/072919

9.      Under the terms of the Employment Agreement, Veit is entitled to continue to receive his Base Salary and certain employment benefits through the balance of the term of the Employment Agreement (April 30, 2021) in the event Veit's employment is terminated without cause,

10.     LFE terminated Veit's employment without cause effective April 15, 2019.

11.     Under the terms of the Employment Agreement, Veit is owed the following sums:

   a.   $275,000.00 for base salary[4];

   b.   $14,423.07 for unpaid and accrued vacation time for April 30, 2018 through April 16, 2019; and,

   c.   $17,952.48 for Employee Benefits (medical) per Section 4.c. of the Employment Agreement incorporating Section 3.e.1.

   d.   Total Claim: $307,375.55.

**Cause Exists to Terminate the Automatic Stay**

12.     Section 362(d)(1) provides that the Court shall grant relief from stay for cause, including lack of adequate protection. In this instance cause exists to terminate the automatic stay in that the Escrow Funds are not property of the Bankruptcy Estate. The Escrow Agreement was established to satisfy the obligations owed to Veit. LFE terminated Veit without cause pre-petition. LFE owes Veit his base salary and certain employee benefits and the conditions of the Escrow Agreement have been satisfied.

---

[4] Because the Employment Agreement was terminated without cause, absent the bankruptcy Veit would be entitled to receive his yearly base salary of $250,000.00 that increases by $25,000.00 each year for the period of April 17, 2019 through May 1, 2020 plus employee benefits as provided in the Employment Agreement. However because of Section 502(b)(7), Veit's damages for breach of the Employment Agreement are limited to the compensation for the one year following the petition date plus any unpaid compensation due under the contract without acceleration which would be the base salary of $275,000.00 plus $14,423,07 for unpaid and accrued vacation time for 2018, plus $17,952.48 for the Employee Benefits for one year after the petition date for a total of $307,375.55

4

13.     Because Veit was terminated without cause prior to the commencement of the Bankruptcy Case, the Escrow Funds belong to Veit and are not property of the Bankruptcy Estate. "…funds that are deposited into an escrow account by a debtor, for the benefit of others, cannot be characterized as property of the estate." *Dizkowski v NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195 at 1198 (11th Cir. 2001) quoting *In re S.E.L. Maduro*, 205 B.R. 987, 990-991 (Bankr. S.D. Fla. 1997)(citing *In re AGSY, Inc*., 120 B.R. 313, 317-320 (Bankr. S.D.N.Y. 1990)." The majority of courts have concluded that "an escrow into which a debtor puts its property (or from which the debtor is entitled to payments after satisfying a condition) is not property of the estate*." In re Atlantic Gulf Communities, Corp.,* 369 B.R. 156 at 164 (Bankr. D. Del. 2007).

14.     Neither **LFE** nor ESMG have control over the Escrow Funds with City National Bank, and they alone cannot control who would receive the Escrow Funds. Rather, the escrow account at City National Bank was established and funded for the benefit of Veit and not ESMG or LFE. Its purpose was to protect Veit and to satisfy the compensation owed to Veit.

15.     While **the** funds are held in the escrow account, neither LFE nor ESMG has the legal authority to utilize or direct the funds. To allow the Trustee the right to utilize or direct the escrowed funds would be to allow the bankruptcy estate a greater interest in the escrowed funds than either LFE or ESMG possessed, in contravention of the Bankruptcy Code.[5]

16.     Since the **Escrowed** Funds are not property of the estate, Veit requests that the automatic stay be terminated to permit Veit take whatever action is necessary to obtain the

---

[5] Section 363(b)(1) only permits a trustee to use "property of the estate". Furthermore, to the extent the estate were to have an interest in the Escrow Funds, the interest would constitute cash collateral under Section 363(a) and the Trustee would be prohibited from using the Escrow Funds without order of the Court and generally upon providing adequate protection. Section 363(c )(2).

Escrowed Funds from City National Bank and authorizing and ordering the Trustee to execute such documents as are reasonably necessary to effect the release of the remaining Escrowed Funds to **Thomas A. Veit**, including the execution of joint instructions to City National Bank

17.     Alternatively, Veit requests that the Court provide him with adequate protection by:

(1) Prohibiting the Trustee or any other party from withdrawing or encumbering the Escrowed Funds;

(2) Prohibit City National Bank from disbursing any of the Escrowed Funds until further order of the Court;

(3) Requiring the Trustee to pay all fees and expenses of City National Bank under or related to the Escrow Agreement;

(4) Providing Veit access to all escrow account information; and,

(5)  Paying Veit each month an amount equal to his monthly base salary and all employee benefits.

WHEREFORE, Veit requests the Court to terminate the automatic stay to permit Veit to take any and all actions he deems advisable to obtain the Escrow Funds from City National Bank and alternatively provide Veit adequate protection as requested in this Motion, and for such other relief as the Court deems proper.

4846-5585-1164.4/65919/386015/072919

Respectfully submitted,

CLARK HILL STRASBURGER

   /s/ Stephen A. Roberts
Stephen A. Roberts
TX State Bar No. 17019200
720 Brazos, Suite 700
Austin, Texas 78701
Telephone: 512.499.3624
Facsimile: 512.499.3660
Email: stephen.roberts@clarkhillstrasburger.com

**Attorneys for Thomas A. Veit**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this Motion of Thomas A. Veit for Relief from the Automatic Stay or Alternatively for Adequate Protection was served via CM/ECF and the parties listed below, as indicated, on the 29th day of July, 2019.

**Debtors:**
Legendary Field Exhibitions, LLC
AAF Players, LLC
AAF Properties, LLC
Ebersol Sports Media Group, Inc.
LFE 2, LLC
We Are Realtime, LLC
4525 Macro
San Antonio, TX 78218

**Debtors' Counsel:**
William A. (Trey) Wood, III
Bracewell, LLP
711 Louisiana, Suite 2300
Houston, TX 77002
Email:  Trey.wood@bracewell.com

**Trustee:**
Randolph N. Osherow
342 W. Woodlawn, Suite 100
San Antonio, TX 78212
Email:  rosherow@hotmail.com

Brian S. Engel
Barrett, Daffin, Frappier, Turner & Engel
3809 Juniper Trace, Suite 205
Austin, TX 78738
Email:  brianen@bdfgroup.com

Kell C. Mercer
Kell C. Mercer, PC
1602 E. Cesar Chavez St.
Austin, TX 78702
Email:  kell.mercer@mercer-law-pc.com

Steve Turner
Barrett, Daffin, Frappier, Turner & Engel
3809 Juniper Trace, Suite 205
Austin, TX 78738
Email:  wdecf@bdfgroup.com

7

**Parties Requesting Notice:**

Three Sisters Partnership
c/o Russell W. Savory
Beard & Savory, PLLC
119 South Main Street, Suite 500
Memphis, TN 38103
Email: russ@bsavory.com

IsoLynx, LLC
c/o Lathrop Gage, LLP
Raymond J. Urbanik
2101 Cedar Springs Road, Suite 1400
Dallas, TX 75201
Email: rurbanik@lathropgage.com

TRT Development Company – San Antonio
d/b/a Omni San Antonio Hotel at the
Colonnade
Kristen A. Miller Reinsch
TRT Holdings, Inc.
4001 Maple Avenue, Suite 600
Dallas, TX 75219
Email: Kristen.reinsch@trtholdings.com

Stephen J. Humeniuk
Locke Lord LLP
600 Congress Ave., Suite 2200
Austin, TX 78701
Email: Stephen.humeniuk@lockelord.com

Zachary Hospitality, LLC
c/o Roderick J. Regan
11118 Wurzbach, #101
San Antonio, TX 78230
Email: rod@rodregan.com

Dundon Capital Partners, LLC
c/o Russell W. Mills
Bell Nunnally & Martin LLP
2323 Ross Avenue, suite 1900
Dallas, TX 75201
Email: rmills@bellnunnally.com

LMREC III CLO I REO I, Inc.
Heather J. Panko
Stutzman, Bromberg, Esserman & Plifka, PC
2323 Bryan Street, Suite 2200
Dallas, TX 75201
Email: panko@sbep-law.com

Deb Secrest
Commonwealth of Pennsylvania
Department of Labor & Industry
Collections Support Unit
651 Boss Street, Room 925
Harrisburg, PA 17121
Email: ra-li-ucts-bankrupt@state.pa.us

Cynthia Frelund
c/o Aaron C. Smith
c/o Stephen J. Humeniuk
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
Email: asmith@lockelord.com

Sodexo
c/o Thomas Stanton, Esq.
Assistant General Counsel
9801 Washingtonian Blvd., 12th Floor
Gaithersburg, MD 20878
Email: Thomas.stantin@sodexo.com

Artoush Varshosaz
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, TX 75201
Email: artoush.varshosaz@klgates.com

Pavilion Management Company
Jonathan L. Howell, PLLC
Glast, Phillips & Murray, P.C.
14801 Quorum Dr., Suite 500
Dallas, TX 75254
Email: jhowell@gpm-law.com

4846-5585-1164.4/65919/386015/072919

Security Industry Specialists, Inc.
c/o Wayne R. Terry
Hemar, Rousso & Heald, LLP
15910 Ventura Blvd., 12th Floor
Encino, CA 91436-2829
Email: wterry@hrhlaw.com

CBS Corporation, CSTV Networks, Inc.
d/b/a CBS Sports Network and Affiliates
c/o Weil, Gotshal & Manges LLP
Yehudah L. Buchweitz
Garrett A. Fail
767 Fifth Avenue
New York, NY 10153
Email: yehudah.buchweitz@weil.com
Garrett.fail@weil.com

First Insurance Funding
c/o Daniel J. Zeller
Shapiro Sher Guinot & Sandler
250 West Pratt Street, Suite 2000
Baltimore, MD 21201
djz@shapirosher.com

NCM Wireless, Inc.
c/o William L. Niro
Aronberg Goldgehn Davis & Garmisa
330 North Wabash, Suite 1700
Chicago, IL 60611
wniro@agdglaw.com

CBS Corporation, CSTV Networks, Inc. d/b/a
CBS Sports Network and Affiliates
c/o Weil, Gotshal & Manges LLP
Alfredo R. Perez
700 Louisiana St., Suite 1700
Houston, TX 77002
Email: alfredo.perez@weil.com

Arizona Board of Regents
Arizona State University
c/o Roberts M. Charles, Jr.
Lewis Roca Rothgerber Christie LLP
One South Church Avenue, Suite 2000
Tucson, AZ 85701-1611
Email: rcharles@lrrc.com

IsoLynx, LLC
c/o Wendi Alper-Pressman
Lathrop Gage LLP
7701 Forsyth Blvd., Suite 500
St. Louis, MO 63105
wpressman@lathropgage.com

Blue Cross of California
d/b/a Anthem Blue Cross and
Anthem Blue Cross Life and Health Ins. Co.
c/o Eric S. Goldstein, Esq.
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, CT 06103-1919
egoldstein@goodwin.com
bankruptcy@goodwin.com
bankruptcyparalegal@goodwin.com

9

Texas Comptroller of Public Accounts
c/o Courtney J. Hull
Assistant Attorney general
Bk-chull@oag.tex.gov
c/o Sherri K. Simpson, Paralegal
sherri.simpson@oag.texas.gov
Attorney General's Office
Bankruptcy & Collections Division
P.O. Box 12548
Austin, TX 78711-2548

Colton Schmidt & Reggie Northup
c/o Abir Cohen Treyzon Salo, LLP
16001 Ventura Blvd., Suite 200
Encino, CA 91436
JFarahi@actslaw.com

Shaun O'Hara and 60 Soho Consulting, LLC
c/o Stephen J. Humeniuk
Locke Lord LLP
600 Congress Avenue, Suite 2200
Austin, TX 78701
Email: stephen.humeniuk@lockelord.com

*/s/ Stephen A. Roberts*
Stephen A. Roberts

4846-5585-1164.4/65919/386015/072919

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, et al.; | § | CASE NO. 19-50900-CAG |
| | § | |
| AAF PLAYERS, LLC; | § | CASE NO. 19-50902-CAG |
| | § | |
| AAF PROPERTIES, LLC; | § | CASE NO. 19-50903-CAG |
| | § | |
| EBERSOL SPORTS MEDIA GROUP, INC.; | § | CASE NO. 19-50904-CAG |
| | § | |
| LFE 2, LLC; | § | CASE NO. 19-50905-CAG |
| | § | |
| WE ARE REALTIME, LLC | § | CASE NO. 19-50906-CAG |
| | § | |
| DEBTORS. | § | (SUBSTANTIVE CONSOLIDATION UNDER CASE NO. 19-50900) |

## AFFIDAVIT OF THOMAS A. VEIT IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO FUNDS IN ESCROW ACCOUNT OR ALTERNATIVELY FOR ADEQUATE PROTECTION

STATE OF FLORIDA          )
COUNTY OF HILLSBOROUGH    )

**BEFORE ME**, the undersigned authority, personally appeared THOMAS A. VEIT, who, being duly sworn deposes and says:

1.    "I, THOMAS A. VEIT, declare under penalty of perjury pursuant to the provisions of 28 U.S.C. § 1746, that the following statements are true and correct:

2.    I am over the age of twenty-one years and competent to make this Affidavit.

3.    I make this Affidavit based upon my personal knowledge of the facts stated herein.

1

4.      I am the principal and sole shareholder of Solutions Group Global, Inc. ("**Solutions Group**").

5.      Solutions Group had entered into a Consulting Agreement with Ebersol Sport Media Group, Inc. ("**ESMG**") whereby ESMG hired Solutions Group and myself to act as consultants for ESMG in connection with the formation of a professional, spring American football league (the "**League**"). In order to satisfy ESMG's obligations to me and Solutions Group under the Consulting Agreement, ESMG and Solutions Group established an escrow account with City National Bank that was funded with $525,000.00. A copy of the Escrow Agreement is attached to this Affidavit as *Exhibit 1.*

6.      ESMG represented to me that Legendary Field Exhibitions, LLC ("**LFE**") was a wholly owned subsidiary of ESMG that was formed to further the business of ESMG and to operate the League. At the time of the Consulting Agreement, LFE had not begun operations.

7.      At the time of the Consulting Agreement, ESMG and I contemplated that I would become an employee of the entity operating the League.   This entity would become LFE.

8.      On May 1, 2018, LFE and I entered into an employment agreement whereby LFE hired me for an initial three-year period commencing May 1, 2018 through April 30, 2021 at a base salary of $250,000.00 that would increase by $25,000.00 each year (the "**Employment Agreement**"). A copy of the Employment Agreement is attached to this Affidavit as *Exhibit 2.* I was employed by LFE as Head of Business Operations and performed essentially the same functions that I performed under the Consulting Agreement with ESMG. My primary duties were to manage the business operations of the league. My duties did not include raising capital for the operation of the league but were limited to management of the league's business operations; and I performed those duties faithfully, diligently, and to the best of my abilities.

2

9.     In order to satisfy LFE's payment obligations to me under the Employment Agreement and for my benefit, LFE agreed to establish an escrow agreement in the amount of $125,000.00.

10.    Rather that establish a new escrow account, ESMG, LFE, and I agreed to use the existing Escrow Agreement and escrow account at City National Bank for the Employment Agreement. ESMG and Global Solutions then instructed City National Bank to disregard the escrow termination instruction and to disburse all but $125,000.00 of the Escrow Funds to ESMG. A copy of the instructions to City National Bank and an email between ESMG's and LFE's counsel and me regarding the reduction of the Escrow Funds in the existing City National Bank Escrow Agreement for the Employment Agreement are attached to this Affidavit as *Composite Exhibit 3*.

11.    City National Bank informed me that the current balance of the escrow account is $126,761.70.

12.    LFE terminated my employment without cause effective April 15, 2019.

13.    Under the terms of the Employment Agreement and subject to the limitations of Section 502(b)(7), I am owed the following sums:

   a.  $275,000.00 for base salary;

   b.  $14,423.07 for unpaid and accrued vacation time for April 30, 2018 through April 16, 2019; and,

   c.  $17,952.48 for Employee Benefits (medical) per Section 4.c. of the Employment Agreement incorporating Section 3.e.1.

   d.  Total Claim: $307,375.55."

THIS CONCLUDES MY AFFIDAVIT.

4813-7695-4268.3/65919/386015/070919

_____
THOMAS A. VEIT

**SWORN TO** and subscribed before me in my presence on 7/10/19, by THOMAS A. VEIT, who is personally known to me/produced a valid Florida Driver's license.



EDWARD L VANCE
Notary Public - State of Florida
Commission # GG 023146
My Comm. Expires Sep 29, 2020
Bonded through National Notary Assn.

_____
Notary Public, State of Florida

My commission expires:

# EXHIBIT 1

# GENERAL ESCROW AGREEMENT



This Escrow Agreement (the "Escrow Agreement") is entered into as of <u>December 5, 2017,</u> by and between City National Bank, a national banking association (the "Escrow Agent"), <u>Ebersol Sports Media Group, Inc., a Delaware C-Corporation (the "Company"), Solutions Group Global, Inc., a Florida Corporation ("Consultant")</u>. The Company and Consultant are individually referred to herein as a "Party" and collectively as Parties (the "Parties").

## ARTICLE I
## ESCROW FUND

1.1 <u>Establishment of Escrow.</u>

The purpose of the Escrow Agreement is to establish an account with Escrow Agent (the "Escrow Account") comprised of the Consulting Fee (as defined in the Consulting Agreement) and to satisfy the payment obligations of the Company to the Consultant and Veit under that certain Consulting Agreement dated December 1, 2017, between the Parties (the "Consulting Agreement"). The Parties acknowledge that the Escrow Agent has not been provided a copy of the Consulting Agreement and has not reviewed nor is obligated to review the Consulting Agreement.

1.2 <u>Separate Sub-Accounts of the Escrow Account.</u> The Parties may direct the Escrow Agent to establish one or more separate sub-accounts within the Escrow Account to hold such portions of the assets and Permitted Investments (as hereinafter defined) of the Escrow Fund as the Parties shall direct, along with the earnings and profits thereon.

## ARTICLE II
## THE ESCROW AGENT

2.1 Scope of Powers, Duties and Obligations of the Escrow Agent. Subject to the Parties' directions, the Escrow Agent has whatever powers are conferred by law and which are required to discharge its obligations and exercise its rights under this Escrow Agreement, including but not limited to the powers specified in the following Paragraphs of this Article, and the powers and authority granted to the Escrow Agent under other provisions of this Escrow Agreement. The Escrow Agent shall have no duties or obligations except those specifically set forth in this agreement.

2.2 Powers Exercisable by the Escrow Agent, Subject to this Agreement. The Escrow Agent is authorized and empowered to exercise the following powers, subject to the limitations contained in this Agreement:

    2.2.1 To register any investment held in the Escrow Fund in its own name or in the name of a nominee and to hold any investment in bearer form. The books and records of the Escrow Agent shall show that all such investments are part of the Escrow Fund. The Escrow Agent shall be liable for all acts of its nominee.

    2.2.2 To utilize registered securities depositories to hold assets of the Escrow Fund, provided however that the Escrow Agent shall not be relieved of any fiduciary responsibility with respect to the assets so held;

    2.2.3 To employ agents, including public accountants and legal counsel (which may be counsel for Parties), as it shall determine appropriate, and to pay their reasonable expenses and compensation from Escrow Funds;

    2.2.4 To rely on Parties to defend and litigate, or settle, at their expense, any suit brought against the Escrow Funds or any order sought to be satisfied out of the Escrow Funds, without duty on the Escrow Agent beyond forwarding related papers to Parties and complying with any final order to the extent of the Escrow Funds;

    2.2.5 To withhold from taking any action until it receives proper written notice of an occurrence of an event affecting the escrow arrangement under this Escrow Agreement;

    2.2.6 To treat as genuine, sufficient and correct, in form, execution and validity, and as the document it purports to be, and from the party it purports to be from, any notice, instruction, letter, paper, telex or other document purported to be furnished to Escrow Agent by Parties and believed by Escrow Agent to be both genuine and to have been transmitted by the proper party or parties, and Escrow Agent shall have no liability with respect to any action taken or foregone by Escrow Agent in good faith in reliance on such document;

    2.2.7 To be fully released and discharged from any obligation to perform any further duties imposed upon it with respect to this Escrow Agreement and the Escrow Account following its resignation or removal and the appointment of a successor or the deposit of the Escrow Funds under Paragraph 8.2, below; and

2.2.8    To be free from any liabilities or change in duties, other than as may be specifically described elsewhere herein, for the action or inaction of a party to this Escrow Agreement, or any other party, or the occurrence or non-occurrence of an event outside of this Escrow Agreement.

## ARTICLE III
## INVESTMENT OF THE ESCROW FUND

3.1    Permitted Investments. The Escrow Agent shall from time to time invest and reinvest the principal and accumulated income of the Escrow Fund in such of the following investments as Parties may from time to time elect by joint notice in writing ("Permitted Investment"):

(i)    Any U.S. Government or U.S. Government Agency security;

(ii)    Any commercial paper;

(iii)    Any certificate of deposit or time deposit in any bank (including Escrow Agent);

(iv)    Escrow Agent's money market fund or any other interest-bearing deposit accounts with any federally-insured bank (including the Escrow Agent or its affiliates (individually, a "Bank")).

In the absence of written instructions to the contrary from the Parties, the Escrow Agent shall invest the Escrow Funds in the Permitted Investments set forth in clause (iv) of this Section 3.1.

3.1.1    Any Interest shall be added to and become part of the Escrow Funds.

3.1.2    The Escrow Agent will act upon written investment instructions the business day ("Business Day") after the Escrow Agent receives such instructions, provided the requests are communicated within sufficient amount of time to allow the Escrow Agent to make the specified investment. Instructions received after an applicable investment cutoff deadline will be treated as being received by the Escrow Agent on the next Business Day, and the Escrow Agent shall not be liable for any loss arising directly or indirectly, in whole or in part, from the inability to invest Escrow Funds on the day the instructions are received. The Escrow Agent shall not be liable for any loss incurred by the actions or third parties or by any loss arising by error, failure, or delay in making of an investment or reinvestment, and the Escrow Agent shall not be liable for any loss of principal or income in connection therewith, unless such error, failure, or delay results from the Escrow Agent's gross negligence of willful misconduct or failure of the Escrow Agent to comply with any of the terms of this Escrow Agreement. As and when the Escrow Funds or any interest or any portion thereof is to be released under this Escrow Agreement, the Escrow Agent shall cause the Permitted Investments to be converted into cash, and the Escrow Agent shall not be liable for any loss or principal or income in connection therewith, unless such loss results from the Escrow Agent's gross negligence or willful misconduct or the failure of the Escrow Agent to comply with any of the terms of this Escrow Agreement. The Escrow Agent or the Parties shall not be liable for any loss of principal or income due to the choice of Permitted Investments in which the Escrow Funds are invested or the choice of Permitted Investments that are converted into cash pursuant to this Section 3.1.2.

3.2    Escrow Agent Not Responsible For Investment Advice. The Escrow Agent assumes no responsibility for advising the Parties with respect to the investment and reinvestment of the Escrow Funds. The Escrow Agent shall as promptly as possible comply with any direction given by the Parties; provided, however, that the Escrow Agent shall have no duty to take any action which, in the Escrow Agent's opinion, would expose the Escrow Agent to liability unless and until the Parties indemnify the Escrow Agent to its satisfaction. The Escrow Agent shall neither be liable in any manner nor for any reason for any losses or other unfavorable investment results arising from its compliance with such direction, nor be liable for failing to invest any assets of the Escrow Fund in the absence of written investment directions regarding such assets.

3.3    Delegation of Responsibility and Authority for Investment of Escrow Fund. The Parties may by written resolution delegate its authority over the investments of the Escrow Fund to its designated representative ("Representative"), and Escrow Agent shall accept Representative's instructions to invest and reinvest the assets of all or any portion of the Escrow Fund. The Parties may revoke the delegation of any such investment responsibility and authority by written notice to the Escrow Agent, and Representative may relinquish such responsibility and authority by written notice to the Parties and Escrow Agent.

3.4    Notification of Rights Regarding Securities. Following receipt of information, the Escrow Agent will notify the Parties of any conversion, redemption, exchange, subscription or other right relating to any securities purchased hereunder of which notice was given after the acquisition of such securities by the Escrow Agent, and the Escrow Agent shall have no obligation to exercise any such right unless it is instructed by the Parties or their Representative in writing to exercise such right, within a reasonable time prior to the expiration of such right.

3.5    Uninvested Cash. Subject to the directions of the Parties, or its Representative, the Escrow Agent may hold any or all of the Escrow Fund in cash, uninvested and nonproductive of income. The Escrow Agent shall not be required to pay interest on any cash so held uninvested. The Escrow Agent may deposit cash awaiting investment

or distribution in any interest-bearing account in any Bank (including the Escrow Agent), subject to the collateral requirements set forth in paragraph 3.1 above.

3.6 Shareholder Communications. The Parties directs the Escrow Agent not to disclose to any company requesting shareholder information the name and the address of the Parties or the share position of the securities of the inquiring company in the Escrow Fund.

## ARTICLE IV
## ESCROW AGENT NOTICES AND INSTRUCTIONS

4.1 Instructions; Notices. The Escrow Agent shall make disbursements from the Escrow Account solely upon receipt of joint written instructions from the Parties (such instructions to clearly set forth the amount to be distributed, beneficiaries, and wire information). In accordance with such Consulting Agreement, all payments shall be made directly to the Consultant (as that term defined in the Consulting Agreement). Except with respect to the foregoing, all other directions, instructions or notices which the Parties or any other duly authorized person is required or permitted to give to the Escrow Agent under this Escrow Agreement (the "Instructions") shall be in writing and shall be deemed effective upon receipt by the Escrow Agent; The Escrow Agent shall be provided with specimen signatures of the authorized representatives of the Parties. The Escrow Agent shall be entitled to rely in good faith upon any Instructions signed by any authorized representative of the Parties, and shall incur no liability for following such directions. Any written notices, affidavits or other communications hereunder shall be deemed to have been duly given if delivered or mailed first class, certified mail, postage prepaid, addressed as follows:

City National Bank, a national association

Wealth Management Services – Custody #715-01

Attn: Michele Katz, Vice President

555 South Flower, 10th Floor

Los Angeles, CA 90071

Tel: (213) 673-8852

Fax: (213) 673-2807

| | |
|---|---|
| Signer's name: | Charles Ebersol (on behalf of the Company) |
| Signer's address: | 10866 Wilshire BLVD, #300, Las Angeles, CA 90024 |
| Signer's telephone number: | Ebersol- (310) 446-4700 |
| Signer's fax number: | (844)848-5922 |
| Signer's name: | Solutions Group Global (the Consultant); Attn: Thomas A. Veit, Jr. |
| Signer's address: | 7801 Terrace Oaks Ct Tampa, FL 33617 |
| Signer's telephone number: | (813) 435-8884 |
| Signer's fax number: | ( ) - |

4.2 Email/Photostatic Teletransmission. The transmission of the Instructions by electronic transmission (email) as attributed to an authorized person or photostatic teletransmission with duplicate or facsimile signatures shall be an authorized method of communication and shall be considered in writing until the Parties notify the Escrow Agent to the contrary.

4.3 Electronic Affirmation. Notwithstanding any other provision of this Article IV, the Escrow Agent may settle securities trades effected by the Parties through a securities depository that utilizes an institutional delivery system, in which event the Escrow Agent may deliver or receive securities in accordance with appropriate trade reports or statements given to the Escrow Agent by such depository without having received direct communications or instructions from the Parties.

4.4 Additional Instructions. In any matter under this Escrow Agreement in which the Escrow Agent is permitted or required to act upon Instructions, the Escrow Agent, where it deems necessary, may request further Instructions from the person or entity giving the original instructions, or from the Parties, as the case may be, and may defer any and all action pending receipt thereof.

# ARTICLE V
## COMPENSATION AND EXPENSES OF THE ESCROW AGENT

5.1 Escrow Agent's fees will be as set forth on the fee schedule attached hereto, plus actual expenses incurred in performing its duties hereunder, and Escrow Agent is hereby granted a lien on the Escrow Funds for such amounts. Any setup fee will be payable in advance by the Company. In addition, Escrow Agent will receive its usual sweep fee for any Escrow Funds, which are invested in a sweep vehicle selected by the Parties. Unless other payment arrangements are set forth herein or are agreed to by Escrow Agent in writing, Escrow Agent may disburse from the Escrow Funds sufficient funds to pay its compensation and expenses. If at any time cash is not available in the Escrow Funds to pay the Escrow Agent's compensation and expenses, the Escrow Agent may bill Parties for such amounts and the Parties agree, jointly and severally, to pay such bill upon demand.

# ARTICLE VI
## RECORDS AND ACCOUNTS

6.1 Accurate Records and Accounts. The Escrow Agent shall keep accurate records and accounts with respect to all cash and other assets held by it in the Escrow Fund, and all receipts and disbursements and other transactions involving such cash, securities and other assets. The Parties shall have access to all such accounts, books and records at all reasonable times. All such accounts, books and records shall be open for inspection and audit at all reasonable times by the Parties or by any person or persons duly authorized by the Parties.

6.2 Periodic Reports. The Escrow Agent shall furnish the Parties and any third party with such periodic reports, as the Parties and the Escrow Agent shall mutually agree, setting forth all receipts, disbursements and transactions effected by the Escrow Agent.

6.3 Principal and Income. Except as otherwise specifically provided in this Escrow Agreement, the determination of all matters with respect to what is principal or income of the Escrow Fund and the apportionment and allocation of receipts and disbursements between these accounts (if any), shall be governed by the provisions of the California Revised Uniform Principal and Income Act from time to time existing. Any such matter not provided for herein or in the California Revised Uniform Principal and Income Act shall be determined by the Escrow Agent in the Escrow Agent's discretion.

6.4 Income Tax Reporting Parties assume all duties to file any and all tax reports and returns, except as noted below, as well as full responsibility for the payment of all taxes assessed on or with respect to any funds or Permitted Investments held in the Escrow Account and all taxes due on the income collected for Parties on any and all transactions with respect to any funds or Permitted Investments held in the Escrow Account. For purposes of IRS form 1099, which Escrow Agent may be required to prepare and file, all reportable income shall be reported to the IRS as being attributable to Parties.

# ARTICLE VII
## CANCELLATION AND CLOSING

7.1 In any event, this Escrow Agreement shall terminate two (2) years from the date of this Agreement and all assets then remaining, less any fees and out-of-pocket expenses due the Escrow Agent, shall be distributed to the Company.

# ARTICLE VIII
## RESIGNATION AND REMOVAL OF THE ESCROW AGENT

8.1 Resignation and Removal. The Escrow Agent may resign at any time upon thirty- (30)-days' written notice to the Parties, unless a shorter period is acceptable to the Parties. The Parties may at any time remove the Escrow Agent upon thirty- (30)-days' written notice to the Escrow Agent, unless a shorter period is acceptable to the Escrow Agent.

8.2 Appointment of Successor. In the event of the removal or resignation of the Escrow Agent, the Parties shall appoint a successor which, upon its acceptance in writing of such appointment delivered to the Parties and the former Escrow Agent, shall be vested with all the rights, powers and duties of the Escrow Agent under this Escrow Agreement, and upon compliance with the terms of this Article VIII, the retiring Escrow Agent shall be released and discharged from all further liability with respect to the Escrow Agreement and Escrow Account. If the Parties fail to appoint a successor Escrow Agent within thirty (30) days after removal or resignation of the Escrow Agent, the Escrow Agent is authorized to deliver the Escrow Fund and any Permitted Investments to the (Ernest Johns who shall be deemed the successor Escrow Agent. The retiring Escrow Agent shall transfer, assign and deliver

to its successor all of the funds and Permitted Investments then held by it in the Escrow Account under this Escrow Agreement, except such reasonable compensation and expenses in connection with the settlement of accounts and the delivery of the assets to the successor Escrow Agent, which the retiring Escrow Agent will be entitled to charge to the Escrow Account. After settlement of the retiring Escrow Agent's final accounting, the retiring Escrow Agent shall also transfer to the successor Escrow Agent true copies of its records as they relate to the Escrow Fund, as may be requested by the successor Escrow Agent. The successor Escrow Agent shall not be liable or responsible for anything done or omitted in the administration of the Escrow Fund pursuant to this Escrow Agreement prior to the date it shall have become Escrow Agent, nor to audit or otherwise inquire into or take any action concerning the acts of any retiring Escrow Agent.

8.3   Final Periodic Report. Within sixty (60) days after the transfer of the assets of the Escrow Fund to the successor Escrow Agent, unless a different period is mutually agreed to, the Escrow Agent shall file with the Parties a final periodic report, covering the period since the close of the last periodic report.

8.4   Deemed Acceptance. In the absence of any exception filed in writing with the Escrow Agent within ninety (90) days after the date of filing with the Parties, any periodic report filed with the Parties shall constitute a final periodic report by and discharge of the Escrow Agent from all claims and liabilities with respect to the acts and transactions as shown in such report, and shall be binding and conclusive upon all persons.

## ARTICLE IX
## AMENDMENT AND TERMINATION

9.1   Amendment. This Escrow Agreement may be modified at any time by writing signed by the Escrow Agent and the Parties.

9.2   Termination. This Escrow Agreement may be terminated at any time upon two (2) Business Days' written notice delivered by the Parties to the Escrow Agent; provided, however, that this Escrow Agreement shall continue thereafter for such period as may be necessary for the complete divestiture of all cash, securities, and other instruments held hereunder by the Escrow Agent, but solely to the extent necessary to effect such complete divestiture. Upon such termination, all assets remaining in the Escrow Account after payment of all expenses properly chargeable thereto shall be paid or distributed in accordance with written directions of the Parties.

9.3   Final Periodic Report. Within sixty (60) days after the termination of this Escrow Agreement, unless a different period is mutually agreed to, the Escrow Agent shall file with the Parties a final periodic report, covering the period starting with the close of the last periodic report and ending on the date of termination.

9.4   Deemed Acceptance. In the absence of any exception thereto filed in writing with the Escrow Agent within ninety (90) days after the date of filing with the Parties, any periodic report filed with the Parties shall constitute a final periodic report by and discharge of the Escrow Agent from all claims and liabilities with respect to the acts and transactions as shown in such report, and shall be binding and conclusive upon all persons.

## ARTICLE X
## LIMITATION ON LIABILITY

10.1   Liability of Escrow Agent. In performing any duties under this Escrow Agreement, Escrow Agent shall not be liable for any damages, losses, or expenses, except for gross negligence or willful misconduct on the part of the Escrow Agent. Escrow Agent shall not incur any liability for: (a) any act or failure to act made or omitted in good faith, or (b) any action taken or omitted in reliance upon any instrument, including any written statement or affidavit provided for in this Escrow Agreement that the Escrow Agent shall in good faith believe to be genuine, nor will the Escrow Agent be liable or responsible for forgeries, fraud, impersonations, or determining and verifying the scope of any representative authority, or any person acting or purporting to act on behalf of any party to this agreement.

10.2   Indemnification by Parties. Parties further agree to pay on demand, and to indemnify and hold Escrow Agent harmless from and against, all costs, damages, judgments, attorneys' fees, expenses, obligations, and liabilities of any kind or nature which, in good faith, Escrow Agent may incur or sustain in connection with or arising out of or in any way related to the Escrow Agreement or the Escrow Account, and Escrow Agent is hereby given a lien upon all the rights, titles and interests of the Parties in the Escrow Funds, to protect Escrow Agent's rights and to indemnify and reimburse Escrow Agent under this Escrow Agreement.

10.3   Force Majeure. The Escrow Agent shall not be liable for any delay or failure to act as may be required hereunder when such delay or failure is due to fire, earthquake, any act of God, interruption or suspension of any communication or wire facilities or services, war, emergency conditions or other circumstances beyond its control, provided it exercises such diligence as the circumstances may reasonably require.

10.4   Scope. The Escrow Agent shall have no duties or obligations hereunder except those specifically set forth herein and such duties and obligations shall be determined solely by the express provisions of this Escrow Agreement.

10.5 Controversies

    10.5.1 Upon receipt of conflicting demands or notices relating to this Escrow Agreement or the Escrow Account, Escrow Agent may, at its election, without liability to Parties, do either or both of the following:

        10.5.1.1 Withhold and stop all further proceedings in, and performance of, this Escrow Agreement, until such conflict is resolved to Escrow Agent's satisfaction;

        10.5.1.2 File a suit in interpleader and obtain an order from the court requiring the Parties to litigate their several claims and rights among themselves, in which case, Escrow Agent shall be fully released and discharged from any obligation to perform any further duties imposed upon it with respect to this Escrow Agreement, and the Parties shall pay Escrow Agent all costs, expenses and reasonable attorney fees expended or incurred by it, the amount thereof to be fixed and a judgment thereof to be rendered by the court in such suit.

    10.5.2 Any dispute arising out of or relating to this Escrow Agreement, including a breach of this Escrow Agreement, will be decided by reference under California Code of Civil Procedure 638 and related sections. A referee, either an active attorney or retired judge, will be selected according to the procedures of the American Arbitration Association and then appointed by the court in which the action regarding the dispute or controversy originated. The dispute will be submitted to the referee for determination in place of a trial before a judge and jury.

10.6 Legal Counsel. The Escrow Agent may consult with, and obtain advice from, legal counsel of its own selection as to the construction of any of the provisions of this Escrow Agreement or the Escrow Agent's obligations and duties, and shall incur no liability in acting in good faith in accordance with the reasonable advice and opinion of such counsel.

**ARTICLE XI**
**MISCELLANEOUS**

11.1 Governing Law. This Escrow Agreement shall be governed, construed, regulated and administered under the laws of the State of California.

11.2 Invalid Provisions. It is not the intention of any party to this Escrow Agreement to violate any statute, regulation, ruling, judicial decision, or other legal provision applicable to this Escrow Agreement or the performance thereof. If any term of this Escrow Agreement, or any act or omission in the performance thereof, is or becomes violative of any such provision, such term, act or omission shall be of no force or effect and any such term shall be severed from this Escrow Agreement. Any such invalid term, act or omission shall not affect the validity of any other term of this Escrow Agreement that is otherwise valid, nor the validity of any otherwise valid act or omission in the performance thereof, unless such invalidity prevents accomplishment of the objectives and purposes of this Escrow Agreement. In the event any such term, act or omission is determined to be illegal or otherwise invalid, the necessary steps to remedy such illegality or invalidity shall be taken immediately by the parties.

11.3 Counterparts. This Escrow Agreement may be executed in several counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument, which may be sufficiently evidenced by any one counterpart.

11.4 Successors and Assigns. This Escrow Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their successors and assigns, except as is expressly provided to the contrary herein.

11.5 Important Information About Procedures for Opening a New Account. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for the Parties: Upon opening an account, Escrow Agent, as applicable, will ask the Parties' names, addresses, dates of birth, and other information that will allow Escrow Agent to identify the Parties or any Representative. Escrow Agent may also ask to see the Parties' or Representatives' driver's licenses, if applicable, or other identifying documents.

11.6 Notice of Transfer of Unclaimed Property. Please take notice that funds or Permitted Investments that the Parties maintain in the Escrow Account may be transferred to the State of California or other appropriate state if no activity originated by a Party occurs in the Escrow Account or no Party makes a claim to the funds or Permitted Investments within the time period specified by the applicable state unclaimed property law.

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed by their respective duly authorized officers on the dates set forth below.

Date: December 5, 2017

The Company: Ebersol Sports Media Group, Inc.

By:

Name: Charles Ebersol

Its: President

Date: December 5, 2017

The Consultant: Solutions Group Global, Inc.

By:

Name: Thomas A. Veit, Jr.

Its: President

Date: 12 8 17

ESCROW AGENT: City National Bank, a national banking association

By:

Its: Vice President

ESCROW ACCOUNT #: ESC17907

# EXHIBIT 2

Legendary Field Exhibitions, LLC
10866 Wilshire Blvd., Suite 300
Los Angeles, CA 90024

<u>PERSONAL AND CONFIDENTIAL</u>

May 1, 2018

Thomas A. Veit
7801 Terrace Oaks Ct
Tampa, FL 33617

Dear Tom:

Legendary Field Exhibitions, LLC (the "**Company**" or "**LFE**") agrees to employ you, and you agree to be employed by the Company, in accordance with the terms and conditions set forth in this agreement (the "**Agreement**"). The Company and you are each referred to herein individually as a "Party" and together as the "Parties."

1. <u>Effective Date.</u> This Agreement shall become effective on May 1, 2018 (the "**Effective Date**"). This Agreement shall supersede the consulting agreement by and between you and Ebersol Sports Media Group, Inc. ("**ESMG**"), dated December 1, 2017 (the "**Previous Agreement**"), and, except as specifically provided herein, the Previous Agreement shall terminate. For the avoidance of doubt, the Previous Agreement shall continue to govern the terms and conditions of your relationship with the Company until the Effective Date. The term ("**Term**") of this Agreement shall commence on the Effective Date and continue through April 30, 2021, unless earlier terminated by you or the Company pursuant to Section 4 below.

2. <u>Employment; Authority.</u>

a. Your title will be Head of Business, reporting directly to the Company's Chief Executive Officer. You agree to perform such duties and services related to the Company's spring football league ("**League**"), and to have such other responsibilities, as Mr. Ebersol may, from time to time, reasonably assign to you consistent with your position as Head of Business, including without limitation, the Key Priorities set forth on Exhibit A attached hereto.

b. You agree that you will serve the Company faithfully, diligently and to the best of your ability, that you will devote your full business time, energy and skills exclusively to the business and affairs of the Company, and that you will not participate in any other employment or any other activity detrimental to the best interests of the Company.

c. You shall be located at the Company's office in Tampa, Florida or Orlando, Florida with travel as needed to locations throughout the United States. If you and the Company mutually agree that relocation to a state other than Florida becomes necessary, you will be reimbursed for reasonable relocation expenses to be mutually agreed on by the

Parties; provided, however, that if such state is California, the Parties will meet and confer regarding appropriate adjustments to Section 3 of this Agreement. In the event that you are relocated pursuant to this Section, references to the State of Florida in Section 6 below will automatically be amended to refer to the state to which you are relocated.

3. <u>Compensation.</u> In consideration of all services provided and duties performed by you under this Agreement, the Company will pay you the following:

a. <u>Base Salary.</u> Your base salary ("**Base Salary**") shall be equal to Two Hundred and Fifty Thousand Dollars ($250,000.00) per annum, payable semi-monthly in arrears in accordance with the Company's normal payroll practices and pro-rated for any partial year of employment under this Agreement. Your Base Salary will increase by Twenty-Five Thousand Dollars ($25,000.00) on May 1, 2019 and on May 1, 2020 provided that you remain employed on such dates.

b. <u>Escrow Account</u>. The Company agrees to establish an escrow account to satisfy certain payment obligations of the Company to you under this Agreement in an aggregate amount of One Hundred Twenty-Five Thousand Dollars ($125,000.00), pursuant to the terms set forth in the escrow agreement to be entered into between you and the Company. Upon execution of this Agreement, that certain Escrow Agreement between Ebersol Sports Media Group, Inc. ("ESMG"), you and Solutions Group Global, Inc. ("SGGI"), dated December 5, 2017, will terminate and the remaining funds (such amount to be further reduced by the Consulting Services Bonus to be paid by ESMG to SGGI)) returned to ESMG.

c. <u>Annual Incentive Bonus.</u>

(i) You will be eligible to receive an annual incentive bonus as detailed on Exhibit B (the "**Annual Bonus**"), and will be based on the achievement of the applicable performance measures as set forth in Exhibit B. In order to be eligible to receive an Annual Bonus, you must be actively employed by the Company on the day the applicable milestone is achieved. Your Annual Bonus will be paid to you in the year to which it relates within a reasonable amount of time after achieving the milestone or performance measure set forth in Exhibit B.

(ii) <u>Equity Incentives.</u> The Company hereby grants and agrees to issue to you qualified stock options to purchase 69,240 shares of Common Stock of the fully diluted equity in EMSG, at a price per share equal to the fair market value on the grant date and subject to a four (4) year vesting period (and the applicable stock option plan of the Company), beginning on the date of grant.

d. <u>Vacation.</u> For each year during the Term, you will be entitled to 3 weeks of paid vacation, which shall be provided in accordance with the Company's vacation policy and pro-rated for any partial years.

e.     Employee Benefits. During the Term, you will be eligible to participate in all employee benefit plans generally available to other executive level employees of the Company from time to time, as follows: (1) health dental and vision; (2) long and short term disability; and (3) participation in the Company's 401(k) plan which shall provide safe- harbor matching contributions, in each case subject to the terms and conditions of the applicable plan, which may be amended or terminated at any time.

f.     Expenses. During the Term, the Company will reimburse you for reasonable and documented travel and other business expenses incurred in fulfilling your obligations and duties hereunder, subject to, and in accordance with the Company's expense reimbursement policies.

g.     League Team License Operation: If the Company elects to award operating licenses for League teams, you shall have the option to purchase a license to operate and control a League team, at a discounted valuation to be determined as described below, in accordance with the terms and conditions of team control/operation generally applicable to the League at such time, if the following requirements are met: (i) your achievement of the 2018 objectives set forth in Exhibit B; (ii) your completion of the full Term of this Agreement; or (iii) the League offering team control/opportunities at or within six (6) months after the completion of the Term. The discounted valuation shall be determined as follows: you shall be offered such license described above at 5% discount of the fair market value of the specific team as determined by the league in its sole discretion for each year of service (capped at a total of 5 years); i.e., three years of service equals a 15% discount.

h.     Indemnification. You shall be a beneficiary of and will be indemnified as an officer of the Company as provided in Section 12 of that certain Operating Agreement of Company dated February 6, 2018. Capitalized terms in this Section have the same meaning ascribed to them as in Operating Agreement.

4.     Termination. Either you or the Company may terminate your employment at any time, subject to the provisions of this Section 4.

a.     The Term of this Agreement, and your engagement hereunder, may earlier terminate upon the occurrence of one or more of the following events:

(i)     Immediately upon the mutual agreement of the Parties;

(ii)     Upon not less than five (5) days' prior written notice of termination from you to the Company or the Company to you, subject to the requirements of Section 4(b) and 4(c) set forth below; and

(iii)     Immediately upon written notice to you in the event one of the following has occurred ("Cause"): (1) any breach by you of any of your

representations, warranties, covenants or agreements set forth in this Agreement; (2) that any representation, warranty, covenant or agreement made by you in this Agreement was materially false when made; (3) you have committed any act or omission which involves gross negligence or more culpable conduct, material neglect of the Company or any of its affiliates' business, or dishonesty or disloyalty to the Company or any of its affiliates or any of its or their respective employees, officers, directors, contractors, equity holders, members, customers, clients, vendors, suppliers, agents, representatives, advisors, successors or permitted assigns; (4) that you are charged with a felony or a crime involving moral turpitude or illegal use of a controlled substance; or (5) you otherwise engage in, or have engaged in conduct that impairs and/or is detrimental to the reputation, character or standing of the Company, any of its affiliates or Charlie Ebersol.

b.     Upon termination of this Agreement and your employment for Cause under 4(a)(iii) above, the Company shall have no further obligations to you under this Agreement.

c.     You may terminate this Agreement and continue to receive your Base Salary and the employment benefits referenced in 3(e)(1) and 3(e)(2) for what would have been the balance of the Term, i.e., through April 30, 2021, if one of the following occurs or has occurred: (1) the Company terminates your employment without Cause; (2) the Company determines without your consent to move your place of employment more than 60 miles from either the Tampa or Orlando MSA; provided however, if the move is in relation to a move of the league office this clause shall not apply; (3) the Company materially changes your duties and/or responsibilities as detailed on Exhibit A; or (4) any breach by the Company of any of its representations, warranties, covenants or agreements set forth in this Agreement.

d.     For the avoidance of doubt, claims related to any Party's actions, rights or obligations pursuant to this Section 4 shall be subject to arbitration procedures set forth below.

5.     Confidentiality.   You acknowledge and agree that the Confidentiality and Non-Disclosure Agreement between ESMG and you (the **"NDA"**) shall apply to your employment under this Agreement and is therefore incorporated by reference herein.

6.     Dispute Resolution.   The Parties each agree that with respect to any all claims that you on the one hand, and the Company on the other, now have or in the future may have against the other, directly or indirectly arising out of or related to this Agreement, your relationship with the Company, your employment with the Company or the termination of your employment with the Company (collectively **"Covered Claims"**), such claims are subject to and will be resolved by binding arbitration, except with respect to any claim (i) that is expressly precluded from arbitration by a governing federal law or by a state law that is not preempted by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (**"FAA"**); or (ii) that seeks injunctive or other equitable relief in aid of arbitration. The Parties irrevocably consent and agree that (i) any arbitration will occur in the State of Florida; (ii) arbitration will be conducted confidentially by a single arbitrator in accordance with the then-current arbitration rules and procedures of JAMS (and its then-existing

emergency relief procedures to the extent applicable), which rules and procedures are available at www.jamsadr.org, unless those rules or procedures conflict with any express term of this Agreement, in which case this Agreement shall control; (iii) the federal courts sitting in the State of Florida, have exclusive jurisdiction over any appeals and the enforcement of an arbitration award; and (iv) the state or federal courts sitting in the State of Florida have exclusive jurisdiction over any claim that is not subject to arbitration, and in such case, the rights and obligations of the Parties will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without regard to choice of law or conflict of law rules or provisions (whether of the State of Florida or any other jurisdiction). EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES TO ARBITRATE ANY COVERED CLAIMS THROUGH BINDING ARBITRATION, AND FOREVER WAIVES AND GIVES UP ITS RIGHT TO HAVE A JUDGE OR JURY DECIDE ANY COVERED CLAIMS. If you initiate arbitration, you shall be responsible for your own attorneys' fees, as well as any filing fee up to the amount of the filing fee, if any, that would have been incurred had such claims been filed in court. The Company shall be responsible for its own attorneys' fees, as well as all additional arbitration filing fees, forum fees, and other administrative fees and costs of the arbitration forum.

7. <u>Miscellaneous.</u>

a. <u>Notice.</u> All notices and other communications required or permitted hereunder shall be given in writing and shall be deemed to have been duly given (a) on the date delivered if personally delivered, (b) upon receipt by the receiving Party of any notice sent by registered or certified mail or by facsimile, or (c) on the date targeted for delivery if delivered by a nationally recognized overnight courier or similar courier service, in each case addressed to the Company or you, as the case may be, at the respective addresses set forth herein in the preamble to this Agreement (if to the Company, Attention: Charlie Ebersol), or such other address as either Party may in the future specify in writing to the other.

b. <u>Entire Agreement.</u> This Agreement, together with the NDA, constitutes the entire agreement of the Parties with respect to the subject matter hereof, and as of the Effective Date, supersedes all negotiations, proposals and agreements (whether written or oral) between them (or their respective affiliates or representatives) relating to the subject matter hereof.

c. <u>Amendment.</u> This Agreement may not be amended, changed or modified except by an instrument in writing, signed by the Company and you.

d. <u>No Waiver.</u> A waiver by either Party of a breach of any term or provision of this Agreement shall not operate or be construed as a continuing waiver or as a consent to or waiver of any subsequent breach hereof.

e. <u>Severability.</u> If any one or more of the provisions of this Agreement is invalid, illegal or unenforceable in any respect, it will be ineffective only to the extent of such invalidity, illegality or unenforceability, and will not in any way affect or impair the

validity, legality and enforceability of the balance of such provision or any other provision contained herein.

      f.      Binding Effect; Assignment. This Agreement shall be binding on and inure to the benefit of each of the Parties and their respective successors and permitted assigns. You may not assign this Agreement, in whole or in part, or delegate any of its duties or obligations under this Agreement, without the Company's prior written consent.

      g.      Rights of Third Parties. Anything in this Agreement to the contrary notwithstanding, no person, firm or entity will be entitled to the benefit of, or to enforce, any provision hereof other than the Parties hereto (and their heirs, successors and permitted assigns).

      h.      Survival. The respective rights and obligations of you and the Company as provided in this Agreement will survive the termination or expiration of this Agreement to the extent necessary to the intended preservation of such rights and obligations.

      i.      Construction. The headings used herein are for convenience of reference only, are not part of this Agreement and are not intended to affect the construction of, or to be taken into account in the interpretation of, this Agreement. This Agreement is the subject of negotiation, each Party has had the advice of outside legal counsel, and no rule of construction against the drafter is to be applied in enforcing or interpreting this Agreement.

      j.      Counterparts; Effect. This Agreement may be signed in counterparts with the same effect as if the signatures were all upon the same instrument; provided, that no Party will be bound hereto unless and until all Parties have executed and delivered this Agreement (or a counterpart).

      k.      Withholding. The Company may withhold from any amounts payable to you under this Agreement any amounts which are required to be withheld for federal, state or local taxes.

8.      Section 409A. The Agreement shall be interpreted and operated to reflect the intent of the Parties that all provisions of the Agreement shall comply with Section 409A of the Internal Revenue Code of 1986, as amended, and any regulations thereunder ("**Section 409A**"). The Company shall not have any liability or obligation to you with respect to any taxes that may become payable by you pursuant to Section 409A. Notwithstanding anything in this Agreement to the contrary, if you are a "specified employee" for purposes of Section 409A and if payment of any amounts under this Agreement is required to be delayed for a period of six months after separation from service pursuant to Section 409A, payment of such amounts shall be delayed as required by Section 409A, and the accumulated amounts shall be paid in a lump sum payment within 15 days after the end of the six-month period, or if earlier, upon your death. For all purposes under this Agreement, reference to your "termination of employment" (and corollary terms) with the Company shall be construed to refer to your "separation from service" (as defined by Section 409A), and any right to installment payments under this

Agreement shall be treated as a right to a series of separate payments. In the event that any payment under this Agreement may be paid in two calendar years, depending on the timing of execution of a Release, such payment shall be made in the later calendar year. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (a) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (b) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year; and (c) such payments shall be made on or before the last day of your taxable year following the taxable year in which the expense was incurred.

Tom, we are extremely excited to have you take on this opportunity with the Company. Please confirm your agreement with the foregoing by signing and returning to us two copies of this Agreement.

Sincerely,

Legendary Field Exhibitions, LLC

Charles Ebersol, Chief Executive Officer
Ebersol Sports Media Group, Inc.

Dated:

Agreed to and Accepted by:

Thomas A. Veit

Dated:

# EXHIBIT A

## KEY PRIORITIES

The Head of Business is responsible for the business operations of the football-related aspects of the League, including, but not limited to, securing venues and related facilities to operate the League's football teams in a first class and professional manner, establishing and managing ticket sale operations, leading and procuring sponsorship acquisitions and sales, promoting, securing and managing league and team partnerships, leading and managing all non-football related operations of each individual League team (including, but not limited to, the hiring of all operation related staff, sales teams, security, support and administrative staff, and all other positions necessary to run a first class, professional League football teams.) Additionally, the Head of Business is responsible for identifying, securing, and implementing all League team, staff, and coaching travel, accommodations, support, insurance (including, but not limited to, workers' compensation), and relevant operations and utilities as set forth and requested by the Chief Executive Officer of the Company.

**EXHIBIT B**

**ANNUAL BONUS INCENTIVES**

Incentives for the Term are set forth below and may be updated from time to time as necessary by the mutual agreement of the Parties.

Compensation:

- Target Bonus for year 1 (May 1, 2018 – April 30- 2019: You shall have the opportunity to earn a bonus based on achievement of the following targets and subject to your continued employment:
    - $33,000 upon execution of eight stadium contracts and successful opening business operations in each of those markets
    - $34,000 upon the start of the first League season
    - Up to $34,000 anniversary bonus at the sole discretion of the Chief Executive Officer of the Company
- Target Bonus for Year 2 May 1, 2019 – April 30, 2020:
    - $40,000 for attaining the mutually agreed upon revenue goal set for the budget year 2
    - $40,000 upon the start of the second season of the League
    - Up to $40,000 anniversary bonus at the discretion of the CEO
- Target Bonus for Year 3 May 1, 2020 – April 30, 2021:
    - $40,000 for attaining the mutually agreed revenue goal set for the budget year 3
    - $40,000 upon completion of the 2021 spring football season
    - Up to $45,000 anniversary bonus at the discretion of the CEO
    - Additional league compensation TBD.

All compensation and benefits will be subject to the terms and conditions of the applicable plan documents and agreements.

# EXHIBIT 3

September 12, 2018·

**VIA FACSIMILE AND EMAIL**

City National Bank
555 South Flower, 10th Floor
Los Angeles, CA 90071
Attn: Michele Katz, Vice President
Fax: (213) 673-2807

WIRE VERBAL CONFIRMATION
Person Contacted *Charles Ebersol*
Telephone No. *(646) 551-5267*
Date and Time *2/12/18 @ 10:37*
Call-Back By *Deborah*
O Exempt    O FTA (pg 6)    O Closing

WIRE VERBAL CONFIRMATION
Person Contacted *Thomas A. Veit Jr.*
Telephone No. *(813) 424-2100*
Date and Time *9/12/18 @ 9:31 hr*
Call-Back By *Deborah*
O Exempt    O FTA (pg 6)    O Closing

Re:    Escrow Account No. ESC17907

To Whom It May Concern:

Reference is made to the Escrow Agreement, dated December 5, 2017 (the "Escrow Agreement"), by and among City National Bank, a national banking association (the "Escrow Agent"), Ebersol Sports Media Group, Inc., a Delaware C-Corporation (the "Company") and Solutions Group Global, Inc., a Florida Corporation ("Consultant"). Capitalized terms used herein without definition shall have the meaning ascribed to them in the Escrow Agreement.

Pursuant to the Escrow Agreement, by its execution and delivery of this Joint Instruction, each of the Parties hereby directs and instructs the Escrow Agent to (1) disregard the Parties' Joint Instruction to terminate the account dated May 6, 2018, and (2) promptly, and in any event within two (2) Business Days, make a disbursement to the Company such that only One Hundred Twenty-Five Thousand Dollars ($125,000.00) remain in the Escrow Fund, notwithstanding anything to the contrary in the Escrow Agreement.

Such disbursement shall be made in accordance with the wire transfer instructions set forth in Exhibit A hereto and reproduced below for convenience.

Company:  Ebersol Sports Media Group, Inc.
Bank Name:  SIL VLY BK SJ
Bank Address:  3003 Tasman Drive, Santa Clara, CA 95054, USA
Routing No.:  121140399
Account Name:  Ebersol Sports Media Group, Inc.
Account Number:  3302322308

This Joint Instruction may be executed in separate counterparts, each of which will be deemed an original, and all of which together will constitute one and the same document. Delivery of an executed signature page to this Joint Instruction by facsimile or other electronic transmission (including in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this notice.

Date:  September 12, 2018

Company:  Ebersol Sports Media Group, Inc.
By:
Name:  Charles Ebersol
Its:  President

Date:  September 12, 2018

Consultant:  Solutions Group Global, Inc.
By:
Name:  Thomas A. Veit, Jr.
Its:  President

AWAITING APPROVAL

**VIA FACSIMILE AND EMAIL**

*City National Bank*
555 South Flower, 10th Floor
Los Angeles, CA 90071
Attn: Michele Katz, Vice President
Fax: (213) 673-2807

      Re:    <u>Escrow Account No. ESC17907</u>

To Whom It May Concern:

Reference is made to the Escrow Agreement, dated December 5, 2017 (the "<u>Escrow Agreement</u>"), by and among City National Bank, a national banking association (the "<u>Escrow Agent</u>"), Ebersol Sports Media Group, Inc., a Delaware C-Corporation (the "<u>Company</u>") and Solutions Group Global, Inc., a Florida Corporation ("<u>Consultant</u>"). Capitalized terms used herein without definition shall have the meaning ascribed to them in the Escrow Agreement.

Pursuant to the Escrow Agreement, by its execution and delivery of this Joint Instruction, each of the Parties hereby directs and instructs the Escrow Agent to (1) disregard the Parties' Joint Instruction to terminate the account dated May 6, 2018, and (2) promptly, and in any event within two (2) Business Days, make a disbursement to the Company such that only One Hundred Twenty-Five Thousand Dollars ($125,000.00) remain in the Escrow Fund, notwithstanding anything to the contrary in the Escrow Agreement.

Such disbursement shall be made in accordance with the wire transfer instructions set forth in Exhibit A hereto and reproduced below for convenience.

Company: Ebersol Sports Media Group, Inc.
Bank Name: SIL VLY BK SJ
Bank Address: 3003 Tasman Drive, Santa Clara, CA 95054, USA
Routing No.: 121140399
Account Name: Ebersol Sports Media Group, Inc.
Account Number: 3302322308

This Joint Instruction may be executed in separate counterparts, each of which will be deemed an original, and all of which together will constitute one and the same document. Delivery of an executed signature page to this Joint Instruction by facsimile or other electronic transmission (including in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this notice.

| | | |
|---|---|---|
| Date:  September 12, 2018 | Company: | Ebersol Sports Media Group, Inc. |
| | By: | |
| | Name: | Charles Ebersol |
| | Its: | President |
| | | |
| Date:  September 12, 2018 | Consultant: | Solutions Group Global, Inc. |
| | By: | |
| | Name: | Thomas A. Veit, Jr. |
| | Its: | President |

**Bob Wahl**

| | |
|---|---|
| **From:** | Tom Veit <taveit@taveit.com> |
| **Sent:** | Thursday, February 28, 2019 5:46 PM |
| **To:** | David Saslow |
| **Subject:** | Fwd: Question |
| **Attachments:** | mg_info.txt |

Begin forwarded message:

> **From:** "Fogel, Baird D." <baird.fogel@morganlewis.com>
> **Date:** February 21, 2019 at 5:00:42 PM EST
> **To:** "Tom Veit" <taveit@taveit.com>
> **Subject: RE: Question**
>
> Correct sir
>
>
> Baird D. Fogel
> Morgan, Lewis & Bockius LLP
> One Market, Spear Street Tower | San Francisco, CA 94105
> Direct: +1.415.442.1170 | Mobile: +1.415.205.2605 | Fax: +1.415.442.1001
> baird.fogel@morganlewis.com | www.morganlewis.com
> Assistant: Christine Mustin | +1.415.442.1508 | chris.mustin@morganlewis.com
>
> **From:** Tom Veit <taveit@taveit.com>
> **Date:** Thursday, Feb 21, 2019, 1:57 PM
> **To:** Fogel, Baird D. <baird.fogel@morganlewis.com>
> **Subject:** Question
>
> [EXTERNAL EMAIL]
>
> Baird,
>
> Hey when we did escrow account for my employment agreement we just reduce the amount in the escrow account we use for the consulting agreement with City National Bank correct. We did not create a new account anywhere.
>
> I'm finishing up my taxes and my account wanted to know if I had any other Accounts.
>
> I believe it's just that one correct?
>
> Thanks
> Tom
>
>
> Sent from my iPad