**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE** | § | **CHAPTER 7** |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS, LLC.** | § | **CASE NO. 19-50900-CAG** |
| | § | |
| | § | |
| **AAF PLAYERS, LLC;** | § | **CASE NO. 19-50902-CAG** |
| | § | |
| **AAF PROPERTIES, LLC;** | § | **CASE NO. 19-50903-CAG** |
| | § | |
| **EBERSOL SPORTS MEDIA GROUP, INC.;** | § | **CASE NO. 19-50904-CAG** |
| | § | |
| | § | |
| **LFE 2, LLC;** | § | **CASE NO. 19-50905-CAG** |
| | § | |
| **WE ARE REALTIME, LLC** | § | **CASE NO. 19-50906-CAG** |
| | § | |
| **DEBTORS** | § | |

**(SUBSTANTIVE CONSOLIDATION OF ALL 6 CASES, INTO ONE CASE, LEGENDARY FIELD EXHIBITIONS, LLC, CASE NO. 19-50900-CAG) JOINTLY ADMINISTERED UNDER CASE NO. 19-50900-CAG)**

**TRUSTEE'S OBJECTION TO CLAIM NO. 214-2 OF**
**COLTON SCHMIDT AND REGGIE NORTHRUP AND ACCOMPANYING BRIEF**

**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS. IF NO TIMELY RESPONSE IS FILED WITHIN TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD. A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

**TO THE HONORABLE H. CRAIG A. GARGOTTA, U. S. BANKRUPTCY JUDGE:**

Randolph N. Osherow, Trustee, the duly appointed chapter 7 trustee in the above-referenced substantively consolidated cases ("Trustee") files this Objection to Claim No. 214-2 of

Colton Schmidt and Reggie Northrup[1] (the "Objection") and respectfully shows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this objection pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

3.      Legendary Field Exhibitions, LLC ("LFE"), Ebersol Sports Media Group, Inc. ("ESMG") and four affiliates (collectively, the "Debtors") filed their petitions for voluntary relief under Bankruptcy Code Chapter 7 on April 19, 2019 (collectively, the "Bankruptcy Cases").[2]

4.      Randolph N. Osherow was appointed as Chapter 7 Trustee thereafter and continues to serve in that capacity.

5.      On the Trustee's motion, the Court substantively consolidated the Bankruptcy Cases into *In re Legendary Field Exhibitions*, Case No. 19-50900 (the "Main Case"). [Docket No. 150].  Neither Schmidt nor Northrup objected to this consolidation.

6.      The consolidated Debtors each were involved in the development and business operations of the Alliance of American Football ("AAF").  The AAF was conceived and formed to operate a professional football league during the NFL's inter-season break.

7.      The AAF was structured such that the Ebersol Sports Media Group, LLC owned the league's 8 teams.  Other professional sports leagues adopt this structure.

---

[1] Schmidt and Northrup are sometimes collectively referred to as the "Claimants."
[2] *In re Legendary Field Exhibitions, LLC,* Case No. 19-50900.
*In re Ebersol Sports Media Group, Inc.,* Case No. 19-50904.
*In re AAF Players, LLC,* Case no. 19-50902.
*In re AAF Properties, LLC*, Case No. 19-50903.
*In re LFE2, LLC,* Case No. 19-50905.
*In re We are Realtime, LLC,* Case No. 19-50906.

8.     ESMG is the direct or indirect parent and 100% owner of each Debtor.

9.     ESMG was initially financed through both equity investment and convertible debt and convertible draw lines of credit.  More than 25 investors participated.

10.     To complement its football product, AAF planned to develop an interactive fan experience through an "app" that would allow fans access to real time streaming and game generated data, player statistics and other metrics.  The app-based interactive product component AAF conceived depended on offering a quality football product capable of attracting and keeping fans.  AAF also believed and intended that the app could eventually compliment sports gambling.

11.     ESMG was initially financed through equity investment and convertible loans, a large percentage of which were converted to equity, and a convertible debt credit line.

12.     Colton Schmidt played as a punter for the AAF's Birmingham Iron team.  Reggie Northrup played as a linebacker with the Orlando Apollos. Both Schmidt and Northrup executed a Standard Player Agreement (the "Player Contract") and Authorized Alternative League Release (the "NFL-Out") with AAF Players, LLC ("AAF Players").  Schmidt and Northrup each entered into a Standard Commercial License Agreement with Alliance Properties, LLC (a/k/a AAF Properties, LLC and herein called "AAF Properties") (the "Commercial License").  Schmidt and Northrup were each represented in obtaining their contracts by different sports agents.

13.     The player agreements set out for Schmidt and Northrup an "annual base compensation" for each of 3 seasons to be paid in installments during the corresponding regular season with the potential for other bonus compensation.

14.     The Commercial License provided a mechanism for players to fractionally share in certain revenues generated using player likenesses.

15.     Although their Player Contracts set the amount of annual base compensation in

each covered season, the Player Contract is not a lump sum contract and contained no guarantees. To the contrary, the SPA provides:

> (a). . . If the SPA is terminated after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation having become due and payable up to the time of termination.

16.     Both Schmidt and Northrup were compensated as provided under the terms of their respective player agreements for the 2019 contract year through the time the league unexpectedly folded on or about April 2, 2019.

17.     After the AAF suspended its operations, both Schmidt and Northrup sought and signed contracts to play with XFL teams.[3]  Schmidt and Northrup have treated their obligations under their Player Contracts and NFL-Out.

18.     The Trustee did not elect to assume either the Schmidt or Northrup Player Contracts.

19.     Days before the Debtors filed their bankruptcy cases, Schmidt and Northrup filed a lawsuit in California state court against AAF representatives Charles Ebersol and Thomas Dundon and four of the Debtors, including AAF Players, AAF Properties, ESMG and LFE. [4]

20.     The Court entered its Order Fixing Last Date For Filing Proofs of Claim, Combined with Notice Thereof, setting the claims bar date as August 15, 2019. (Docket No. 51).[5]  The Docket reflects service on all former players, including Colton Schmidt and Reggie Northrup.

---

[3] The Trustee is aware that the XFL suspended its operations due to the  COVID-19 pandemic and is reported to have laid off most employees. The Trustee believes that it has released players to seek other employment in professional football.

[4] After being removed, transferred and referred to this Court, their suit is pending in this Court as Adversary Proceeding No. 19-ap-5053.

[5] All references to "Docket No." entries refer to the Court's Pacer docket in the Main Case unless otherwise indicated.

21.     On July 15, 2019, Schmidt and Northrup filed Proof of Claim 214-1. On July 16, 2019 they filed Claim 214-2 (together the "Claim"). Northrup and Schmidt did not execute the Claim. Instead, one of their attorneys in the California case signed the Claim.

22.     Through their Claim, Schmidt and Northrup seek from the estate for themselves and for "others similarly situated" at least $673,920,000.00.

23.     Schmidt and Northrup computed the Claim amount by multiplying 416 (the number of players on AAF team rosters) time $180,000.00 (the sum of the annual base compensation amounts for the 2020 and 2021 seasons) and for punitive damages multiplied the resulting product by 9 because "single digit multipliers are more likely to comport with due process." *See* Claim 214-2, Addendum at p. 4).

24.     Schmidt, Northrup and other former players were paid all base compensation due to them during the 2019 season and in the 180 days prior to the Debtors' petition date.

25.     Nevertheless, the Claim includes $5,678,400.00 as a priority claim. The amount is the result of multiplying 416 (the number of players alleged) x $13,650 (the priority treatment limit amount noted on Official Form 410 for 2019 §507(a) (4) amounts).

26.     The Claim and incorporated civil complaint allege that Schmidt and Northrup each entered into a Player Contract with AAF Players that AAF Players breached by suspending operations on April 2, 2019. They say that if the AAF had not folded, Schmidt, Northrup and each putative class member would have received $80,000 as annual base compensation in season 2 of the contract period and $100,000.00 as annual base compensation in year 3. The Claim assumes this is so for 414 other putative class members. In other words, the Claim assumes that no AAF

player in the putative class would ever be cut or injured or leave the AAF for any reason.[6]

27.     In addition to breach of contract, Schmidt and Northrup allege that AAF Players breached an alleged covenant of good faith and fair dealing by interfering with its own contract and violated a California prompt wage payment and unfair competition statute. Schmidt and Northrup contend that the Debtors, each and all, acting as the agents of each other, fraudulently induced Schmidt and Northrup to contract with AAF Players and should be prohibited from repudiating the Player Contract by promissory estoppel.

28.     Although the complaint incorporated into the Claim purports to seek various personal injury damages, the computation in the claim itself includes just alleged contract damages and punitive damages as part of the Claim computation.

29.     Finally, Schmidt and Northrup purport to seek recovery in the Claim on behalf of an alleged "class" comprising a list of specified persons alleged to have been on the player rosters of the AAF league's 8 teams.

30.     Few, if any, of the persons Schmidt and Northrup allege are putative class members filed a proof of claim despite receiving notice.[7]

**REASONS FOR OBJECTION**

The Trustee has examined and objects to the Claim pursuant to Federal Rules of Bankruptcy Procedure 3007 and 9014.  The Claim must be disallowed entirely or alternatively

---

[6] Other than speculation, Schmidt and Northrup do not explain in their Claim how they are able to foretell the future for 414 other unique individuals, most of whom Schmidt and Northrup undoubtedly do not know under 414 contracts, that even  if all the same, provide many different mechanisms by which compensation in future contract years would not become due. The assumption seems unlikely.  For example, Both Schmidt and Northrup joined the AAF after being cut from other teams, Schmidt from the Bills and Northrup from the Rams practice squad.

[7] At least one such player, Aaron Murray, filed a Proof of Claim under his contract, which is evidently not identical to the agreements that the Schmidt and Northrup contend are uniform. Claim No. 6 filed in Case No. 19-50902, *In re AAF Players, LLC*.

reduced to reflect only an amount, if any, that must be allowed by law and the "class" proof of

claim expunged because.

**A.  A Class Proof of Claim is Not Permitted and Should Not Be Permitted**

a.  **Proofs of Claim Can Only be Filed by a Creditor or The Creditor's Authorized Agent.  A Putative Class Representative is Neither.** Self-appointed putative class representatives and their attorneys are not "authorized agents."  To the extent the Claim purports to be made by or for alleged creditors other than Claimants, the Claim is not allowable and should be expunged.

b.  **Rule 7023 Can Not be Invoked in This Case Even if Invoking it is a Matter of Discretion.** Even if not absolutely prohibited in the proof of claim context, Rule 7023 does not apply unless invoked pursuant to Rule 9014.  The Claimants filing creditors, nine months after the filing the claim, have not moved to invoke Rule 7023. Furthermore, invoking Rule 7023 would be improper; it would unduly delay and increase the expense and burden of estate administration without substantial benefit to the estate.  No class was certified prepetition and alleged putative class members received individual notice of the bankruptcy and bar date.  Most did not file a proof of claim.

c.  **Even if Rule 7023 Were Applied, the Claim Cannot Satisfy Rule 7023's Class Certification Prerequisites.**  Virtually all theories underlying the Claim depend on individual proof on all or most necessary elements. Individual questions would necessarily dominate this contested case. The Claimant's claims are not typical and numerosity is not satisfied.  Common issues do not predominate and a class action is not superior to other available methods of adjudication.

**B.  As Individual Claimants, The Claim of Each Schmidt and Northrup Should Be Disallowed.**

a.  All sums due to Schmidt and Northrup were paid up to the time their individual player agreements terminated and when the debtors sought relief in bankruptcy. The contracts were severable and not for a guaranteed lump sum.

b.  Claimants' individual claims are overstated.  Bankruptcy Code § 502(b)(7) limits future damages to one year.

c.  Claimants Claim is not entitled to priority treatment under § 507(a) (4).

d.  No action lies under California Labor Code §201 *et seq*. because no earned wages were due and unpaid at the time of discharge.

e.  California Bus. & Professions Code § 17200 does not apply to work performed outside California for a California-based employer by out-of-state plaintiffs. Moreover, even where applicable, remedies under the act are limited to injunctions and restitution of money or property lost.

f.  The Claimant's fraud and false promise claims are insupportable and; The Claim alleges as actual damages only amounts allegedly unpaid under contracts. Although

contract and fraudulent inducement claims can coexist, independent tort damages must be established.

g.    The Claimants cannot prevail on a promissory estoppel claim because they had, and concede they had a valid written contract covering the same subject.

h.    Claimants have not stated and cannot prove a claim for breach of an implied covenant of good faith and fair dealing.

i.    Claimants cannot state a claim for tortious interference with contract.

## BRIEF OF ARGUMENTS AND AUTHORITIES

### A.  A Class Proof of Claim is Not Permitted In This Case.

**a.    Proofs of claim can only be filed by a creditor or the creditor's authorized agent. A putative class representative is neither.**

**i.    Class proofs of claim in general.**

31.    Bankruptcy Code[8] § 501 explicitly provides for the filing of a proof of claim only by a creditor or indenture to trustee.  11 U.S.C. 501(a).  If a creditor does not file a proof of claim, the trustee, the debtor or a co-debtor, or guarantor can file a proof of claim for the creditor.  *Id*. § 501(b-c).  This language is clear and explicit; it states no other exceptions.   Bankruptcy Rule[9] 3001 implements § 501 and establishes the procedures for presenting a proof of claim.  The rule requires the use of an Official Form and that every proof of claim must be signed by the creditor or the creditor's authorized agent. Bankr. R. 3001(a-b).  Exactly tracking §501(b), Bankruptcy Rules 3004 and 3005 permit the Trustee, the debtor, a co-debtor or guarantor to file a proof of claim within 30 days after the bar date.  There are no other exceptions.

32.    Each unsecured creditor ***must*** file a proof of claim by the applicable bar date for the claim to be allowed.  Bankr. R. 3002(a) and (c).  It is fundamental that only allowed claims are

---

[8] References to the Bankruptcy Code mean Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

[9] Reference to the Bankruptcy Rules mean the Federal Rules of Bankruptcy Procedure.

paid out of the estate *res*.[10]   Bankruptcy Code section 501 and 502, and Bankruptcy Rules 3001, 3002, 3004 and 3005 thus provide carefully considered and constructed specific coordinated rules to determine who can file a claim, the form of the claim, how and when it must be filed, an when it can be paid from the bankruptcy estate.

### ii.    The rule that class proofs of claim are absolutely prohibited.

33.    Adhering to the clear text of § 501 and its implementing rules, bankruptcy courts in Texas and elsewhere historically held that so-called "class" proofs of claim are unambiguously prohibited because a putative class representative cannot by self-declaration become an "agent," much less an "authorized agent" under long-respected agency precepts.[11]   *In re Standard Metals Corp.*, 817 F.2d 625, 631 (10th Cir. 1987); *In re FIRSTPLUS Financial, Inc.*, 248 B.R. 60, 70-72 (N.D. Tex. 2000); *In re Great W. Cities, Inc. of New Mexico*, 88 B.R. 109 (Bankr.N.D.Tex.1988), *rev'd on other grounds*, 107 B.R. 116 (N.D.Tex.1989);[12] *see In re Craft*, 321 B.R. 189, 192 (Bankr. N.D. Tex. 2005) (observing that where class is not certified prepetition, putative representative has no agency relationship with putative class members and declining to invoke Rule 7023 or allow class proof of claim).

---

[10] *See, e.g., Katchen v. Landy*, 382 U.S. 323, 329–31, 86 S. Ct. 467, 472–73, 15 L. Ed. 2d 391 (1966) (explaining that the whole process of proof, allowance, and distribution is an adjudication of interests claimed in a res within the bankruptcy court's jurisdiction to summarily determine).

[11] An agency arises in all cases from the manifestations from the principal.  Actual agency involves the principal's manifestations to the ***agent*** under which the agent reasonably concludes that the principal wishes the agent to act in some particular.  *In re Matter of Osborne*, 951 F.3d 691 (5th Cir. 2020); Agency by estoppel arises where the principal's manifestations to a third party would make it inequitable to allow the principal to deny the agent's authority (so-called ostensible agency). *Id.*

[12] *See In re Allegheny Intrn., Inc.*, 94 B.R. 877, 878-79 (W.D. Penn. 1988); *In re Johns–Manville Corp.*, 53 B.R. 346 (Bankr.S.D.N.Y.1985); *In re Baldwin–United Corp.*, 52 B.R. 146 (Bankr. S.D. Ohio 1985); *In re Computer Devices, Inc.*, 51 B.R. 471 (Bankr.D.Mass.1985); *In re Grocerland Coop., Inc., 32 B.R. 427 (Bankr.N.D.Ill.1983)*; *In re Shulman Transport Enterprises, Inc.*, 21 B.R. 548 (Bankr.S.D.N.Y.1982), aff'd, 33 B.R. 383 (S.D.N.Y.1983), aff'd, 744 F.2d 293 (2d Cir.1984) (observing that class action rules are largely antithetical to the established bankruptcy process).

### iii.   The view that bankruptcy courts have discretion in appropriate cases to allow class proofs of claim.

34.     Courts following the Seventh Circuit Court of Appeals decision in *In re American Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988), have held class proofs of claim, although in many respects antithetical to the bankruptcy process, are not absolutely prohibited under § 501 and Bankruptcy Rule 3001. These courts conclude that Rule 3001 and § 501's specific enumerations state are not limits but flexible guidelines that leave room for judicial expansion.

35.     These courts reason that § 501 is expandable because Congress' failure to include putative representatives or class actions specifically in § 501 or mention the subject in legislative history may simply reflect that Congress has yet to consider whether they should be included.  *Id.* at 493.  Moreover, they imagine that a representative party in a class action is a "putative agent" who becomes "authorized" *post-hoc* if the case is ultimately certified as a class action. *See id.* at 493 (characterizing a representative party in a class action as an "agent for the missing."  Finally, these courts conclude that because Bankruptcy Rule 9014(c)'s mother-hubbard clause permits bankruptcy courts to invoke one or more adversary rules at any stage in a contested case, Congress must have intended for courts to apply that discretion to proofs of claim Congress clear expression of the rules notwithstanding.[13]  *Id.* at 492-93.

36.     Under this view, a class proof of claim may be permitted, but only if the bankruptcy court first determines that Rule 7023 should be invoked and only if the court thereafter determines that Rule 7023's requirements are met.

### iv.   The court should adopt the view that class proofs of claim are not permitted as expressed in *In re Firstplus Financial, Inc.*

37.     *In re FirstPlus Financial, Inc.* is not alone in applying § 501 and Rule 3001

---

[13] Bankruptcy Rule 9014(c) provides that bankruptcy courts may "at any stage in a particular matter direct that one or more of Part VII's adversary proceeding rules shall apply."

according to their plain and specific language. *Sheftelman v. Standard Metals Corp. (In re Standard Metals Corp.)*, 817 F.2d 625, 631 (10th Cir.1987); *In re Allegheny Intern., Inc.*, 94 B.R. 877, 880–81 (Bankr. W.D. Pa. 1988 (recognizing that whatever benefits permitting a class proof of claim may have in particular cases, "Congress has not empowered us to do so"). [14]

38.     Although several circuit courts have applied *Matter of American Reserve Corp.'s* two-step approach,[15] the Fifth Circuit has not. *In re TWL Corp.*, 712 F.3d 886, 891 (5th Cir. 2013) (observing that "our circuit has not addressed whether a *class* proof of claim even is permissible" and stating that "we expressly decline to address the merits of that claim."). [16] The trend is to apply the *Matter of American Reserve Corp.* two-step approach. *In re Craft*, 321 B.R. 189, 192 (Bankr. N.D. Tex. 2005); *In re Vanguard Natural Resources, LLC*, 2017 WL 5573967, at * 3 (Bankr. S. D. Tex. 2017).[17]

39.     But that approach is fundamentally illogical and wrong. Instead, the Court should adopt the thoughtful reasoning in *In re FirstPlus Financial, Inc.* and hold that Bankruptcy Rule 3001 and § 501 do not permit a putative representative or his attorney to file a "class proof claim. That reasoning carefully steadfastly adheres to the plain statutory text without resorting to

---

[14] Other cases following this line of reasoning include: *In re Electronic Theatre Restaurants Corp.*, 57 B.R. 147 (Bankr. N.D. Ohio 1986); *In re Johns-Manville Corp.*, 53 B.R. 346 (Bankr.S.D.N.Y.1985); *In re Baldwin-United Corp.*, 52 B.R. 146 (Bankr. S.D. Ohio 1985); *In re Computer Devices, Inc.*, 51 B.R. 471 (Bankr.D.Mass.1985); *In re Grocerland Coop., Inc.*, 32 B.R. 427 (Bankr.N.D.Ill.1983); *In re Shulman Transp. Enters., Inc.*, 21 B.R. 548 (Bankr.S.D.N.Y.1982), aff'd, 33 B.R. 383 (S.D.N.Y.1983), aff'd, 744 F.2d 293 (2d Cir.1984).

[15] *Gentry v. Siegel*, 668 F.3d 83, 88–89 (4th Cir. 2012) (adopting approach and affirming bankruptcy court's determination not to invoke Rule 7023) *Reid v. White Motor Corp.*, 886 F.2d 1462, 1470 (6th Cir. 1989) (same); *In re Charter Co.*, 876 F.2d 866 (11th Cir.1989), cert. dismissed, 496 U.S. 944, 110 S.Ct. 3232, 110 L.Ed.2d 678 (1990) (adopting approach and remanding for determination whether Rule 7023 would be invoked.;
.
[16] In *In re TWL Corp.*, 712 F.3d 886, 891 (5th Cir. 2013); the Fifth Circuit was called on to decide whether in an adversary proceeding where Rule 7023 automatically applies, the bankruptcy court could bankruptcy-related factors in determining if the case satisfied Rule 7023's numerosity and superiority prerequisites. Id. at 892-93. The Court
[17] *In re Vanguard Natural Resources, LLC* involved requests for the reimbursement of administrative expenses, which are not subject to § 501 or Bankruptcy Rule 3001, although such a request, if objected to, presents a contested case governed by Rule 9014. *Matter of TransAmerican Natural Gas Corp*., 978 F.2d 1409, 1416 (5th Cir. 1992).

legerdemain to conclude, as Matter of American Reserve Corp. does, that by excluding putative class representatives and their lawyers from § 501 and Bankruptcy Rule 3001, Congress really meant that they are included.

40.     *Matter of American Reserve Corp.'s* clever fiction that a Rule 7023 putative class representative is really a putative "agent for the missing" retroactively transformed by class certification into an actual authorized agent[18] finds no support either in the Seventh Circuit's opinion or in the law.  *See Matter of American Reserve Corp.*, 840 F.2d 487, 493 (7th Cir. 1988).

41.     As sole support for its *ipse dixit* conclusion, *Matter of American Reserve Corp.* analogizes unconvincingly to *Sosna v. Iowa*, 419 U.S. 393 (1975) and *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1975).  Neither case has anything to do with agency[19] or remotely approaches holding that a class representative is an "agent for the missing."  Instead, they consider in two contexts whether an appeal could continue under the capable of repetition but evading review exception to constitutional mootness.

42.     In *Sosna* a woman sought a declaratory judgment that Iowa's durational residency requirement was unconstitutional because she wanted a divorce before residing there for a year.  At trial, the parties stipulated to the elements of F.R.C.P. 23(a).  *Sosna v. Iowa*, 419 U.S. 393, 397 (1975).   The district court panel declared the statute constitutional.  During her appeal, Sosna satisfied the residency requirement; extinguishing her personal standing.  The Supreme Court held that upon certification of the class action "the class of unnamed persons described in the certification acquired a legal status separate from Sosna's interest; their personal stake was thus

---

[18] *Matter of American Reserve* invokes the *ipse dixit* that:  "If the bankruptcy judge denies the request to certify a class, then each creditor must file an individual proof of claim; the putative agent never obtains 'authorized agent' status.  If the court certifies the class, however, the self-appointed agent has become 'authorized,' authorized and the original filing is effective for the whole class (the principals)."  *Id*. at 493.

[19] The word agent or agency appears in neither case.

sufficient to present a real case or controversy capable of repetition but evading review sufficient to avoid dismissal as moot. *Id*. at 400-403.

43.     In *U.S. Parole Comm'n v. Geraghty,* Geraghty was denied parole and filed a putative class action challenging the constitutionality of federal parole guidelines. 445 U.S. 388, 404, 100 S. Ct. 1202, 1212–13, 63 L. Ed. 2d 479 (1980).  Geraghty appealed the district court's refusal to certify the case as a class action and denied another inmate's request to intervene "to ensure the legal issue raised would not escape review."  Geraghty completed his sentence while the consolidated appeals remained pending.   *Id*. at 394, 396.  The Supreme Court held that Geraghty's appeal of the trial court's order refusing to certify a class action could continue under the "capable of repetition but evading review" mootness exception even though his release from prison mooted his individual suit. *Id*. at 397-402.

44.     *Sosna* and *Geraghty* in no way suggest that the law of agency is turned upside down because a class action is sought or certified.  Just contrary, the Supreme Court observed that the procedural "'right' to have a class certified if the requirements of the Rules are met" "is more analogous to the private attorney general concept" than to agency principles.  *Id*. at 403; *accord In re Aiello*, 231 B.R. 693, 709 (Bankr. N.D. Ill. 1999).  *Geraghty's* characterization implicitly recognizes that class representatives are ***not agents*** of absent class members.

45.     Some courts have assumed that because class representatives owe fiduciary duties to protect the interests of the class, they are the agents of individual class members.  E.g., *In re Craft*, 321 B.R. 189, 192 (Bankr. N.D. Tex. 2005).  But this incorrectly conflates the concepts.  Although principal and agent is one type of relationship involving fiduciary duties, there are many other types of relationships both formal and informal attended by fiduciary duties.  *See e.g., Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp.*, 823 S.W. 2d 591, 593-94 (Tex. 1992)

(collecting examples of formal and informal fiduciary relationships).[20]

46.    *In re FirstPlus Financial, Inc.* thoughtfully considers and rejects *Matter of American Reserve Corp.'s* "admirably inventive" approach:

> The concept of agency is so fundamental that it barely requires articulation: An agency relationship "exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent to so act." Or, to put it another way, "Rule 3001(b) allows a creditor to decide to file a proof of claim and to instruct an agent to do so; it does not allow an 'agent' to decide to file a proof of claim and then inform a creditor after the fact."

*Id*. at 68. (citing *Sheftelman v. Standard Metals Corp. (In re Standard Metals Corp.)*, 817 F.2d 625, 631 (10th Cir.1987) and Restatement (Second) Agency § 15 (1958)); *see N. Assur. Co. of London v. Grand View Bldg. Ass'n.*, 183 U.S. 308, 331, 22 S. Ct. 133, 141, 46 L. Ed. 213 (1902) (stating that the powers of agents of every kind to act for and bind their principals are determined by the unvarying rule of ascertaining what authority is delegated to them).

47.    The notion that a court can step into the shoes of an absent class member to retroactively create an agency by ratification is equally mistaken.  Only a principal is vested with authority to ratify an act allegedly on the principal's behalf.  *E.g. In re First Plus Financial, Inc.*, 248 B.R. at 69; Restatement (Second) of Agency § 87 (1958) (stating that the affirmance constituting ratification "must be by the person identified as the principal at the time of the original act.").[21] "The bringing of an action, or of an appeal, by a purported agent cannot be ratified after the cause of action or right to appeal has been terminated by lapse of time." Restatement (Second) of Agency § 90, Comment a (1958). The U.S. Supreme has applied § 90 in exactly this context.

---

[20] *See Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 571, 160 S.W.2d 509, 512 (1942) (stating that it is difficult to formulate a definition of the term "fiduciary" that is comprehensive enough to cover all cases); *Texas Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980) (stating that a fiduciary duty "contemplates fair dealing and good faith, rather than legal obligation").

[21] The Texas Supreme Court adopted Restatement § 87 in *Padilla v. LaFrance*, 907 S.W.2d 454, 461 n. 9 (Tex. 1995).

*Fed. Election Com'n v. NRA Political Victory Fund*, 513 U.S. 88, 98, 115 S. Ct. 537, 543, 130 L. Ed. 2d 439 (1994); *Mission Towers v. Grace*, CIV.A. 07-287, 2007 WL 4333817, at *5 (D. Del. Dec. 6, 2007), aff'd sub nom. *In re W.R. Grace & Co.*, 316 Fed. Appx. 134 (3d Cir. 2009) (affirming expungement of proofs of claim where ratifying act did not occur before the bar date passed); *In re Cmty. Home Fin. Services, Inc.*, 583 B.R. 1, 77 (Bankr. S.D. Miss. 2018) (same).

48.     *Matter of American Reserve Corp.* incorrectly expands the clear language limiting §501 and Rule 3001 by misapplying and then maligning the legal maxim *expressio unius est exclusio alterius*. *Id.* at 492.  The U.S. Supreme Court case the opinion cites for the contention that silence in the legislative history sanctions judicial expansion holds exactly opposite.  *National R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458-60 (1974).  Observing that this "ancient maxim" could only be overcome by "clear contrary evidence of legislative intent," the Supreme Court declined to expand the specific private remedies Congress enacted in the Rail Passenger Service Act of 1970 to include a private cause of action whereby citizen riders could sue to enjoin discontinuance of a passenger line.[22]  *Id.*  Only those persons Congress enumerated in the statute could seek an injunction.  *Id.* at 456-57.

49.     Contrary to the suggestion in *Matter of American Reserve Corp.*, the legislative history is not silent concerning who Congress authorized to file a proof of claim and why.  For example, Congress explained that the purpose of permitting a bankruptcy trustee or debtor to file a proof of claim if a creditor does not is "mainly to protect the debtor if the creditor's claim is

---

[22] The plaintiff railroad passengers invited the Supreme Court to imply such a private cause of action because they were the Act's intended beneficiaries.  *National R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. at 457.  The Supreme Court declined the invitation, holding that any "inference of a private cause of action not otherwise authorized by the statute must be consistent with the ***evident*** legislative intent.  *Id.* at 458. [***Emphasis added***].

nondischargeable" S. Rep. 95-989, 61, 1978 U.S.C.C.A.N. 5787, 5847.[23] And Congress' specific

inclusion of "indenture trustee" was certainly not accidental.

50.    The Bankruptcy Code defines both the term "indenture" and "indenture trustee" in

Bankruptcy Code.  11 U.S.C. §§ 101(28), (29).  It takes its definitions directly from the Trust

Indenture Act of 1939 ("TIA"), which generally requires an indenture trust to have at least one

independent corporate institutional trustee.  *See* 15 U.S.C. §§ 77ccc(7), (11), 77jjj(1).  Although

an indenture trustee in that capacity is not generally considered the bondholders' agent absent

proof of an actual common-law agency relationship,[24] Trust Indenture Act section 317

specifically authorizes an indenture trustee to file proofs of claim to protect bondholders' interest

in bankruptcy.  15 U.S.C. §§ 77qqq(a) (2).

51.    When Congress undertook in 1978 to overhaul the Bankruptcy Act of 1898,

recognizing the TIA's statutory policy encouraging indenture trustees' participation in

bankruptcy cases was particularly appropriate.[25]  Congress' recognition of indenture trustees'

important role in creating and servicing corporate financings is evident in § 501 and throughout

the Bankruptcy Code and Rules.  *See* 11 U.S.C. §§ 303(b) (1), 343, 501(a), 503(b) (5), 1106(a)

(4), 1109(b), 1121(b); *see also* Bankruptcy Rules 2002 and 2015.  That Congress took special

care in defining § 501's parameters is confirmed by the fact that H.R. 6, the precursor to H.R.

---

[23] 978 WL 8531 (Leg.Hist.) The corresponding House report also reflects that Congress considered who should be able to file a proof of claim and made changes in the legislative process enacting § 501.  H.R. Rep. 95-595, 549, 1978 U.S.C.C.A.N. 5963, 6447.

[24] *See In re Covenant at S. Hills, Inc.*, 410 B.R. 426, 433 (Bankr. W.D. Pa. 2009) (holding that indenture trustee was not bondholders' agent under recognized agency principles and does not have general power to act for the bondholder as principal); *LaSalle Nat. Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1083-85 (S.D.N.Y. 1996) (same).

[25] Congress is presumed to be knowledgeable about the existing law pertinent to the legislation it enacts. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185, 108 S. Ct. 1704, 1712, 100 L. Ed. 2d 158 (1988)

8200 enacted in 1978, did not provide that an indenture trustee could file a proof of claim. HR 6, 95th Cong., 1st Sess. § 501(a) (Jan. 4, 1977), 92 Stat. 2549, 92 Stat. 2549; see also 11 U.S.C. §§ 501(b) (c) (permitting the trustee, debtor, co-debtor or debtor's surety to file a proof of claim for a creditor who did not, but not for an indenture trustee in the same circumstances).[26]

52.     Like the Seventh Circuit, courts following *Matter of American Reserve Corp.* rush to commend the perceived salutary purposes of class actions to justify supplying supportive terms Congress chose not to enact. *See, e.g., Gentry v. Seigel*, 668 F.3d 83, 90 (4th Cir. 2012); *In re Charter Co.*, 876 F.2d 866, 871 (11th Cir. 1989) (arguing that Congress' decision to include Rule 7023 for adversary proceedings necessarily means Congress intended to make the litigation aggregating function of class actions available to every proceeding in bankruptcy). They protest that hanging fast to the language Congress actually enacted in § 501 and Rule 3001 would undermine the supposed efficiencies of class actions and potentially inhibit small claims creditors from recovering. *See id.*

53.     Whether or not those suppositions ever match experience is irrelevant. It is equally true, and easier to demonstrate, that class litigation for money damages is a complicated and costly, and in most cases less efficient, affair for all involved. More important, Congress is the master of the statutory schemes it creates. It is not a legitimate part of the judicial function for courts to extend a statute beyond the reach Congress selected just because the court views that extension to effect a sounder policy. *E.g., United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 1030, 103 L. Ed. 2d 290

---

[26] "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300, 78 L. Ed. 2d 17 (1983).

(1989)(construing Bankruptcy Code §506 and holding that where a statute's language is plain, (the sole function of the courts is to enforce it according to its terms).[27]

54.     Additionally, the *Matter of American Reserve* approach turns the bankruptcy proof of claim process on its head.  A proof of claim that conforms to Rule 3001 and § 501 is by statute prima facie valid as to both validity and amount, whereas a non-conforming proof of claim is does not enjoy that status.  *E.g.*, *In re DePugh*, 409 B.R. 84, 98 (Bankr. S.D. Tex. 2009) (stating that creditors cannot simply ignore Bankruptcy Rule 3001's requirements until a debtor complains); *In re Reyna*, No. 08-10049-CAG, 2008 WL 2961973, *3-4 (Bankr. W.D. Tex. Jul. 28, 2008) (comprehensively analyzing burdens of proof in claims administration process); *In re Tran*, 369 B.R. 312, 317 (S.D. Tex. 2007); *In re Armstrong*, 347 B.R. 581, 585 (Bankr. N.D. Tex. 2006); *In re First Plus Financial, Inc.* 248 B.R. 60, 70 (Bankr. N.D. Tex. 2000) (holding that an improperly filed proof of claim by a person not the person who has the claim is invalid on its face entitled to no consideration and so defective that it cannot be cured by amendment) (citations omitted).

55.     That the bankruptcy laws alter ordinary burdens of proof is not trivial.  *In re Reyna*, No. 2008 WL 2961973, at *3-4. An objecting trustee has the burden to present evidence to overcome a conforming proof of claim's *prima facie* validity.  *Matter of O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998).  Failing that, a creditor's claim is valid both as

---

[27] Enforcing Rule 3001(b) and § 501 in the proof of claim context is consistent with the structure of the Bankruptcy Code. For example, false claims in bankruptcy were made subject to severe criminal penalties in consideration of the rule that proofs of claim are prima facie valid and deemed allowed.  *See* Act of Jun. 12, 1960, P.L. 86-519, 74 Stat. 219 (currently codified in 11 U.S.C. § 502(a) and 18 U.S.C. § 152(4)).  This infers a strong preference to enact an efficient insolvency system that depends on personal involvement in the claim.  Moreover, the code and rules already provide the Court with authority adjust the bar date for individuals who did not receive notice of the bankruptcy case, a popular justification urged for the *Matter of American Reserve Corp.* rule.  Despite the rationalization offered that permitting class actions generally might serve a public policy goal, nothing about a plain language application of Rule 3001 and § 501 contravenes the underlying purpose of the bankruptcy law to establish rules by which potential creditors in a Chapter 7 liquidation make claims for distribution from an insolvent estate.

to its substance and amount. *Id.* If a "class" proof of claim were valid, its mere filing would impose on the trustee the initial burden to investigate and present evidence overcoming the presumptive validity of each putative class members' claim. The cost of investigating and objecting to "claims" of those too disinterested to file them individually just because some creditor contends that at least one common question exists is hardly a result Congress intended creating an efficient insolvency system. And it makes no sense where every dollar the trustee spends responding to claims that were not filed is a dollar that will not be paid to legitimate creditors that filed a conforming proof of claim.

56.     This case amply illuminates the inequity in the *Matter of American Reserve Corp.* approach. The Claimants here filed their individual proof of claim attesting that they are entitled between them to some part of more than ***$673 Million***.[28] Claim 214-2 at p. 2. Despite their seven-figure size, Schmidt's and Northrup's individual claims are insupportable and wrong. The Trustee has a duty to object to patently exaggerated and flawed individual claims. 11 U.S.C. § 704(a) (5). But under the *Matter of American Reserve Corp.* approach, objecting triggers Rule 9014(c)'s catchall clause and exposes the estate to alleged multi-million dollar claims of more than 400 individuals who received notice, filed no proof of claim and therefor have no claim.[29] *See In re Ellington*, 151 B.R. 90, 94–95 (Bankr. W.D. Tex. 1993) (proof of claim not filed by a person identified under Rule 3001 has no effect and cannot be amended).

---

[28] Based on their addendum to Claim 214-2, it appears that likely that Schmidt and Northrup believe that they and each putative class member's individual claim amounts is at least approximately 1.6 Million. 214-2.

[29] This sort of "bootstrapping" disconnecting a proof of claim from the plain text of the controlling statute and rule to transform an unauthorized and invalid proof of claim into a valid and authorized proof of claim is illogical. E.*g., In re Alleghany Intern'l, Inc.,* 94 B.R. 877, 881 (Bankr. W.D. Pa. 1988) (expressly rejecting the *Matter of American Reserve Corp.* approach as incompatible with the Bankruptcy Code framework); *In re Baldwin United Corp.*, 52 B.R. 146, 149) (Bankr. S.D. Ohio 1985).

57.     Moreover, under accepted standards, the Trustee would have to present evidence to object to more than 400 "claims" of alleged creditors that never authorized or filed them.   In effect, the approach *Matter of American Reserve Corp*. advocates puts the trustee to the impossible choice of either not objecting to Schmidt and Northrup's individual claims, or allowing them to hijack an impoverished Chapter 7 bankruptcy estate to the Trustee's and legitimate creditors' detriment.[30]

58.     This case is materially indistinguishable from *In re FirstPlus Financial, Inc.*  There, the "class" proof of claim advocates were named plaintiffs in a California class action suit alleging causes of action against the Debtors and other defendants under federal and California law.  *Id.* at 65.  Their attorney, who was never the authorized agent of the putative class, nevertheless filed the "class" proof of claim.   All alleged members of the class received actual notice of the bankruptcy case and the bar date. *Id.* at 66.  No class was certified prepetition.  The named plaintiffs did not seek to invoke Rule 7023 in relation to the proof of claim or move for certification in the adversary proceeding for months.   *Id.*

59.     The only evident difference between this case and *In re FirstPlus Financial, Inc.* is that the claims there were relatively small dollar amount claims of thousands of consumer mortgagors.   This is not a negative-value case.    According to the Claimants, each alleged class member has a minimum claim for more than $1.6 Million.  It is strains credulity to suppose that 400 individuals, mostly college graduates, each allegedly owed $1.6 Million who received actual notice that they "must file a claim" by the bar date "or their claim will not be allowed" were uniformly unable to appreciate what they needed to do.  No salutary purpose of the class action

---

[30] To underscore the significance of the inequity involved, the "class" proof of Schmidt and Northrup advocate is one of 301 claims filed, but constitutes 80% of the aggregate amount of all claims filed.

device would be vindicated by indulging such a fiction here.  Here, the *In re FirstPlus Financial, Inc.* analysis even more compelling.[31]

> **b.** **Rule 7023 cannot be invoked in this case even if invoking it is a matter of discretion.**

60. Although this bankruptcy case commenced more than a year ago and the Claimants filed Claim 214-2 more than six months ago, they never moved the Court to invoke Rule 7023. Claimants have not satisfied this first step in the *Matter of American Reserve Corp.* approach.  That alone is a sufficient basis for the Court to decline to direct that Rule 7023 be applicable to this objection. *In re Associated Cmty. Services, Inc.*, 520 B.R. 650, 655 (Bankr. E.D. Mich. 2014) (holding that a curative motion under Rule 9014(c) is not a defense to an objection that the Rule 7023 should not be invoked); *In re FirstPlus Financial, LLC*, 248 B.R. 60, at 72-73.

61. There is also no reason to apply Rule 7023 to Claim 214.  When considering whether to invoke Rule 7023 through Rule 9014(c), courts consider such factors as:

a. whether the class at issue was certified pre-petition;

b. whether the members of the putative class received notice of the claims bar date;

c. whether class certification would adversely affect the administration of the underlying bankruptcy case.

d. the benefits and costs of class litigation to the estate.

---

[31] The more deleterious effects of the *Matter of American Reserve Corp.* approach are masked by the desire to afford a remedy to consumer creditors who often do not receive notice of the bankruptcy or whose claims are so small that an attorney would not likely take interest in a single claim (commonly called a "negative-value" suit). *See, e.g. Matter of American Reserve Corp*., 840 F.2d 487 at 492-93); *In re Think Fin., LLC*, 17-33964 (HDH), 2018 WL 9801454, at *2 (Bankr. N.D. Tex. Aug. 30, 2018) (discussing difficulties of individual notice to 1.13 million consumer creditors and observing that many consumers (26,274) may not have understood the notice they received); *In re Craft*, 321 B.R. 189, 194 (Bankr. N.D. Tex. 2005) (theorizing in a Chapter 11 case that problems with notice to consumer class members may complicate a debtor's effort to resolve all its debts).  Laudable or not, these motives do not override the universal rules of statutory construction and this case does not involve the problem to which these policy motives are addressed.

*In re TWL Corp.,* 712 F.3d 886, 892 (5th Cir. 2013) (describing in dicta factors courts consider in the Rule 9014 analysis and holding that in an adversary proceeding where Rule 7023 automatically applies, court may consider these same factors as bearing on the propriety of the class certification question), *In re Vanguard Nat. Res., LLC*, 17-30560, 2017 WL 5573967, at *4 (Bankr. S.D. Tex. Nov. 20, 2017) (analyzing whether to invoke Rule 7023 to a contest over administrative claims filed in a confirmed Chapter 11 case setting an administrative claims bar date not governed by § 501 and Bankruptcy Rule 3001).

62.     All of these factors weigh heavily against invoking Rule 7023 with respect to Claim 214-2.  No class was certified pre-petition.  Invoking Rule 7023 would resurrect claims that, if they ever existed, are now barred.  Every alleged class member received individual notice of the claims bar date; most did not file a proof of claim. *See In re Johns-Manville Corp.*, 53 B.R. 346, 351-52 (Bankr. S.D.N.Y. 1985)  (observing that class proof of claim was not proper where alleged class members were provided bar date notice in bankruptcy and no one contended that notice was constitutionally inadequate);

63.     Allowing the Claimants to pursue a class proof of claim will significantly inhibit the efficiency of administration and deplete the resources of the estate.  As discussed above, a class proof of claim could not operate as prima facie valid:

    a.  the proof of claim does not state the calculated amount of any individual person's claim; instead, it recites a composite amount.

    b.   Although purporting to be liquidated, even the composite amount does not include all categories of damages sought if the complaint attached and incorporated into Claim 214-2 is to be believed.   *See* Exhibit A to Claim 214-2.

    c.  It is by its very nature not filed by individual creditor or a person to whom that

creditor has delegated authority as an agent.

64.     The fact that the "class" claim cannot enjoy *prima facie* validity enormously impairs the chance for efficient estate administration.  There are legitimate creditors who filed conforming claims within the prescribed time.  The Trustee will be impelled under the circumstances of this case to examine each alleged class member's entitlement to recover.  *E.g., In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992), as amended (May 4, 1992) (stating that absent court leave, only the Chapter 7 trustee may interpose proof of claim objections and has a duty to do so) (internal citations omitted); *James Talcott, Inc. v. Glavin*, 104 F.2d 851, 853 (3d Cir. 1939) (holding that it is the trustee's duty to object to a claim for any reason disentitling it to allowance); *In re King*, 546 B.R. 682, 695 (Bankr. S.D. Tex. 2016) (Chapter 7 trustee has a duty to object to claims that do not attach supporting documents); *In re I & F Corp.*, 219 B.R. 483, 485 (Bankr. S.D. Ohio 1998); *In re Woods*, 139 B.R. 876, 877 (Bankr. E.D. Tenn. 1992).

65.     Moreover, as described in the foregoing section, class action litigation, especially involving proofs of claim, contravenes the purposes of the claims allowance and disallowance process.  A FRCP 23(b) (3) class proceedings does not result in some talismanic final judgment awarding each class member a specific amount of damages on which they simply seek execution. At its best, the device can provide a common answer in appropriate cases to one or more important questions.  Ideally, all that should be left on the other side of class action litigation is for class members to file a proof of their claim.  If that sounds familiar, it is because bankruptcy already embodies that process and it has already largely occurred just as expected.  This is not a negative value consumer case where plausible efficiencies might be realized.  The "class" proof of claim in this case  promises to introduce untenable complexities of proof and legal analysis—only to an end that at minimum will necessitate repeating what has already been done.

66.     Recognizing that in most instances class action principles are antithetical to those of bankruptcy[32], even courts that accept the *Matter of American Reserve Corp.* two-step approach most often consider these factors and decline to invoke Rule 7023.  *E.g., Gentry v. Siegel*, 668 F.3d 83, 94 (4th Cir. 2012) (upholding bankruptcy court's refusal to invoke Rule 7023 where a certified class action would be more cumbersome and costly than the bankruptcy process); *Reid v. White Motor Co.*, 886 F.2d 1462, 1470-71 (6th Cir. 1989) (holding that attorney was not a member of the alleged class and not authorized to file a proof of claim, especially where attorney failed timely request bankruptcy court to invoke Rule 7023 and ignored other mandatory requirements essential to filing a class proof of claim*); In re Vanguard Natural Resources,* LLC, No. 17-30560, 2017 WL 5573967, *4-5 (Bankr. S.D. Tex. Nov. 20, 2017); In *re Craft*, 321 B.R. 189, 198 (Bankr. N.D. Tex. 2005); *In re Musicland Holding Corp.*, 362 B.R. 644, 654–55 (Bankr. S.D.N.Y. 2007) (collecting cases); *In re Computer Learning Centers, Inc.,* 344 B.R. 79, 88–89 (Bankr. E.D. Va. 2006), *In re Ephedra Products Liab. Litig.,* 329 B.R. 1, 6–7 (S.D.N.Y. 2005); *In re Mechem Financial, Inc.* 125 B.R. 151, 153 (Bankr. W.D. Penn. 1991); *In re Thomas McKinnon Securities, Inc.*, 133 B.R. 39, 40-41 (Bankr. S.D.N.Y 1991) (holding that the costs and delay of class litigation are not compatible with liquidation cases).

67.     This Chapter 7 liquidation proceeding presents an even more compelling case to decline invoking rule 7023.

**c.      Even if Rule 7023 were applied, the claim cannot satisfy Rule 7023's class certification prerequisites.**

68.     The Claim cannot satisfy FRCP 23's prerequisites for certification.  Although Rule 7023 and FRCP 23 do not apply and should not be applied, the Trustee is nevertheless constrained to address the Rules' prerequisite elements.

---

[32] *E.g., In re Grocerland Co-op, Inc.*, 32 B.R. 427, 435 (Bankr. N.D. Ill. 1983).

### (i) General class action principles.

69. The usual rule is that only real parties in interest can conduct litigation. F.R.C.P. 17 (a),[33] applicable to adversary proceedings through Bankr. R. 7017. The same rule applies in contested cases. Bankr. R. 9014(c) (specifically incorporating Rule 7017).

70. Class actions must rest on a foundation of rigorous proof. To maintain one, the proponent bears the heavy burden to establish F.R.C.P.'s necessary elements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013); *Spence v. Glock*, 227 F.3d 308, 311 (5th Cir. 2000) *In re American Medical Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996).

71. To that rigorous proof, trial courts must supply a rigorous analysis, going beyond the pleadings to understand the claims, defenses, relevant facts, applicable substantive law and understand how the case can be tried in order to make a meaningful determination whether the requirements of F.R.C.P. 23 are satisfied. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996); *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982) (holding that actual, not presumed, conformance with Rule 23(a) is indispensable); *Spence v. Glock*, 227 F.3d at 311 (5th Cir. 2000); *Castano v. Am. Tobacco Co.*, 84 F.3d 734 at 740.

72. Rule 23 (a) sets forth four threshold elements, colloquially called numerosity, commonality, typicality and adequacy. Rule 23(b)(3), [34] relevant to the Claim, requires the court to "find that common questions predominate over questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently *adjudicating*

---

[33] F.R.C.P. 17(a) provides that "an action must be prosecuted in the name of the real party in interest." The only exceptions are stated in the rule to allow suits by and against an executor, administrator, guardian, bailee, express trust trustee, a party with whom or is whose name a contract has been made for another's benefit, and a party authorized by statute. *Id.*

[34] Although the complaint attached and incorporated in the Claim alleges a class action under a California state procedural rule no longer applicable in this court, it is clear from the allegations that Claimants seek certification under FRCP Rule 23(b)(3).

the controversy. *See e.g., Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (holding that Rule 23(b) (3) requires the court to "find," not merely assume facts justifying class certification).

73.     F.R.C.P. 23(b) (3) does not command that no individual questions exist.  But it also does not permit a court to ignore the requirements for proof or to invent or transform putative representatives into a composite plaintiff to ease the strains of proof or save barred claims. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 n. 8 (8th Cir. 2009) (improper to pursue a § 1981 class action based on a hypothetical plaintiff); *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 345 (4th Cir.1998) (rigorous analysis requirement avoids the real risk of a composite case being much stronger than an individual's case would be); *Lott v. Westinghouse Savannah River Co., Inc.*, 200 F.R.D. 539, 559 (D.S.C. 2000), *aff'd and remanded sub nom. Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248 (4th Cir. 2005) (treating individual issues individually ensures fairness in preventing each putative plaintiff's interest from being overlooked and assuring that defendants do not have to fight against a composite "perfect plaintiff*); Liggett Group Inc. v. Engle*, 853 So. 2d 434, 467 n. 48 (Fla. Dist. Ct. App. 2003).[35]

74.     These prerequisites together ensure that a class action is only used where basic due process can be preserved in the adjudication of the claim of each absent class member and the device is the best way to economically resolve ideally all, but at least most, of the controversy.

**(ii)   Numerosity is not satisfied.**

75.     Rule 23(a) (1) requires proof that joinder of all members be impracticable.   The number of alleged class members is not determinative in evaluating "numerosity."   *Philips v. Joint*

---

[35] *Liggett Group* held a class action improper because the phased trial plan "enabled the plaintiffs to try fifty years of alleged misconduct that they never would have been able to introduce in an individual trial, which was untethered to any individual plaintiff" and thereby "created a composite plaintiff who smoked every single brand of cigarettes, saw every single advertisement, read every single piece of paper that the tobacco industry ever created or distributed, and knew about every single allegedly fraudulent act."

*Legislative Committee*, 637 F.2d 1014, 1022 (5th Cir. 1981). Rather, the analysis considers all relevant factors including "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id.*; *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir. Unit A July 1981).

76.     Whether joinder is impracticable outside of bankruptcy is a very different proposition than within bankruptcy and even more particularly within the proof of claim process. Although the Debtors' records suggest that former players reside in various states, the bankruptcy claims process already vindicates FRCP's policy goal of avoiding multi-forum litigation. This court is the exclusive forum for claims seeking recovery from the bankruptcy estate.[36]

77.     The individuals alleged to be class members are easily identified and located. *See In re First Magnus Fin. Corp.,* 403 B.R. 659, 663–64 (D. Ariz. 2009) (affirming dismissal of 5,000 member putative WARN Act class action adversary proceeding because it duplicated the ordinary bankruptcy claims process easily capable of handling any claims).

78.     Claim 214-2 alleges only that about 400 former players comprise the alleged class and equates the number with impracticability. *See* Exhibit A to at p. 5. There is no suggestion that it would be impracticable to determine their claims through the ordinary bankruptcy process, which is particularly suited for efficient claims handling. *See e.g., In re TWL Corp.,* 712 F.3d 886, 894 (5th Cir. 2013); *In re Woodmoor Corp.*, 4 B.R. 186, 189 (Bankr. D. Colo. 1980) (adjudication of 900 claims through normal bankruptcy process was not impracticable).

79.     The Fifth Circuit recognized in *In re TWL Corp.* that the bankruptcy court can

---

[36] *Compare In re FirstPlus Financial, Inc.*, 248 B.R. at 71, 74. (holding that a "class" of approximately 2000 consumers who filed proofs of claim did not make joinder impracticable) *with Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (recognizing that number of members is not dispositive of impracticability of joinder and upholding a Jones Act class of approximately 150 members with admiralty claims arising out of respiratory distress arising from HVAC issues on floating casino).

permissibly consider the nature of the action as well as the number of persons encompassed in the alleged class in determining whether numerosity is satisfied. 712 F.3d at 894-95.[37] The plaintiffs have not even alleged facts from which numerosity could be inferred and certainly haven't described any facts that even if proved would establish that joinder of claims impracticable.

### (iii)  Commonality is not satisfied.

80.     FRCP 23(a)'s threshold commonality requirement serves to ensure that all putative class members have "suffered the same injury" and their claims depend on a common issue of law or fact whose resolution will resolve an issue that is central to the validity of each one of the class members' claims in one stroke. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011);[38] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 839 (5th Cir. 2012).

81.     *Wal-mart* focuses the commonality requirement on the cohesiveness of the class and requires the court to examine whether there are dissimilarities within the proposed class that may impede the generation of a common answer for the class as a whole. In other words, *Wal-mart* demands that a class proponent show more than a question that when **asked** for one is **asked** for all. What is required is a centrally important question that when **asked** for one is **answered** for all. *See In re Deep Water Horizon*, 739 F.3d 790, 811 (5th Cir. 2014).

---

[37] These same factors also bear on superiority and manageability. *In re TWL Corp.*, 712 F.3d at 894, n. 8.

[38] Historically, the commonality threshold in the Fifth Circuit was considered satisfied if at least one issue whose resolution would affect all or a significant number of the putative class members was present. *James v. City of Dallas, Tex.*, 243 F.3d 551, 570 (5th Cir. 2001); *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993). Many authorities recited this proposition in declaring that identifying a question that applied to each putative class member's claim meets this not particularly demanding requirement. *E.g. Id.* *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), clarified that the requirement is not a mere pleading standard but serves an important function in assuring that a class is sufficiently cohesive to permit class wide resolution of an issue central to the claims of all class members. *Id.* at 349-350. Cases analyzing commonality predating *Wal-Mart*, although many, may not be good law. *See M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 839 (5th Cir. 2012).

82.     Claim 214-2 does not meet this bar.  The Claim on its face does not identify any actually common questions.  The questions it purports as "common" mostly take the form the Supreme Court denounced in *Wal-Mart v. Dukes*.[39]  *See* Exhibit A to Claim 214-2 at p. 6.  The sort of question-begging formulations such "whether defendants committed fraud," "whether defendants are liable for false promise," "whether defendants violated [a statute]," or even "whether defendants breached their contracts with the respective class members" are facially inadequate.  Without any reference to what must be proved at trial under the essential elements of the particular causes of action these sorts of "do plaintiffs win" recitals fall far short of the mark *Wal-mart* sets requiring a class proponent to particularize a contention central to the every putative class member's claim that if resolved for the class representative will be answered in one stroke for every class member.

83.     The Claim's proffered "whether the defendants committed fraud" illustrates this shortcoming.  Each person seeking to establish fraud must prove, among other things, that a false representation was made to **him** that was intended to and did actually induce **his** justifiable reliance and that **he** suffered damages.  Reliance is "actual" only where the alleged representation actually played a substantial part in influencing a person's decision.  *E.g.*, *P.M.I. Services N. Am., Inc. v. Enduro Pipeline Services, Inc.*, EP-16-CV-442-PRM, 2018 WL 8131232, at *8 (W.D. Tex. May 18, 2018).

---

[39] About the common misunderstanding of "common questions," Justice Scalia observed:

> "[t]hat language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–132 (2009). For example: Do all of us plaintiffs indeed work for Wal–Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification.

> *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011).

84.     Where a person substantially relies upon his own investigation and knowledge, courts should not find actual reliance. *Id.*  And whether claimed reliance is justifiable turns on an examination of each putative plaintiff's "individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud." *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 360 (5th Cir. 1996).

85.     It is an axiom of Texas federal procedural law that where individual reliance is an issue, a fraud case cannot be certified.  *E.g., Castano v. Amer. Tobacco Co.*, 84 F.3d 734 at 745; *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (holding that, even in putative securities fraud case, where market efficiency not be established to justify a presumption of reliance, proof of individualized reliance by each investor is required).

86.     In Claim 214-2, even the alleged misrepresentations based on media excerpts are not common questions.  The question "did Ebersol make a statement to a media source on February 19, 2019?" has no importance in the commonality inquiry.  For purposes of a fraud cause of action, the important question is "Did Ebersol make that statement to Colton Schmidt?"  Commonality on the question does not exist unless answering the question for Schmidt answers it for everyone.  Moreover, the gravamen of the Claim is that Ebersol's and Dundon's projections facilitated the inference of everlasting viability that Schmidt and Northrup they made.  None of the pre-contract press clippings actually say that.  Thus, in the context of a fraud claim, who received the press clippings (if anyone), which ones, when, and how the individuals reacted are all necessary and pertinent questions.  They are all individualized questions.  The current factual state of the pleadings, which amounts to reciting after the league folded some months old statements from press sources, will not make out a fraud case even for Schmidt and Northrup.

87.     Although most frequently discussed in relation to the predominance inquiry,

variations in applicable laws can also preclude a commonality under *Wal-mart*'s standard. For example, Claimants posit "whether defendants violated California Business and Professions Code § 17200" as a common question. That cannot be. The California Supreme Court has held that §17200 cannot be applied extraterritorially to work performed outside California for a California employer by persons not California residents. *Sullivan v. Oracle Corp*, 254 P.3d 237, 248-49 (Cal.2011). The Claimants do not allege that every AAF player was a resident of or worked in California. It hardly needs to be said that "Defendants cannot have violated § 17200 in situations where the statute does not apply. But in any case, that must be determined player by player by player.

### (iv)  Typicality is not satisfied.

88.    The typicality requirement also aims to ensure cohesiveness of the class and claims by requiring that the representative plaintiff be a member of the class with the same interests and who has suffered the same injury as all of the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 349, n. 5. The commonality and typicality requirements tend to merge together to guide determining "whether under the particular circumstances. . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Id.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158, 102 S. Ct. 2364, 2371, 72 L. Ed. 2d 740 (1982). Although it does not require complete identity among contentions, typicality does require that a class proponent demonstrate that they will establish the bulk of the elements of each class member's claims when they prove their own. *Id.*; *Brooks v. Southern Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 58 (S.D. Fla. 1990) (holding that variances in facts, availability of unique defenses,, and variations in state laws applicable to class claims are relevant to and destroy typicality).

89.     Claim 214-2 sets out nothing to suggest how the typicality requirement could be fulfilled. It merely recites that plaintiffs and class members sustained injuries caused by an alleged common course of wrongful conduct.  Exhibit A to Claim 214-2 at 6.   These mere recitals do not tend to show that each putative class members' claims are so interrelated that trying Schmidt's or Northrup's individual claim will substantially resolve most of the important elements of the class member's claims.

90.     Moreover, the incorporated complaint makes clear that claims underlying the Claim are more dissimilar than similar.  The putative class members worked and lived in many different states; it is certain that the laws of multiple states will apply to the various recovery theories and causes of action underlying the Claim.  See *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (holding that variances between states laws concerning implied covenants in form oil and gas leases precluded a finding of typicality); *In re FirstPlus Financial, Inc.*, 248 B.R. 60, 75 (Bankr. N.D. Tex. 2000) (holding that variances in proof of reliance destroyed typicality of fraud claims based on alleged common course of conduct).

**(v)     Predominance is not satisfied.**

91.     FRCP 23(b) (3)'s requirement that common issue of law and fact predominate over individual questions resembles but is far more demanding than the commonality and typicality requirement.  *E.g.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997).

92.     In *Cruson v. Jackson Nat'l Life Ins. Co.*, the Fifth Circuit described the test as follows:

> At bottom, the [predominance] inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial." Crutchfield, 829 F.3d at 376; *see also, e.g., Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)

(court considers "how a trial on the merits would be conducted if a class were certified"). The court must "go beyond the pleadings" to "understand the claims, defenses, relevant facts, and applicable substantive law." *Madison*, 637 F.3d at 555 (*quoting Unger*, 401 F.3d at 321). "This, in turn, 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, ***and then determining whether the issues are common to the class,' a process that ultimately 'prevents the class from degenerating into a series of individual trials.'*** *Id.* (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).

*Cruson v. Jackson Nat'l Life Ins. Co.*, 18-40605, 2020 WL 1443531, at *8 (5th Cir. Mar. 25, 2020) [emphasis added].

93. Analyzing predominance begins with the essential elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011). Here, the Claimants have asserted 8 different causes of action against four Debtors and two individuals.[40] The putative class they allege comprises individuals who reside and worked in many states. The causes of action asserted sound in contract, fraud and misrepresentation, common law and California statutory torts and promissory estoppel. They seek damages in contract and in tort, including personal injury damages, and more than $600 million in alleged punitive damages.

> a) **Individual fact questions would dominate and overwhelm any arguably common questions concerning the fraud, false promise and promissory estoppel claims.[41]**

94. The individual complexity of the component claims identified above is obvious. As discussed above, (*See* para. 83-87, *supra*), claims based in misrepresentation (*e.g.,* fraud, false promise, promissory estoppel) each require individualized proof on all or most elements.

---

[40] Individual defendant Charles Ebersol is a former director and officer of ESMG and manager of other Debtors. Thomas Dundon was the controlling director of ESMG at the time the Debtors sought bankruptcy relief. Ebersol is a party to an indemnity agreement with ESMG, the effect and scope of which has not been determined.

[41] Claimants allege these claims against all of the Debtor defendants and defendants Ebersol and Dundon.

95. On these matters, the Claim alleges that in March 2018 public media sources quoted Charles Ebersol as saying in substance that AAF's current investors understood the need for patience and wisdom and that AAF "wanted to find" more investors with a long term outlook. They say that in July, Ebersol announced a multi-year arrangement with Starter to supply apparel to AAF teams. They say that in a February 19, 2019 media interview, Dundon misrepresented the nature of his mid-season investment in the AAF that Ebersol said publicly on the same day that AAF had not been in serious financial trouble. *See* Exhibit A to Claim 214-2 at para. 17, 18, 19, 21, 30, 33, 34, and 35.

96. Schmidt and Northrup evidently contend that they and each of more than 400 alleged putative class members understood those statements as a "promise" of long-term viability that the AAF never intended to perform, and that but for relying on these "promises" they would not have foregone "other financial opportunities" and signed AAF player contracts. Claim 214 -2 at para. 92.

97. These contentions are curious on every level. For starters, Northrup and Schmidt signed their player agreements 5 and 1 months, respectively before the February 2019 media interviews. It surpasses difficult to imagine these statements, even if made and recounted in true context, as an inducement to sign contracts each had already signed. And Schmidt was a punter on the NFL's Buffalo Bills until released in November 2018, months after Ebersols' March and July media statements.

98. It seems incredible that Schmidt was aware of and relied on specific months' prior press clippings in executing a contract a month or so after being released from the NFL. Moreover, none of the March statements attributed to Ebersol actually contain the "promise" Claimants allege

to have distilled from them.[42]

99.     Perhaps Northrup and Schmidt at trial can shed light on how each came to know and interpret the press clippings as "promises," how they justifiably relied on them, what role their respective sports agents played in the contract process, what financial opportunities they passed by, and their damages.  But the point for predominance analysis purposes is that nothing either says about his personal circumstances, knowledge or motivations will prove that any other person received, understood or relied in the same way. That will require individualized proof, if not individual involvement from each putative class member.

100.    Where individual reliance will be an issue a class action cannot be certified.  *See, e.g., Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.,* 319 F.3d 205, 211 (5th Cir. 2003) *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880 (5th Cir.1973) (holding that any variations in the representations made or degree of reliance thereon renders a case unsuited for class treatment and that claims based on oral representations cannot be maintained as a class action).[43]

---

[42] A serious question exists whether the statements in the claim attributed to Ebersol are even actionable statements of material fact that would support a fraud action.  To be an actionable statement of fact, the statement must be one that admits of being adjudged true or false in a way that admits of empirical verification. *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986).  Estimates and opinions are not actionable in fraud. *Id.* (holding this proposition a wise and sound principle deeply embedded in the common law); *see, e.g., Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1052 (5th Cir. 1992) Much like the statements at issue in *Presidio*, the alleged March 2018 statements attributed to Ebersol are merely statements about the future or Ebersol's opinion of what should be important to other investors.  In contrast, Dundon's alleged statements in February 2019 that he had made a commitment to invest $250 Million may be both factual and empirically verifiable as true or false.  But those statements could not form the basis of an inducement to either Schmidt or Northrup to enter contracts they had already signed.  In any case, the statements could only be said to perpetrate a fraud on the Debtors who relied on them to put Dundon in complete charge of the AAF.

[43] Courts have also been suspicious of accepting suggested class-wide misrepresentations built from excerpted attributions in media sources. *See Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178-79 (5th Cir. 1997) (holding that newspaper articles plaintiffs composited to accuse waste disposal company of perpetrating false information in the public media were not specific and open to interpretation and did not form a basis for fraud claim in securities case); *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1252  (S.D.N.Y. 1991) Criticizing the practice as "fraud by hindsight" the district court maligned "plaintiffs have stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud. But by even the modest standards of Rules 9(b) and 12(b) (6), it isn't.

101.     The misrepresentation-based claims also raise a multitude of individual choice-of-law questions that make class certification impossible.  *E.g.*, *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) (directing that a court's rigorous analysis must address variations in applicable state law and whether they can be dealt with fairly and economically through the class action device).

102.     Regarding claims based in fraud and misrepresentation, the Restatement (Second) Conflicts of Law § 148 provides the analytical guideposts. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 728 (5th Cir. 2003).  In general, that section provides that where the alleged fraudulent statements were made, received and relied on in single state, that state's law will control. Where that is not the case, the predominant situation concerning the Claim, § 148 requires a multi-factor analysis considering:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (1971)

In cases where the plaintiff is an individual, the place where the plaintiff acted in reliance, the place where the plaintiff received the representations, the place where the representations were made and the plaintiff's residence are generally the most important determinants.   Comments on

---

Read as a whole, the complaint creates the strong impression that when Citicorp announced a cut in dividends, plaintiff's counsel simply stepped to the nearest computer console, conducted a global Nexis search, pressed the "Print" button, and filed the product as their complaint.

Subsection 2, Restatement (Second) of Conflict of Laws § 148 (1971).

103.     The Claim concedes, and it is true, that the putative class members are citizens or residents of many different states. *See* Claim 214-2 at p. 5-6 (identifying at least 8 states in which AAF teams were located).  It is certain that putative class members resided and were domiciled in many more states than just those 8.  Indeed, Schmidt played on AAF's Birmingham squad but claims to reside in California and was playing football in Buffalo, New York in 2018.  Because the alleged misrepresentations are alleged to have been made through media interviews, it is beyond unlikely that for all putative class members they were received in only one state, if they can be shown to have been received at all.

104.     The Claimants suggest no unifying principle under which only one state's law would apply to their misrepresentation based tort claims.  There is none.  The Fifth Circuit has rejected the notion that a narrow choice of law clause like the one in the Player Contract attached to Claim 214-2 can be applied to anything other than the contract itself.  *Benchmark Elec's, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 728 (5th Cir. 2003).  The Fifth Circuit has also made explicit that a trial court has a duty to identify the substantive law issues that will control the outcome of the litigation in order to make the findings required for predominance and superiority determinations. *Castano v. American Tobacco Co.,* 84 F.3d 734 at 742.  In that determination, a court cannot rely on assumptions or assurances of counsel that any problems with predominance or superiority can be overcome. That too is a matter of strict proof. *Id.*

105.     Without doubt, variations in state law just with respect to these claims are certain to overwhelm the court and the issues, depleting the estate and taxing the court for no useful

purpose.[44]

**b) The claim for breach of implied duty of good faith and fair dealing will be dominated and overwhelmed by the need for individualized proof.[45]**

106.     The Claimants' alleged "implied covenant of good faith and fair dealing" cause of action fairs no better under predominance analysis.  Adopting *arguendo* plaintiffs' assumption that no variation in the form of player agreement exists, that cause of action is governed by Delaware law.[46]  Under Delaware law, the implied covenant of good faith and fair dealing operates as a true implied covenant.  That is, it operates to enforce the parties' contractual bargain by implying only those prohibitions that the parties would have agreed to in their original negotiations if they had thought to address them.  *Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400, 418-19 (Del. 2013).  It is an "extraordinary legal remedy" never to be applied to when a contract addresses a subject and even where the contract is truly silent, not to be applied when the contract could easily have been drafted to expressly provide what is allegedly missing.  *Oxbow Carbon &*

---

[44] The same tangle of choice of law problems that destroy predominance in the fraud context plague the promissory estoppel claim and for the same reasons.  As an equitable remedy, promissory estoppel is not encompassed by a narrow choice of law clause like the one in the agreement attached to Claim 214-2.  *E.g.*, *Nat. Polymer Int'l Corp. v. Hartz Mountain Corp.*, 4:18-CV-00667, 2019 WL 6117352, at *7 (E.D. Tex. Nov. 18, 2019).

[45] Claimants assert this claim against AAF Players, LLC.

[46] The Standard Player Agreement attached to the Claim is "made under and shall be governed by the laws of the State of Delaware." Claim No. 214-2 at p. 50 of 61.  Whether the forum state or federal common law choice of law rules apply to resolve state law questions arising in bankruptcy proceedings can raises complex questions.  *See generally*, *Woods-Tucker Leasing Corp. of Georgia v. Hutcheson-Ingram Development Co.*, 642 F.2d 744, 748-49 (5th Cir. 1981).  Both Texas and federal choice of law rules give effect to contractual choice of law clauses. *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 307 (5th Cir. 2016) (holding that absent establishing that some fundamental of state law would be contravened by enforcing a choice of law clause, such provisions are given effect under federal common law); *Jimenez v. Sun Life Assur. Co. of Canada*, 486 Fed. Appx. 398, 407-08 (5th Cir. 2012) (noting that the Fifth Circuit in applying federal common law choice of law rules has generally adopt Restatement (Second) of Conflict of Laws § 187 providing that forum selection clauses should be given effect); *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003), opinion modified on denial of reh'g, 355 F.3d 356 (5th Cir. 2003); *accord Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1151 (Cal. 1992) (also holding that California's choice of law rules give effect to contractual choice of law clauses).  Thus, Delaware law governs the construction of the contract. Whether under this particular choice of law clause governs the entire relationship of the parties is another question. *See id.*

*Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.2d 482, 506 (Del. 2019).

107.   To determine whether such a covenant should be implied in a particular case, courts must ask whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. *Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400, at 418. "Good faith" in this context, means only faithfulness to the scope, purpose and terms of the parties' contract. *Id.* at 419. It is not a free-floating duty of loyalty and certainly does not encompass the mere failure to perform an express covenant.

108.   Based on the Claim, it is difficult to determine what non-express contractual term should be implied or even what act constituted the breach. The Claim pleads only that AAF Players interfered with the [Claimants'] rights to receive the benefits of the contract owed to them by AAF Players. Exhibit A to Claim 214-2 at para. 60. That allegation strains comprehension.[47] But whether the sparse and circular complaint intends to hang a contract remedy on weak misrepresentation allegations or something else, the question cannot be resolved under the controlling legal standard without individualized investigation, inquiry and adjudications that will dominate over any supposedly common questions.

       **c)   Individual questions predominate concerning the alleged claims under California Labor Code § 201[48] and California Business & Professions Code § 17200.[49]**

109.   Claimants suggest that all and each of the hundreds of former AAF Players who

---

[47] The ordinary rule is that a party cannot interfere with its own contract. *E.g.*, *Souter v. Scott & White Mem'l Hosp.*, 105 F.3d 656 (5th Cir. 1996); *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759 (Tex. 2006) (holding that a party must be a stranger to a contract to interfere with it).
[48] Claimants assert this claim against AAF Players, LLC and defendants Ebersol and Dundon.
[49] Claimants assert this claim against AAF Players, LLC.

resided and worked outside of California are entitled to recover under California Labor Code § 201 (addressing prompt payment of earned and unpaid wages upon discharge) and Business & Professions Code § 17200 (prohibiting certain deemed unfair competition).

110.    These claims cannot be certified for class treatment because they do not apply to a substantial portion of the alleged class.  The California Supreme Court has specifically held that § 17200 does not provide a remedy for out-of-state employees who work outside California even though for an employer based in California.  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209, 254 P.3d 237, 249 (2011).  The Court based its decision on the longstanding rule that statutes are presumed not to operate extraterritorially absent a clear indication in the statute's language that the legislature intended the statute to apply to activities outside of California.  *Id*.  This presumption applies to bar application of California labor laws to work occurring outside California even if the employer is California-based.  *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1062 (N.D. Cal. 2014); *N. Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4, 162 P. 93, 94 (1916); *Wood v. iGATE Techs., Inc.*, C 15-00799 JSW, 2016 WL 3548410, at *5 (N.D. Cal. June 30, 2016); *Poehls v. ENSR Consulting & Eng'g*, CV 04-8885 MMM (SHX), 2006 WL 8431770, at *22 (C.D. Cal. Aug. 31, 2006) (recognizing that there is nothing there is nothing in Labor Code §§ 201 and 203 from which the legislature's intent to give extraterritorial effect to those statutes can be discerned).

111.    The point for predominance purposes is that, while Claimants might allege violations of prompt payment and unfair practices laws of some forum or forums, for most putative class members they will not arise under California law.  Instead, they might be asserted, if at all, under myriad state's laws.  Said another way, each putative class member's individual situation would have to be analyzed to determine if § 201 California labor and unfair competition statutes might apply, and if not, whether there is some prompt payment law from some other forum that

does. Such individual choice of law questions can only be resolved through individualized proof and would swamp any effort to drive efficient resolution on a class-wide basis.

> ### d)  Resolution of Claimants' breach of contract claims involves individual questions and proof and is not susceptible to class-wide resolution.

112.    The Claim suggests that each former player became entitled to the full amount of annual base compensation for the 2020 and 2021 seasons at the moment the AAF suspended league operations, despite having been paid all based compensation due for the 2019 season.

113.    Although the AAF did not then owe Schmidt and Northrup unpaid wages under the player agreements' explicit terms,[50] and the AAF was not then in breach to them, they elected to treat the suspension of league operations as an effective repudiation and filed the suit attached to Claim 214-2 one week after AAF announced that players were free to exercise their NFL-Out contract clauses.  Some players did.  No players other than Schmidt and Northrup engaged any such overt acts indicating an election to treat the entire contract as repudiated.  Both Schmidt and Northrup sought and obtained employment with XFL teams.

114.    On these facts, a significant focus of litigation concerning the alleged breach of contract will be on:

> a.  Whether the contract, which provided for separate compensation in three separate seasons was severable, a question requiring individualized inquiries under controlling Delaware law;
>
> b.  Whether any player, including Schmidt and Northrup elected to terminate the agreement when they sought and obtained employment on NFL or XFL rosters under the rule that a party cannot at once demand performance of a contract and refuse to abide its terms.
>
> c.  Whether any player, including Schmidt and Northrup, mitigated or failed to mitigate damages.

---

[50] The single player agreement attached to Claim 214-2 states that the player will be paid a specified "annual base compensation" in each of three seasons payable in ten "equal payments during the applicable regular season."  Schmidt and Northrup do not dispute that each actually received those ten payments due for the 2019 season.

115.     All of these inquiries necessarily involve individual questions and proof.

116.     Generally, a divisible contract exists where the performance is divided into segments, with each performance to receive an agreed compensation.  *Alabama Football, Inc. v. Wrigh*t, 452 F.Supp. 182, 1844-85 (N.D. Tex. 1977).  The question depends on the intention of the parties to each contract, to be determined from their acts, under all the facts and circumstances of the particular transaction.  *Orenstein v. Kahn*, 13 Del. Ch. 376, 119 A. 444, 445 (1922).  As in other questions of interpretation, the contract language is important.  The Delaware Supreme Court has observed that a contract which divides the performance into segments and apportions payment on its face may be conclusive.  *Id*. at 446.  But it is determinative only where proof of contrary intention is absent. *Id*.  Where the circumstances provide evidence of a contrary intent, intention becomes a question of preponderance. This formulation of the test for divisibility is widely followed.  *E.g.*, *In re Ferguson,* 183 B.R. 122, 124 (Bankr.N.D.Tex.1995); 15 Williston on Contracts § 45:7 (4th ed.) (collecting cases).

117.     Courts have occasionally confronted this exact question in the exact context of this case.  For example, *Alabama Football, Inc. v. Wright*, grew out of the World Football League's failure after one season.  452 F.Supp. 182, 183 (N.D. Tex. 1977).  There, Rayfield Wright, a former Dallas Cowboy, signed a futures contract to play with the WFL's Birmingham team under which he would receive a signing bonus, a reporting bonus and annual salary in a specified amount during each year of the 3-year contract.  When Alabama Football, Inc. folded and filed bankruptcy, litigation ensued in which the debtor sought to recover the signing bonus, and Wright sought to recover the promised reporting bonus and the unpaid salary for under the player contract.

118.     Although the contract on its face apportioned the salary to be paid for each season, Wright contended that the contract should be treated as a lump sum, exactly as Schmidt and

Northrup in this case. The trial court disagreed, holding that the contract, although set out in a single instrument, intended five severable components. *Id*. at 184. As to the four that had not been concluded, the Court found that the team's financial failure and disbanding was not a risk allocated in the contract and rendered further performance impossible, both parties were discharged. *Id*. at 185; *see Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160, 164-65 (S.D.N.Y.1973) (holding that a series of simultaneously executed Standard Player Contracts should be viewed as severable and not as a multi-year guarantee, applying familiar test for determining divisibility). The Fifth Circuit affirmed in a table decision. *Alabama Football, Inc. v. Wright*, 607 F.2d 1004 (5th Cir. 1979)

119. To overcome the presumption of severability, Schmidt and Northrup must present evidence that their unique circumstances at the time of contracting establish a different intent. Other putative class members, who contracted under their own unique circumstances would face a similar burden. As with other matters, whatever the unique circumstances of individual putative class members might be, they cannot be necessarily determined by proof of Schmidt's and Northrup's circumstances.

120. Defenses and damages calculations may also raise unique question that defeat predominance.[51] For example, the Trustee is entitled to assert, as in *Wright*, frustration or impossibility of performance as defenses and alternatively to assert waiver. These defense depend on facts and circumstances at issue; waiver focuses on the conduct of Schmidt, Northrup and the other putative class members.

---

[51] The Fifth Circuit has recognized that the predominance of individual questions necessary to decide defenses may preclude class certification. *Cruson v. Jackson Nat'l Life Ins. Co.*, 18-40605, 2020 WL 1443531, at *11 (5th Cir. Mar. 25, 2020); Decided less than three weeks ago in a case involving alleged standard form contracts, *Cruson* observed that "[e]ven in form contract cases, the risk of voluminous and individualized extrinsic proof defeating predominance runs particularly high where a defendant raises substantial affirmative defenses to breach; *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004).

121.     Here, the facts so far raise a legitimate question of waiver.  Although Schmidt and Northrup agreed that their player contracts were assignable and agreed not to play football for any other professional football enterprise except the NFL under the Alternative League Release, each sought and obtained employment as professional football players with XFL teams before the 2020 season, something prohibited under the AAF contract attached to Claim 214-2.[52]

122.     Different from Schmidt and Northrup, at least 17 individuals who Claimants identify as putative class members are reported to have found their way to NFL rosters by September 4, 2019.[53]  If true, these putative class members stand in a fundamentally different position than Schmidt and Northrup.  Other players may be situated differently from all either Claimants or players moving to the NFL.  What is known is that Schmidt and Northrup gave notice by filing suit they intended to treat the notice of suspension as a repudiation. Other players did not.

123.     Anticipatory repudiation, even if it could be shown from the Debtors' conduct, does no more than afford individual contracting parties an election to treat the contract as no longer in force and seek their remedy or to wait for the performance when it is due.  It should be obvious that Schmidt and Northrup, not being the agent of any putative class member, had no authority to make that election for any other person.  Resolving that question will require individual inquiries, and may raise unique defenses.

124.     All of these matters are relevant to determining waiver regardless whether a standard form of contract is involved.  *Cruson v. Jackson Nat'l Life Ins. Co.*, 18-40605, 2020 WL 1443531, at *11 (5th Cir. Mar. 25, 2020) (holding that individual questions regarding defenses

---

[52] Waiver involves a voluntary relinquishment of a known right or conduct inconsistent with that right.  *E.g.*, *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005).

[53] These players include Garrett Gilbert, D'Ernest Johnson, Mike Purcell, Cole Mazza, Daniel Brunskill, Brandon Green, Kameron Kelley, Bijhon Jackson, John Wolford, Jeremiah Kolene, Logan Woodside, Greg Ward, Aaron Adeoye and Chris Odom.  *See* https://profootballtalk.nbcsports.com/2019/09/04/there-are-17-aaf-products-still-working-in-the-nfl/

must be considered in the court's rigorous analysis). A question of waiver exists that is colorable and which has as many answers as there are putative class members.

125.    Variations in potential damages also defeat predominance in this case, despite the assumed uniformity in contracts.  In *Cruson*, the Fifth Circuit reiterated that even where a class proponent can show that common issues predominate, which Claimants here cannot do, plaintiffs must also present a damages model capable of measurement on a class-wide basis.  *Cruson v. Jackson Nat'l Life Ins. Co.*, 18-40605, 2020 WL 1443531, at *12 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013)). Damages issues alone may defeat predominance where the where the calculation of damages is not susceptible to a mathematical or formulaic calculation." *Bell Atl.*, 339 F.3d at 307.

126.    It is somewhat difficult to discern the amount and makeup of the Claim on its face. Form 410 treats the claim as liquidated in the amount of $673,920,000.  The addendum suggests that the Claim amount comprises alleged contract damages[54] x 416 players x 9, or $673,920,000. The complaint incorporated into the claim 214-2 seeks a variety personal injury damages including past, present and future mental and physical anguish, medical bills, loss of earning capacity and "compensatory damages according to proof.  Exhibit A to Claim 214 Addendum at p. 20].  The Claimants are simultaneously seeking to litigate an adversary proceeding against the Debtors based on this complaint, as they have amended it from time to time.  It is not completely clear whether the 9x multiplier is intended to serve as a proxy for the personal injury damages or as a punitive damages multiplier, or both.

127.    What is clear from the Claim's face that the Claimants have proposed no damages

---

[54] This contention is inconsistent with Bankruptcy Code §502(b)(7) which limits future damages from the termination of an employment contract to the compensation provided by the contract, without acceleration, for one year following the termination date or the petition date, whichever first occurs.

model at all.  They merely assert an aggregate number that appears disconnected from the damages they allege or the legal standards that apply to determining those damages, if any.  As a matter of law, this cannot satisfy the predominance.

128.    It is mundanely apparent that matters such as the alleged personal injury damages are uniquely individual.  It is almost certain that the Claimants don't possess any evidence or likely even have any awareness of the personal injuries that they alleged 416 individual putative class members suffered. *See, e.g.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997)

129.    Individual questions concerning mitigation also destroy predominance.  Generally, an employee's damages will be mitigated by what he earned or could have earned in similar employment after a termination. Employees must use reasonable diligence to obtain similar employment. *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 309 (5th Cir. 2020); *see Hansard v. Pepsi-Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1468 (5th Cir. 1989) (holding that a plaintiff failed to mitigate when he stopped looking for work). Employers bear the initial burden to show that a similar employment opportunity existed for the each player. *Measday v. Kwik-Kopy Corp.*, 713 F.2d 118, 127 (5th Cir. 1983).

130.    Individual variation in players' circumstances dominate the mitigation questions. For example, both Schmidt and Northrup sought and found equivalent employment in professional football in the XFL and presumably were compensated.  Other AAF players exercised their NFL-Out clauses and signed with NFL teams. Considering that NFL league minimum salaries and revenue sharing under the NFL/NFLPA collective bargaining agreement are higher and reflect a better compensation package than their AAF contracts, it is likely that these players were placed in a better financial position by any breach by AAF Players.  Other former players doubtless have

different circumstances, all of which bear individually on their individual claims. These are, of course, individual and not common questions. Their adjudication depends on individual proof and therefore cannot establish predominance.

131.    Class actions are uniquely unsuited for punitive damages such as those alleged in this case. Punitive damages claims raise any number of intractable choice of law issues. State substantive law governs the substance of claims in bankruptcy. *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 19, 120 S.Ct. 1951, 1954, 147 L.Ed.2d 13 (2000); *Firefighters' Ret. Sys. v. EisnerAmper, L.L.P.*, 898 F.3d 553, 557 (5th Cir. 2018).

132.    Generally, states have no legitimate interest in and cannot punish conduct that occurs outside the state's borders. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421, 123 S. Ct. 1513, 1522, 155 L. Ed. 2d 585 (2003). This principle arises from the constitutional fundament that one state cannot exercise power or supervision over the internal affairs of another state. *Id.* at 422 (relying on *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821–822, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

133.    The putative class members in this case resided in many various states when the alleged wrongs occurred. And these various states laws and policies vary. For example, punitive damages are generally capped at greater of $200,000.00 or two times the proved economic damages plus an amount equal to the lesser the amount of noneconomic damages awarded not more than $750,000.00. Tex. Civ. Prac. & Rem. Code § 41.008. Indiana caps punitive damages at the greater of $50,000 or three times the compensatory damage award. *Ind. Code Ann.* § 34-51-3-4 (West). *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 515, 128 S. Ct. 2605, 2634, 171 L. Ed. 2d 570 (2008) (discussing varying state and federal efforts to make punitive damage awards predictable and within the bounds of due process and imposing a federal common law upper limit

ratio of 1:1 for punitive damage award).

134.    In addition, while punitive damages focus on a defendant's conduct, the situation and sensibilities of an individual plaintiff also matters in determining whether an award is warranted and reasonably proportional to the harm to that individual.  The debtors are entitled to contest and the court would be bound to consider evidence from Claimant's and the debtors as to each individual putative class member and to develop that evidence. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 407 (5th Cir. 1998) (holding that punitive damages can only be determined based on liability to *individual* plaintiffs).

135.    There is simply no doubt that if the Rule 7023 were invoked, individual factual and legal questions would dominate and overwhelm this litigation, precluding any possibility of a certifiable class action.

> **(vi)  A class action is not superior to other available methods for fairly and efficiently adjudicating the controversy.**

136.    A class action is not superior in this contested case for all of the same reasons that predominance fails.   By demanding that the court consider the bankruptcy claims of persons who had notice but did not file one, the Claimants propose to expose the limited resources of the bankruptcy court and the estate to a bramble of unmanageable and otherwise avoidable questions.

137.    In determining whether superiority requirement is met, courts are to consider:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and]

(D) the difficulties likely to be encountered in the management of the **class action**.

Fed. R. C. P. 23(b) (3).

138.     All of these factors weigh against finding superiority.  First, this is not a negative-value suit, involving claims with individual stakes so small that separate suits would be impractical and the courthouse doors effectively closed to small claim plaintiffs.  *Norwood v. Raytheon Co.*, 237 F.R.D. 581, 604 (W.D. Tex. 2006).  According to the Claimants, the individual claims are very-very- large.

139.     The second and third factors do not bear much on this contested case.  The very nature of bankruptcy concentrates claims against the estate in a single forum; claims are filed here or nowhere.

140.     The fourth factor, commonly referred to as "manageability" is key here and militates overwhelmingly against superiority.  Manageability encompasses the whole range of practical considerations that may render the class action format inappropriate in a particular case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).  Aside from the spaghetti bowl of individual legal and factual questions and the difficulties in obtaining jurisdiction over or proof from putative class members if a class were certified, many bankruptcy factors also weigh against class certification in any context and especially in a bankruptcy claim proceeding.  *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013) (holding that superiority involves a fact intensive inquiry in which the bankruptcy court should consider the effect on administration and other bankruptcy factors like the availability of the proof of claim process in determining whether Rule 7023 is met).

141.     The Claimants here, after nearly a year, have not so much as suggested a trial plan that would establish how this claim could be fairly and efficiently tried as a class action.[55]  And even if the Court could somehow manage and resolve the myriad essential evidentiary and legal

---

[55] Class representatives cannot conjure superiority by speculation.  And courts cannot allow it.  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).

questions, all that is on the other side is a reprise of a proof of claim process past. But this time, everyone who received notice and elected not to file a proof of claim, will be regarded as having filed one unless they notify the court that they won't.

142. There will also be no efficient presumptions of allowance and no input from the individuals most knowledgeable about their personal circumstances informing their personal claims. It is a reasonable question to ask, to what end? Schmidt and Northrup will not get one dime more than each can prove for their individual claims on their individual circumstances. There is no "class claim" despite the suggestion in Claim 214-2.

143. What Schmidt and Northrup propose is anathema to efficient claims administration. In every sense the class action proposed is a "Frankenstein monster posing as a class action." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, at 169.

## B. As Individual Claimants, The Claim of Each Schmidt And Northrup Should Be Disallowed.

### a. All sums due to Schmidt and Northrup were paid up to the time their individual player agreements terminated and when the debtors sought relief in bankruptcy. The contracts were severable and not for a guaranteed lump sum.

144. Exactly as contemplated under their player agreements, Schmidt and Northrup were paid their annual base compensation for their work during the 2019 season. *See* Exhibit B to Claim 214-2. When the league suspended operations, there was no compensation due to either of them that was then earned but unpaid.

145. After the AAF suspended operations, the league authorized all players, including Schmidt and Northrup, to pursue NFL opportunities under their Authorized Alternative League Releases; however, those releases did not extend by their express terms to other competitive leagues. Exhibit B to Claim 214-2 at p. 57-68 p. 61.

146. Schmidt and Northrup evidently elected to treat the 2019 suspension of operations

as an anticipatory breach terminating the contract and filed a civil action on April 10, 2019. Signing such a contract would be a material breach of the AAF player agreement and their action in doing so would have been completely inconsistent with an election to treat the contract as ongoing. Whether the mere announcement that it was suspending football operations constituted an anticipatory breach is doubtful.[56]

147.    But that usually important question is less significant in this case because Claimants' Player Contracts involved divisible obligations, as in *Alabama Football, Inc. v. Wrigh*t, 452 F.Supp. 182, 1844-85 (N.D. Tex. 1977) (holding that five-year futures contract providing for a signing bonus, a reporting bonus, and three season contract with annual salary was divisible to be regarded as three one year contracts); (*see* fuller discussion in paragraphs 116-120, *supra*).

148.    Their AAF Player Contracts provided for base compensation over three seasons to be paid during the applicable regular season. Under the contracts, the AAF had the sole discretion to terminate based on skill or morality and for any other reason allowed by law. Schmidt and Northrup also had the contract right to terminate for any reason allowed by law. And in either case, their Player Contracts provided that if the contract was terminated for any reason, base compensation would be reduced to reflect only amounts becoming due up to the time of

---

[56] Ordinarily anticipatory breach requires an "absolute refusal to perform." *Roehm v. Horst*, 178 U.S. 1, 8, 20 S. Ct. 780, 783, 44 L. Ed. 953 (1900); *CitiSteel USA, Inc. v. Connell Ltd. Partnership*, 758 A.2d 928, 931 (Del. 2000) (holding that the statement must constitute an "outright refusal to perform" entitling the counterparty to treat the contract as rescinded). The contracts were assignable assets of AAF and the league stated in its announcement that it was committed to working on solutions for all outstanding issues. Filing bankruptcy does not automatically effect a repudiation, even in cases where a contract contains an *ipso facto* clause, which the Claimants' Player Contracts did not. *See Central States, Southeast & Southwest Areas Pension Fund v. Basic American Indus., Inc.*, 252 F.3d 911, 916 (7th Cir.2001); *In re Economy Lodging Sys. Inc.*, 226 B.R. 840, 846 (Bankr. N.D. Ohio 1998). To bolster their contention, the Claimants civil action alleges that on April 2, 2019, "the AAF announced that its players were now free to pursue other playing opportunities, indicating that suspension of operations is permanent." *See* Exhibit A to Claim 214-2, at para. 40. Problematic to this allegation, that is not what AAF's published written announcement said. It thanked players and said that they "may now exercise their NFL-out clauses in our contract." In other words, players could seek NFL opportunities as provided in the NFL-Out, a contract they signed. *See* www.aaf.com. On its Twitter page, the AAF posted "effective immediately, all AAF players are authorized to sign with NFL Clubs."https://twitter.com/TheAAF?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor.

termination.  *See* Exhibit B to Claim 214-2, at p. 39-40 of 61 and Standard Terms and Conditions at para. 1(a).  Apportioned compensation alone is sufficient to give rise to the presumption of divisibility. Here, as in *Wright*, the face of the contract evidences an intention consistent with divisibility, and absent contravening extrinsic evidence, under Delaware law, conclusively so. *See Orenstein v. Kahn*, 13 Del. Ch. 376, 119 A. 444, 445 (1922); see also, *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996) (quoting Black's Law Dictionary to define a severable contract as one that "includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement"); *In re Wolflin Oil, L.L.C.*, 318 B.R. 392, 397 (Bankr. N.D. Tex. 2004) (same as Delaware law, holding that divisibility turns on the intention of the parties considering the subject matter of the agreement and the parties' conduct).

149.     Just as in *Wright*, the AAF's financial failure was not a risk either AAF Players or either Claimant allocated in expressly in the agreement.  And it was not expected, certainly not by AAF Players.  Just as in *Wright*, the league's failure made future performances under the Player Contract impossible.  Although Schmidt and Northrup are entitled to, and received, the agreed compensation for the 2019 season, they are not entitled to be paid for future season in which they provided no services. *See also Smith v. Pro-Football, Inc.*, 528 F.Supp. 1266, 1271-72 (D.D.C. 1981) (holding that a single instrument containing a 3-year contract constituted a divisible one-year obligations and not a guarantee of three year injury protection);

150.     But even if performance was not discharged, the Player Contract ***does*** address what happens if it is terminated for any reason, the necessary result of Schmidt's and Northrup's election

if proper.[57] In that event, "Base Compensation payable to the Player will be reduced proportionately and Player will be paid the portion of his Base Compensation having become due and payable up to the time of the termination."

151.     Because all compensation that had become due and payable to the Schmidt and Northrup up to the time they elected to terminate the contract based on an alleged repudiation on April 10, 2019, neither has a claim for damages for breach under the express terms of the contract. Moreover, any obligations AAF Players, LLC might have incurred for future seasons were discharged when AAF's financial failure rendered future performances impossible.

**b.      Claimants' individual claims are overstated.  Bankruptcy Code § 502(b)(7) limits future damages to one year.**

152.     Claimants contend that AAF Players breached their employment contracts.  The Trustee contends that there was not breach and no amounts are due Schmidt and Northrup, but even if their contract claims are valid in some amount, it is not the amount stated in the Claim. Bankruptcy Code § 502(b)(7) caps damages an employee can claim arising out of an employment agreement to "the compensation provided by such contract, without acceleration, for one year following [the earlier of the termination or the petition date].  11 U.S.C. § 502(b) (7); *see In re Cont'l Airlines Corp.*, 64 B.R. 865, 873 (Bankr. S.D. Tex. 1986).

**c.      Claimants' Claim is not entitled to priority treatment under § 507(a) (4).**

153.     Claimants allege that $5,678,400 of the entire Claim amount is entitled to priority treatment under Bankruptcy Code § 507(a) (4).  That cannot be.  Schmidt and Northrup admit that they are not entitled to any compensation for their services performed pre-petition and say this is true for every putative class member.  *See* Claim 214-2 Addendum at p. 3. Their Claim is purely

---

[57] The AAF player contract provides that "the rights of termination set forth in the SPA. . . will be in addition to any other rights of termination allowed either party by law." Exhibit A to Claim 214-2, Standard Terms and Conditions section 12(b).

forward-looking.  Section 507(a) (4) looks back to give priority status to capped amounts earned as compensation in the 180 days preceding bankruptcy.  *See Matson v. Alarcon*, 651 F.3d 404, 409 (4th Cir. 2011) (discussing what it means to "earn" compensation for purposes of § 507(a) (4) priority treatment).

154.    It is evident that the amount claimed is the product of 416 times the $$13,650 current cap amount stated on the proof of claim form.  This appears to simply misunderstand how the relevant statute operates. But whatever the case, it is still wrong.

**d.      No action lies under California Labor Code §201 *et seq*. because no earned wages were due and unpaid at the time of discharge.**

155.    California Labor Code § 201 requires an employer upon discharge to pay an employee "the wages earned and unpaid at the time of discharge" Schmidt and Northrup alleged that they were discharged when the league suspended operations on April 2, 2019.  It is indisputable, and the claim does not allege otherwise, that upon suspension of league operations, all sums then due under the player contracts had been paid.  *E.g.*, Cal Lab. Code § 201. Accordingly, Schmidt and Northrup have no actionable wage claim under this statute.

156.    Furthermore, it is unlikely that Northrup is covered by the statute at all.  He lived and played football in Florida with the Orlando Apollos.  He reported to the AAF that he lived in Jacksonville when executing his contract.  The same can be said of Schmidt, although he at least grew up in California, played college football there and, despite a four-year residence on the NFL's Buffalo Bills squad and playing with the Birmingham Iron throughout the AAF's 2019 season, reported his parents' California address as his residence on his AAF player agreement.

157.    California labor laws do not generally apply to work performed outside California by persons not California residents.  Doing so would violate longstanding rules against the extraterritorial application of state laws.  *See ENSR Consulting & Eng'g*, CV 04-8885 MMM

(SHX), 2006 WL 8431770, at *22 (C.D. Cal. Aug. 31, 2006) (recognizing that there is nothing in Labor Code §§ 201 and 203 from which the legislature's intent to give extraterritorial effect to those statutes can be discerned); *see also* paragraphs 109-111 *supra.*

**e.  California Bus. & Professions Code § 17200 does not apply to work performed outside California for a California-based employer by out-of-state plaintiffs. Moreover, even where applicable, remedies under the act are limited to injunctions and restitution of money or property lost.**

158.  Schmidt and Northrup alleged that the failure to pay wages in violation of Labor Code § 201 also violates California Business & Professions Code § 17200 entitling them to restitution under section 17203.  This contention fails on its face.  First, because no wages "earned and unpaid" on the date they say they were discharged, there is no violation of Labor Code § 201 and therefore no violation of § 17200 through tying as a matter of law.  Moreover, § 17200, although broad, is not a general breach of contract statute.  Its remedies do not include breach of contract damages.  Rather § 17203 authorizes a court only to award restitutionary remedies.  Cal. Lab. Code § 17203 (providing that a court may issue orders "to restore to any person in interest any money or property. . . which may have been acquired by means of such unfair compensation).  There were no wages in this case that at the time of discharge were earned and unpaid.  The § 17200 claim fails for this reason.

159.  Moreover, the same bar against extraterritorial application that prohibits a Labor Code §201 claim applies to claim under § 17200.  The California Supreme Court has specifically so held.  *Sullivan v. Oracle Corp*, 254 P.3d 237, 248-49 (Cal.2011) (holding that § 17200 does not apply to work performed outside California even for a California based employer).

**f.    The Claimants' fraud and false promise claims are insupportable; the Claim alleges as actual damages only amounts allegedly unpaid under contracts. Although contract and fraudulent inducement claims can coexist, independent tort damages must be established.**

160.    Considering the narrow choice of law clause in the player agreements (*See* p.38 n.46, *supra*), the Court must first determine which law applies.  Based on the Claim's allegations and making few assumptions in applying Restatement (Second) Conflicts of Law § 148, it seems most likely that California law applies to Schmidt's fraud claims and Florida law applies to Northrup's fraud claims. (*See* para. 101-105, *supra),*

161.    Schmidt and Northrup allege in substance that Charles Ebersol on March 20, 2018 made statements giving the impression that the AAF wanted to build something worthwhile over a long term and that it had and wanted more investors who wanted the same thing.  Exhibit A to Claim 214-2 at para. 17-19.[58]  Neither Claimant alleges that Ebersol or Dundon made these statements to him directly.

162.    Characterizing these meager allegations consecutively as "representations" and then as "promises" of everlasting viability, Claimants allege two fraud theories.  First, they say that because AAF folded, the Debtors obviously didn't care or intend the league to be viable and were duty bound to tell Claimants so before they were hired.  They say that during negotiations

---

[58] Claimants also allege that in February 2019, Thomas Dundon made media statements mischaracterizing the nature of his investment and that Ebersol falsely said the AAF was never really in financial trouble.  These statements are extraneous because, having not yet been made when these players signed contracts, they *ipso facto* did not motivate those decisions.  Neither Florida nor California law permit a claim for fraud committed during the performance of a contract related to the contract's subject matter.  *E.g., HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1240 (Fla. 1996); *La Pesca Grande Charters, Inc. v. Moran*, 704 So.2d 710, 712–13 (Fla. 5th DCA 1998) (explaining the difference between fraud in the inducement and fraud in the performance, the latter not constituting a separate cause of action from that of a concurrent breach of contract action); *Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1185, 864 P.2d 88, 93 (1993) (holding that misrepresentations in the course of performing contract to secure termination are not actionable in fraud, only in contract); *but see Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 992, 102 P.3d 268, 275 (2004) (allowing a fraud claim during performance because executing false certificates of conformance of helicopter parts to induce their acceptance even though defective was independent of the contract to provide parts and violated important public policies).

the debtors' concealed their disregard for longevity and that the AAF was insolvent, which they assume.  *See* Exhibit A to Claim 214-2 at para 81-89.   Second, the Claimants say the Debtors never intended to perform these so-called promises of longevity.  *See* Exhibit A to Claim 214-2 at para 91-96.  The Claim divides these contentions under separate "Fraud" and "False Promise" sections, but they really are the same fraudulent inducement claim, the only difference being that under the heading "Fraud" it is alleged that concealment under a duty to disclose constitutes the false representation whereas the "False Promise" section alleges an affirmative "promise" coupled with a present intention never to perform.  *See* Exhibit A to Claim 214-2 at 17-19.

163.    Despite alleging these frauds and other torts, the Claim itself includes only two damage components: the contract damages and punitive damages. *See* Claim 214-2, Addendum at 3.  Generally, a mere breach of contract does not give rise to an action fraud.  *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000); *Walter H. Leimert Co. v. Woodson*, 125 Cal. App. 2d 186, 192, 270 P.2d 95, 99 (1954).

164.    But both California and Florida law recognizes that claims for fraudulent inducement, among others can be maintained alongside a contract action because they represent independent torts based on proof and elements distinct from the contract claim. [59] *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1240 (Fla. 1996); *Lazar v. Superior Court*, 12 Cal. 4th 631, 645, 909 P.2d 981, 989 (1996).

165.    But that does not mean that fraud can always be used as a substitute theory for recovery of the economic loss of the contract.  In Florida, although a claim for breach of contract and a claim for fraud to induce that contract are not mutually exclusive, to be actionable, the damage stemming from the alleged fraudulent misrepresentation must be independent, separate

---

[59] California codifies the fraudulent inducement to contract cause of action in Cal. Civ. Code § 1572 (West).

and distinct from the damages sustained from the contract's breach. *Island Travel & Tours, Ltd., Co., et al v. MYR Indep., Inc.,* 3D16-1364, 2020 WL 1451990, at *3 (Fla. Dist. Ct. App. Mar. 25, 2020); *Williams v. Peak Resorts Intern. Inc.*, 676 So. 2d 513, 517 (Fla. Dist. Ct. App. 1996). California follows a similar course. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 992, 102 P.3d 268, 275 (2004) (holding that fraud committed in falsifying conformance certificates to induce acceptance of helicopter parts was actionable in fraud but required showing of damages independent of the plaintiff's economic loss).

166.    In this case, the Claim makes no attempt to identify any damages except the allegedly lost future wages that Claimants ***might*** have received during the second and third seasons.  In other words, they seek to enforce the contract in the guise of a fraudulent inducement claim, it appears, purely as a springboard to claim more than $600 Million in punitive damages. Almost no principle of contract law regarding damages is more venerated than the rule that punitive damages are not available for breach of contract.[60]  *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 392, 181 P.3d 142, 154 (2008); *John Brown Automation, Inc. v. Nobles*, 537 So. 2d 614, 617 (Fla. Dist. Ct. App. 1988) (holding that a legion of cases supports the proposition that punitive damages for breach of contract are barred by Florida law);

167.    Moreover, just like any other fraud claim, the person asserting it bears the burden both to particularly plead and then to prove every essential element of the cause of action. *Lazar*

---

[60] This is enormously important and exposes the Claim as massively exaggerated.  The Complaint incorporated in the Claim does allege that someone, maybe even Schmidt or Northrup suffered some tort damages for physical and mental suffering.  See Exhibit A to Claim 214-2 at p. 20).  But considering that the Claim doesn't identify a single fact describing the nature of those harms or how they could possibly arise from AAF's demise, those damages, if proved cannot possibly be uniform or incurred by all 416 putative class members.   Under the rule that a punitive damages must bear some reasonable relationship to the harm limited constrained by state caps, suggesting that $600 million could be awarded in punitive damages is nothing except a fantasy. *See Connecticut Gen. Life Ins. Co. v. Jones*, 764 So. 2d 677, 682 (Fla. Dist. Ct. App. 2000) (discussing this problem).

*v. Superior Court*, 12 Cal. 4th 631, 645, 909 P.2d 981, 989 (1996);[61] *Eagletech Communications, Inc. v. Bryn Mawr Inv. Group, Inc.*, 79 So. 3d 855, 862 (Fla. Dist. Ct. App. 2012).  In the Fifth Circuit, articulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.  *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997).[62]

168.    Also, although a person may generally plead intent, meeting that standard requires more than simply stating that a defendant had fraudulent intent or that defendant knew a material fact was false; what is required is pleading particular facts that give rise to a strong inference of the fraudulent intent.  *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (collecting cases); *In re Ortiz*, 441 B.R. 73, 76 (Bankr. W.D. Tex. 2010) (articulating what is required to satisfy FRCP 9[63]).

169.    Schmidt and Northrup, as individual Claimants, do not come close to meeting this standard on either score.  The reported media statements they attribute to Ebersol are not statements of particular fact.  They are more properly characterized as mere statements of opinion or projections, or candidly, expressions of hope.   For example, the statement "if you are not

---

[61] *Lazar* illuminated that in California, fraud must be pled specifically; general and conclusory allegations do not suffice. This necessitates pleading *facts* which show how, when, where, to whom, and by what means the representations were tendered. A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. *Lazar v. Superior Court*, 909 P.2d 981, at 989.

[62] In *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997), the Fifth Circuit considered a situation much like the one in the present case in which the plaintiff's attorneys constructed a "fraud" theory retrospectively from press clippings.  In a thoughtfully reasoned decision, Judge Higginbotham considered the origins and application of FRCP 9 and in dismissing fraud claims observed that a "complaint can be long-winded, even prolix, without pleading with particularity" and that "such a garrulous style is not an uncommon mask for an absence of detail."

[63] FRCP 9 applies in contested cases.  Bankruptcy Rule 7009 incorporates the rule and applies automatically pursuant to Bankruptcy Rule 9014(c).

committed to seven to ten years, you are not taking this seriously," a fundament of the claim, is an expression of pure opinion. Likewise, the allegation that "Ebersol stated that the AAF wanted to find partners who understood that in order to build the league into a successful and viable business, long term ad patient investment strategy was necessary" is a pure expression of opinion, or hope. The final alleged statement attributed to Ebersol is equally not a statement of fact:

> "[W]e are not reinventing football. We want to reinvent the experience. . . to a large degree what we think this is, is a very sober business model, long term plan that over the course of many years is going to build into something worthwhile. We are not trying to boil the entire ocean on the first day."

Exhibit A to Claim 214-2 at para. 17-19.

170.    Other than pleading that the AAF announced an apparel deal with "legendary apparel brand Starter to be the official on field apparel and game day uniform supplier,"[64] the foregoing statements set out the whole of Claimants' woeful attempt at articulating fraud. The only empirically verifiable fact in the mix is the statement that AAF had partnered with Starter. That statement is not even alleged to have been false, likely because it was demonstrably true.

171.    A fuller discussion of the distinguishing characteristic of opinion is set out *supra* at notes 42, 43. Other than proclaiming that the league folded a year following the statements, the Claimants posit no reason or allegation to show why or how these opinions became transformed into facts, or how it is that they were false, how they were known to be false, or who received them, or when, or how individual recipients reacted, or how it is they relied, or scienter. The Claim simply does not state a fraud case.

g.    **The Claimants cannot prevail on a promissory estoppel claim because they had, and concede they had a valid written contract covering the same subject.**

172.    It is hornbook law that promissory estoppel does not apply to promise covered by

---

[64] This reference is evidently to a July 23, 2018 post on AAF's Twitter feed.

a valid contract.

173.    Promissory estoppel is not applicable to a promise covered by a valid contract. Schmidt and Northrup contend they entered into a valid contract covering their compensation. *See, e.g., Trevino & Associates Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.); *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013); *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del.2000); *Doctors Hosp.1997, L.P. v. Sambuca Hous., L.P.*, 154 S.W.3d 634, 636 (Tex.App.2004);

174.    Claimants aver curiously that their promissory estoppel claim's essential purpose is to prevent defendants from repudiating their agreements with putative class members. *See* Exhibit A to Claim 214-2 at p. 5. At least as to the Claimants, promissory estoppel cannot achieve that objective. Filing a suit following an alleged repudiation makes binds the Claimants to that contention. *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, CIV.A. 2742-VCN, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009).

**h.    Claimants have not stated and cannot prove a claim for breach of an implied covenant of good faith and fair dealing.**

175.    The Claimants allege that AAF Players and Claimants were obliged to treat each other fairly and that AAF violated this duty by allegedly breaching the contract. See Exhibit A to Claim 214-2 at p. 14. This does not state a claim for relief under governing Delaware law (or likely any other law). As discussed at some length in relation to predominance (*See* para. 106-108, *supra*), the implied covenant of good faith and fair dealing in Delaware asks whether it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to the matter." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006). It is an extraordinary legal

remedy to be applied only when a contract is truly silent, not an equitable tool to rebalance outcomes. *Id.*, *see Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

176.     All the Claimants allege is that AAF Players, LLC filed suspended operations and failed to be able in the future to pay the agreed "annual base compensation" for 2020 and 2021. In other words, the Claimants say that breaching the contract violated a covenant that should be implied into the contract to prohibit AAF Players from breaching it.  This makes no sense; if it was so, every breach of contract would perforce be a violation of good faith and fair dealing.  That clearly is not the law.

### i.     Claimants cannot state a claim for tortious interference with contract.[65]

177.     The Claim's factual allegations on this issue are scant.  What can be discerned is that Claimants allege that (a) suspending league operations and discontinuing games on April 2, 2019 constituted the breach, (b) Dundon and AAF Players made the decision, and (c) Dundon, ESMG, LFE and AAF Properties intended to cause and did cause AAF Players to breach.

178.     The Court must first determine what law to apply to Claimants' tortious inducement to breach claims.  Under Texas choice of law rules, the law of the state with the most significant relationship to a particular substantive issue controls.  *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990).  Because there is no dispute in this case, and the Claimants admit, that their Player Contracts were valid and no one suggests the Player Contracts were illegal, the choice of law analysis involves only the rules concerning torts.  *See Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 704-05 (5th Cir. 1999).

179.     Factors bearing on that determination include (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence,

---

[65] Claimants assert this claim against Ebersol Sports Media Group, Inc., AAF Properties, LLC, Legendary Field Exhibitions, LLC and Thomas Dundon.

nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties, if any, is centered. *Id*.; Restatement (Second) of Conflict of Laws § 145 (West).

180.    The place where the conduct causing the injury occurred is a more relevant and reliable determinant of the state with the most significant interest and relationship to a tortious interference claim because it is difficult outside the personal injury and property damage context to fix the location of injury. *See PrinterOn, Inc. v. BreezyPrint Corp.*, 93 F.Supp. 3d 658, 706 (S.D. Tex. 2015) (collecting cases). That is certainly true in this case. For example, the Claim alleges Northrup is a California resident[66] but when he signed with AAF Players he reported his address in Jacksonville, Florida. He played for AAF's Orlando Apollos team. Schmidt reports a California address but played on the AAF's Birmingham Iron immediately after leaving the NFL's Buffalo Bills, where he had been on the roster since 2014.

181.    In comparison, the conduct that Claimants contend caused the breach and the alleged interference occurred only in Texas, where Dundon resided and maintained his principal place of business. Applying Texas substantive law as the rule of decision is therefore appropriate. *See Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 311 n.6 (5th Cir. 2000) (issue by issue analysis required in determining which law to apply); *see also O'Gara v. Binkley*, 384 F.Supp.3d 674, 681-82 (N.D. Tex. 2019).

182.    Claimants cannot maintain a tortious interference claim arising out of the breach of the AAF player contract as a matter of Texas law. ESMG is the parent of AAF Properties, LFE

---

[66] It is possible, though not likely, that Northrup maintains a residence in California because for six months in 2017, he had a futures contract and practice squad assignment with the Los Angeles Rams before the team released him prior to training camp. However, in signing with AAF Players, he reported his address as Jacksonville Florida, where he grew up and played high school and college football at Florida State University.

and its subsidiary, AAF Players.  All of these entities had exactly the same economic interest in the AAF's success.  AAF Properties is the licensee of the Commercial License Claimants each signed in conjunction with their Player Contracts.  A successful AAF was essential to AAF Properties ability to receive the benefits of the license and a successful AAF was necessary to the development of the fan-based app the company's software developers were building.

183.    As a matter of Texas law, parent corporations and their subsidiaries are incapable of interfering with each other's contracts. *ProTradeNet, LLC v. Predictive Profiles, Inc.*, 369 F. Supp. 3d 788, 791-92 (W.D. Tex. 2019) (collecting cases and citing U.S. Supreme Court cases observing that parents and their subsidiaries ***always*** share a complete unity of interest and share a common purpose because the parent may assert full control at any moment); *Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico*, 304 F. Supp. 2d 903, 912 (W.D. Tex. 2003); *see Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1192 (5th Cir. 1985) (holding that wholly owned subsidiaries are incapable of conspiring with their parents). Their business interests are so aligned that they are considered, for tortious interference purposes, the same entity.  *Id.*

184.    Claimants' interference claim should also be rejected outright because it doesn't actually plead any facts from which a cause of action can be discerned.  Instead, the Claim merely makes the sort of "threadbare recitals of elements, supported by mere conclusory statements" that the United States Supreme Court has ruled worthy of dismissal for failure to state a facially plausible claim.  *E.g. Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

## C.  Conclusion

185.    The Claim proposes to supplant the efficient proof of claim and claim administration process with a duplicative Frankenstein creation that seeks to sweep aside the

individual decisions putative class members have already made and their consequences. Rule 7023 is not applicable to this proceeding and there is no good, and certainly no compelling, reason to invoke it. The papers before the Court establish that its prerequisites could never be satisfied in any event. Schmidt and Northrup as individuals have no claims. The course they have set the claims process on so far has been enormously expensive in an underwater estate and has already inflated the costs of administration to no legitimate purpose. Every dollar spent determining unfounded and barred claims is a dollar unavailable to pay creditors. The proper course now is to reject the improper so called "class" proof of claim and to efficiently determine and disallow Schmidt's and Northrup's claims.

## RELIEF REQUESTED

**FOR THE FOREGOING REASONS**, the Trustee respectfully requests that Court expunge the "class" proof of claim, treat the claim as a "group claim" only of Schmidt and Northrup and upon consideration of said individual claims disallow the Claim in its entirety and failing complete disallowance, determine the proper amount of Claim for each Northrup and Schmidt. The Trustee requests such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

BARRETT DAFFIN FRAPPIER
TURNER & ENGEL, LLP

By: */s/ Brian S. Engel*
    Steve Turner
    Texas Bar No. 20314700
    Brian S. Engel
    Texas Bar No. 00789279
    3809 Juniper Trace, Suite 205
    Austin, Texas 78738
    Phone: (512) 687-2500
    Fax: (512) 477-1112

SteveT@bdfgroup.com
Brianen@bdfgroup.com

GENERAL COUNSEL FOR RANDOLPH N.
OSHEROW, CHAPTER 7 TRUSTEE

**CERTIFICATE OF SERVICE**

By my signature below, I hereby certify that on the 14th day of April 2020, a true and correct copy of the foregoing document was served via electronic means as listed on the Court's ECF noticing system and by electronic or first class mail to those persons filing a notice of appearance requesting notice and persons filing a proof of claim, all pursuant to the Court's order for limited notice mailing entered on the Court's docket as document no. 79 and the attached service matrix. The undersigned notes that due to staff reductions in light of COVID 19 and the large size of the matrix, some first class mailing may not actually be placed in the mail until April 15, 2020.

*/s/ Brian S. Engel*
Brian S. Engel

**Limited Mailing Matrix as of February 21, 2020**

**Pursuant to Order Granting Trustee's Motion to Limit Matrix (Docket No. 79)**

| PERSONS FILING A PROOF OF CLAIM | | |
|---|---|---|
| | | |
| Joe Bosack<br>1661 Oak Road<br>Pottsville, PA 17901 | Marriott International, Inc.<br>John C Josefsberg<br>12740 HILLCREST RD #240<br>DALLAS, AZ 75230 | Nicolas Larios<br>206 Cork Way<br>Davenport, FL 33897 |
| The Montag Group, LLC<br>14 Vanderventer Ave., Ste. 255<br>Port Washington, NY 11050 | Pavilion Management Company<br>dba Hilton Phoenix<br>Mesa Hotel<br>1011 W Holmes Avenue<br>Mesa, AZ 85210 | Steven Shafer<br>1290 Rip-Jay Circle<br>Canyon Lake, TX 78133 |
| Steve Mariucci<br>c/o Arnie Herz<br>14 Vanderventer Ave., Ste. 255<br>Port Washington, NY 11050 | Silverman Group<br>436 Orange Street<br>New Haven, CT 06511 | John R Richardson<br>13100 Hissen Ridge Ln<br>Clermont, FL 34715 |
| Outdoor America Images, Inc. OAI<br>4545 W Hillsborough Ave<br>Tampa, FL 33614 | Renee Stout<br>2630 Fallbrook Dr.<br>Oviedo, FL 32765 | Ruth Palmer<br>1827 Schley Ave.<br>San Antonio, TX 78210 |
| Arizona Department of Revenue<br>2005 N Central Ave, Suite 100<br>Phoenix, AZ 85004 | Embassy Suites by Hilton South<br>Jordan<br>Salt Lake City<br>10333 South Jordan Gateway<br>South Jordan, UT 84095 | LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 |
| PRISMIC IO, Inc.<br>185 Alewife Brook Parkway, Suite<br>210<br>Cambridge, MA 02138 | LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Alan J Snyder<br>3315 Falling Creek<br>San Antonio, TX 78259 |
| SHOCK DOCTOR INC<br>11488 SLATER AVENUE<br>Fountain Valley, CA 92708-5440 | AAF-Arizona Hotshots<br>Park Place Printing, Inc.<br>535 W Baseline Rd., Ste. 104<br>Mesa, AZ 85210 | Jennifer L Whitmore<br>6022 Spring Time<br>San Antonio, TX 78249 |
| JDH Broadcasting LLC - Dan Hellie<br>324 31st St.<br>Manhattan Beach, CA 90266 | DR. JILLS FOOT PADS INC<br>384 S MILITARY TRAIL<br>DEERFIELD BEACH, FL 33442 | Angela Cates<br>27022 Foggy Meadows Street<br>San Antonio, TX 78260-1822 |
| Fresh Concepts, LLC<br>49 Research Drive<br>Milford, CT 06460 | CBT CREATIVE<br>BROADCASTING<br>TECHNIQUES<br>15 Charles Place<br>Closter, NJ 07624 | Manuel Ramirez<br>22702 Sabine Summit<br>San Antonio, TX 78258-2401 |
| Teamworks Innovations, Inc.<br>122 E Parrish St<br>Durham, NC 27701 | Security Industry Specialists, Inc.<br>Attn: Tom P. Seltz, Pres. & CFO<br>20 West Galer Street<br>Seattle, WA 98119 | Trey Bates<br>215 N Center<br>#310<br>San Antonio, TX 78202-2756 |
| Safety Services, Inc. dba U.S. Safety<br>Services<br>5525 Blanco Rd. Suite 124<br>San Antonio, TX 78216 | Foot Management, Inc.<br>7201 Friendship Rd.<br>Pittsville, MD 21850 | Carroll William<br>1285 Burgundy Ct<br>Oviedo, FL 32766-6686 |
| James Patrick Gleason<br>1237 Union Club Drive<br>Winter Garden, FL 34787-3077 | VITAC Corporation<br>8300 E Maplewood Ave Suite 310<br>Greenwood Village, CO 80111 | Rhinehart, Danny<br>11476 Willow<br>Windermere, FL 34786 |

| | | |
|---|---|---|
| Cox Media - San Diego<br>c/o Szabo Associates Inc.<br>3355 Lenox Road NE, Suite 945<br>Atlanta GA 30326 | Broadway Media, LLC dba KALL-ESPN 700<br>50 West Broadway<br>Suite 200<br>Salt Lake City, UT 84101 | William Roberts<br>413 Four Seasons Ave<br>Mascotte, FL 34753 |
| bluemedia, Inc.<br>Gallagher& Kennedy c/o Joe Cotterman<br>2575 E Camelback Road Suite 1100<br>Phoenix, AZ 85016 | Rhino Arizona, LLC<br>125 W Julie Dr<br>Tempe, AZ 85283 | Gary Hortenstine<br>1353 Old Virginia Ct.<br>Marietta, GA 30067 |
| Marriott Hotel Services, Inc. dba Scottsdale Marri<br>John C Josefsberg<br>12740 Hillcrest Road #240<br>Dallas, TX 75230 | Stacie Johnson<br>3039 Chavez Avenue<br>Clermont, FL 34715 | LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 |
| Jennifer Monn<br>3597 Gatlin Place Circle<br>Orlando, FL 32812 | Thomas A. Tarasewich<br>3647 All American Blvd<br>Orlando, FL 32810 | Patrick A Harrington<br>P. O. Box 1019<br>Vidor, TX 77670-1019 |
| Major Promotions<br>3517 Spring Valley Court<br>Mountain Brook, AL 35223 | Lewis Consulting<br>11317 Via Playa de Cortes<br>San Diego, CA 92124 | Mcclure, Ed<br>1610 C R 323<br>Jourdanton, TX 78026 |
| Anthony Hurst<br>4716 Valdina Way<br>San Diego, CA 92124-2433 | LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Michael Hamilton<br>2349 N Atwood Cir<br>Mesa, AZ 85207 |
| April Schulze<br>10627 Larch Grove Ct<br>HELOTES, TX 78023 | Jones, Byron<br>113 Moseley Ave<br>Eatonville, FL 32751 | Eric Gelvin<br>4354 E. Sandia St<br>PHOENIX, AZ 85044 |
| Donna Winfrey<br>2980 Cordie Lee Lane<br>Germantown, TN 38138-8184 | Datatix - SLC<br>334 W Bugatti Drive<br>Salt Lake City, UT 84115 | Salene Ali<br>110 Sunnyland Dr<br>San Antonio, TX 78228 |
| LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Letty Baldit Estrada<br>535 W Olmos Dr<br>San Antonio, TX 78212 | Thomas Mason<br>7777 Glen America Drive<br>#349<br>Dallas, TX 75225 |
| Willaim J Neuls<br>4910 Hershey Dr<br>San Antonio, TX 78220 | Michael Reed<br>16165 Cayenne Ridge Rd<br>San Diego, CA 92127 | Dale A. Wellman<br>2692 Indigo Drive<br>El Cajon, CA 92019 |
| Fidelis Bookkeeping And Payroll Services<br>812 N Pacific St<br>Unit C<br>Oceanside, CA 92054 | John M Tompkins<br>4703 Camberley Ct<br>San Diego, CA 92154 | Walter John Ellis dba Sports and Broadcast Service<br>12101 E Mountain View Rd<br>SCOTTSDALE, AZ 85259 |
| Chris Muffoletto<br>2781 Wassum Trail<br>Chuluota,, FL 32766-8544 | Aflanny Inc.<br>P.O. Box 233<br>Rancho Santa Fe, CA 92067 | Hyatt Regency Riverwalk San Antonio<br>123 Losoya<br>San Antonio, TX 78205 |
| Denise DeLoach<br>13214 Vista del Mundo<br>San Antonio, TX 78216 | Morris, Colin<br>152 NE 167 Street<br>Suite 403<br>Miami, FL 33162 | Cain Broadcast Traffic, LLC<br>c/o Ava Cain<br>8820 SW 123rd CT. Apt. L107<br>Miami, FL 33186 |
| Robert Zearfoss<br>2548 Rio Cordillera<br>Boerne, TX 78006 | LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Ray Sprayberry Dds Msd Pa<br>410 N School St<br>Boerne, TX 78006 |

| | | |
|---|---|---|
| LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Robert Callaway<br>12644 Brite Ranch<br>San Antonio, TX 78245 | Juleyna, LLC dba Exhibit Experts<br>4012 East Broadway<br>Suite 307<br>Phoenix, AZ 85040 |
| ohn Rountree<br>9188 Mudville Rd.<br>Millington, TN 38053<br>MILLINGTON, TN 38053 | Vaughn, Nia<br>405 Pleasant Hill Road<br>Lilburn, GA 30047 | Annotti, Mark<br>2170 FAIRMONT CIRCLE<br>ORLANDO, FL 32837 |
| Samantha Evans<br>539 Parkmont Ct<br>San Antonio, TX 78258 | Stieg, Frank<br>215 Salvador Square<br>Winter Park, FL 32789 | ohn C Maywald<br>39 Walnut Grove Rd<br>Boerne, TX 78006 |
| Daniel K. Ward<br>8431 Cheyenne Pass<br>San Antonio, TX 78254 | Marriott International, Inc.<br>John C Josefsberg<br>12740 HILLCREST RD #240<br>DALLAS, AZ 75230 | Nationwide Referral Company, Inc. dba Apartment & Relocation Center<br>11818 Wurzbach Rd.<br>San Antonio, TX 78230 |
| Timothy Grant<br>867 S. GRANT ST<br>LONGWOOD, FL 32750-5507 | Johnson Group, Inc.<br>9 W Country Gables Drive<br>Phoenix, AZ 85023 | Roberto Coronado<br>8034 Myrtle Glade<br>Converse, TX 78109-3275 |
| LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Teamworks Innovations, Inc.<br>122 E Parrish St<br>Durham, NC 27701 | Tastinger, Anthony<br>14867 Hawksmoor Run Circle<br>Orlando, FL 32828 |
| Sneaky Big Studios, LLC<br>15750 N. Northsight Blvd.<br>Scottsdale, AZ 85260 | WILLIAM SHAPINS<br>13119 LAKESHORE GROVE DR<br>WINTER GARDEN, FL 34787 | Georgia State University dba GSU Panther Dining<br>55 Gilmer Street Room 318<br>Atlanta, GA 30303 |
| Paul M Halsey dba Admiral Video, LLC<br>503 E. Erie St. Suite B<br>Lancaster, NY 14086 | PCS Production Company, LP<br>1551 Corporate Drive<br>Suite 125<br>Irving, TX 75038 | Georgia State University Athletics /<br>Georgia State University Stadium<br>755 Hank Aaron Dr.<br>Atlanta, GA 30315 |
| David Capraro<br>3215 River Frio<br>San Antonio, TX 78253 | Ladds<br>6881 Appling Farms Parkway<br>Memphis, TN 38133 | Residence Inn by Marriott Orlando Downtown<br>680 N Orange Ave<br>Orlando, FL 32801 |
| Scott Enos<br>14718<br>Eagles Crossing Drive<br>Orlando, FL 32837-6923 | William Michael Murray<br>4019 Conway Place Circle<br>Orlando, FL 32812 | Royal Restrooms Mountain West, LLC<br>563 N Colorado St<br>Salt Lake City, UT 84116 |
| Edward Lepp dba Leppdesign, LLC<br>320 North Shadowwood Drive<br>St. Augustine, FL 32086 | LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Thomas Ward<br>612 Angelica Circle<br>CARY, NC 27518 |
| Stewart Ogier<br>9238 Brae Moss<br>San Antonio, TX 78249 | Chrystal Davis<br>1017 Margot Ln<br>Lake Wales, FL 33853 | Steve Wolff<br>2131 Palomar Airport Rd Ste 330<br>Carlsbad, CA 92011 |
| Donna Franklin<br>6050 Brunswick Rd.<br>Lakeland, TN 38002 | Thomas S. Knuckey<br>310 W. Hornbeam Drive<br>Longwood, FL 32779 | F&F Productions<br>14333 Myerlake Circle<br>Clearwater, FL 33760 |
| Lindsay Skousen<br>459 Virginia Drive<br>Winter Park, FL 32789 | Rick and Tammy Colsell<br>3128 Guilitoy Ave<br>San Diego, CA 92117-2540 | EM Printing, LLC<br>3081 Bartlett Corporate Dr.<br>Bartlett, TN 38133 |

| | | |
|---|---|---|
| Flying V Group<br>2051 Placentia Ave.<br>Costa Mesa, CA 92627 | TOP Marketing USA<br>c/o Jonathan Hodgins<br>1332 Baur Blvd<br>St. Louis, MO 63132 | John Evangelist<br>2669 Eltinge Drive<br>P.O. Box 2637<br>Alpine, CA 91903 |
| Green, Nicholas<br>18626 Creekside Pass<br>San Antonio, TX 78259 | Signal Wiz - Technical Services<br>6822 Fisk Avenue<br>San Diego, CA 92122-2437 | Atlanta Journal-Constitution<br>c/o Szabo Associates Inc.<br>3355 Lenox Road NE, Suite 945<br>Atlanta GA 30326 |
| Charles E. Smith<br>4233 Avocado Blvd<br>LaMesa, Ca 91941 | Matthies, Mason<br>PO Box 732<br>Rancho Santa Fe, CA 92067 | Christina Gage<br>13021 Shenandoah dr.<br>lakeside, CA 92040-3333 |
| Joy R Wilson<br>15330 75 Ave N<br>Palm Beach Gardens, FL 33418 | CLIFF KEEN ATHLETIC<br>4480 VARSITY DR<br>ANN ARBOR, MI 48106 | Lopez, Jake<br>8922 Summer Trail<br>San Antonio, TX 78250 |
| John & Teresa Markey<br>5508 Redland Dr<br>San Diego, CA 92115-2215 | LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Brenda Sue Shavers<br>574 Terry Street SE<br>Atlanta, GA 30312-2838 |
| LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Big Fogg, Inc.<br>42095 Zero Dr. Unit A2<br>Temecula, CA 29590 | CaliVenture Party Rentals<br>5562 Las Alturas Terrace<br>San Diego, CA 92114 |
| Decker, Shawn<br>17525 Silver Creek Ct<br>Clermont, FL 34714 | TNT GameTruck, LLC<br>26788 Rhapsody Ct<br>menifee, CA 92584 | LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 |
| A Bounce Above Party Rentals<br>13745 Lyall Place<br>Lakeside, CA 92040 | Nicholas L McLain<br>3753 E Fairfield Street<br>Mesa, AZ 85205 | High Rise Audio<br>6783 S 2300 E<br>Salt Lake City, UT 84121 |
| Campbell Clinic Orthopedics<br>1400 South Germantown Road<br>Germantown, TN 38138 | Ford, Steve<br>3275 Madison Ave<br>San Diego, CA 92116 | Kohlhausen, Susan<br>5918 Tivoli Gardens Blvd<br>Orlando, FL 32829 |
| Prospect Productions LLC dba<br>Barnicle<br>175 Varick St. 2nd floor<br>New York, NY 10014 | IHEARTMEDIA +<br>ENTERTAINMENT, INC.<br>Herzlich & Blum, LLP<br>15760 Ventura Blvd.<br>Suite 700<br>Encino, CA 91436 | ICM Partners - Terrell Davis<br>10250 Constellation Blvd. 31st<br>floor<br>Los Angeles, CA 90067 |
| Jason Zone Fisher<br>128 South Kilkea Drive<br>Los Angeles, CA 90048 | Florida Medical Distributors, LLC<br>123 Barrier Isle Drive<br>Ormond beach, FL 32176 | Rheinbold, Jim<br>10437 La Morada Dr<br>San Diego, CA 92124 |
| CenturyLink Communications, LLC<br>1025 El Dorado Blvd. (Legal-BKY)<br>Broomfield, CO 80021 | Down In Front Productions, LLC<br>1318 Alford Ave, Suite 201<br>Hoover, AL 35226 | Lori Ollier<br>31459 Sonoma Lane<br>Temecula, CA 9259 |
| Jose Hernandez<br>1681 San Altos Place<br>Lemon Grove, CA 91945 | Contemporary Services<br>Corporation - CSC<br>17101 Superior St.<br>Northridge, CA 91325 | Aramark Sports and Entertainment<br>Services, LLC<br>c/o Duane Morris LLP - Attn:<br>Jarret P. Hitchings<br>222 Delaware Avenue, Ste. 1600<br>Wilmington, DE 19801 |
| San Antonio Express<br>c/o Zalina Tsarakova<br>4747 Southwest Frwy.<br>Houston, TX 77027 | Theodore J Cottrell<br>4580 Regency Trace,SW<br>Atlanta, GA 30331 | Bruce D. Fikes<br>113 W Huff Ave<br>San Antonio, TX 78214 |

| | | |
|---|---|---|
| Carolyn J. Downey<br>7450 Olivetas Avenue<br>Apartment 40<br>La Jolla, CA 92037 | John Russell<br>3642 Terrace Place<br>Carlsbad, CA 92010-6593 | PCH TRIBUNE LLC DBA<br>NUMBER SIX LLC<br>4770 S 5600 W<br>West Valley City, UT 84118 |
| Jim Wadley<br>786 West Solana Circle<br>Solana Beach, CA 92075 | LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | AY Productions LLC<br>1334 Park View Avenue #250<br>Manhattan Beach, CA 90266 |
| NBCUniversal Media, LLC<br>30 Rockerfeller Plaza (1221<br>Campus)<br>New York, NY 10112 | John F Goddard<br>1833 Wind Willow Rd<br>Belle Isle, FL 32809 | Lawrence (Larry) D. Park<br>109 Oakwood Dr.<br>Cumming, GA 30040 |
| Engstrand, William<br>1505 South Siliverstone Ct.<br>Orange City, FL 32763 | Kelly Ann MacDonald<br>1923 San Jose Ave<br>San Francisco, CA 92114 | WinCraft, Incorporated<br>960 E Mark St<br>Winona, MN 55987 |
| Stallard, Diane<br>1503 South Silverstone Court<br>Orange City, FL 32763 | Simplified Coach, Inc.<br>14051 Saratoga-Sunnyvale Rd.<br>Saratoga, CA 95070 | School of Health Corp.<br>6764 Eagle Way<br>Chicago, IL 60678-1067 |
| Five Marketing & Management LLC<br>925 B Street #603<br>San Diego, CA 92101 | Big Ticket Inc. (Rich Waltz)<br>820 5th Ave. NW<br>Issaquah, WA 98027 | Hines Ward Jr.<br>Knox Law Firm<br>120 West Tenth Street<br>Erie, PA 16501 |
| Kenneth Watson<br>3503 Tree Crossing Parkway,<br>Birmingham, AL 35244 | Blake Beddingfield<br>828 Woodburn Dr<br>Brentwood, TN 37027 | Shaun O'Hara<br>60 Soho Consulting, LLC<br>c/o Aaron C. Smith<br>Locke Lord LLP<br>111 South Wacker Drive<br>Chicago, IL 60606 |
| Nicole Varner<br>221 Crumley St. SW<br>Atlanta, GA 30312 | Holiday Inn Riverwalk<br>217 N. St. Marys Street<br>San Antonio, TX 78205 | Hubbard Radio Phoenix, LLC<br>1100 N 52nd St<br>Phoenix, AZ 85008 |
| CMAXIII Entertainment/ Charles<br>Sloan Jr.<br>24245 Wilderness Oak Apt #3310<br>San Antonio, TX 78258 | Cox Media - San Diego<br>c/o Szabo Associates Inc.<br>3355 Lenox Road NE, Suite 945<br>Atlanta GA 30326 | Won Worldwide, LLC<br>c/o Nicholas Cutaia<br>Goulston & Storrs PC<br>885 Third Avenue<br>New York, NY 10022 |
| BUCKS BAGS, INC.<br>2401 W MAIN ST<br>BOISE, ID 83702 | Blue Cross of California d/b/a<br>Anthem Blue Cross<br>Anthem Blue Cross Life and<br>Health Insura<br>c/o Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103 | MGM RESORTS<br>INTERNATIONAL<br>OPERATIONS, INC.<br>SAMUEL A. SCHWARTZ, ESQ.<br>100 N CITY PARKWAY, STE<br>1600<br>LAS VEGAS, NV 89106 |
| Three Sisters Partnership<br>c/o Russell W. Savory<br>BEARD & SAVORY , PLLC<br>119 South Main St., #500<br>Memphis, TN 38103 | NEP Supershooters, LP<br>c/o Paul Mazeski, Esq.<br>301 Grant Street, 20th Floor<br>Pittsburgh, PA 1521 | Deseret Digital Media INC<br>David Pearce<br>PO Box 45654<br>Salt Lake City, UT 84145 |
| Weber, Jake<br>1120 Ecology Loop<br>Eads, TN 38028 | 3636 merrimac ave<br>san deigo, CA 92117 | Delta Dental of California<br>Phillip K. Wang, Esq.<br>RIMON, P.C.<br>One Embarcadero Center, Suite<br>400<br>San Francisco, CA 94111 |

| | | |
|---|---|---|
| 1715 Aaron Brenner Drive Suite 800<br>1291 Tully Street<br>1715 Aaron Brenner Drive Suite 800<br>Memphis, TN 38107 | Creditor<br>Texas Comptroller of Public<br>Accounts<br>c/o Office of the Attorney General<br>Bankruptcy - Collections Division<br>MC-008<br>PO Box 12548<br>Austin TX 78711-2548 | Sequoia One PEO, LLC<br>1850 Gateway Dr.<br>Suite 700<br>San Mateo, CA 94404 |
| Tri-C Club Supply, Inc.<br>32615 Park Lane<br>Garden City, MI 48135-1528 | Texas Comptroller of Public<br>Accounts<br>c/o Office of the Attorney General<br>Bankruptcy - Collections Division<br>MC-008<br>PO Box 12548<br>Austin TX 78711-2548 | IGG Consulting, LLC<br>8100 La Mesa Blvd<br>suite 105<br>La Mesa, CA 91942<br>La Mesa, CA 91942 |
| Embassy Suites San Antonio<br>Riverwalk Downtown<br>125 East Houston St.<br>San Antonio, TX 78205 | John Larios<br>8222 Manderly PL<br>Converse, TX 78109 | Swirl Inc.<br>c/o Davis & Gilbert LLP<br>Attn: Massimo Giugliano<br>1740 Broadway<br>New York, NY 10019 |
| nerdmatics<br>8149 Santa Monica Blvd<br>#404<br>West Hollywood, CA 90046 | Gray, Michael<br>9262 Dames Rocket Pl,<br>Las Vegas, NV 89148 | Jake Bennett<br>c/o Bryan and Cathy Bennett<br>4653 S Vivian Court<br>Morrison, CO 80465-1851 |
| LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 0762 | Colton Schmidt and Reggie<br>Northup<br>c/o Jonathon Farahi, Esq.<br>Abir Cohen Treyzon Salo LLP<br>16001 Ventura Blvd, Suite 200<br>Encino, California 91436 | Carey International, Inc.<br>c/o Greenberg Traurig LLP, Attn:<br>Thomas McKee<br>1750 Tysons Boulevard, Suite<br>1000<br>McLean, VA 22102 |
| Dundon Capital Partners, LLC<br>c/o Russell W. Mills<br>Bell Nunnally & Martin LLP<br>2323 Ross Avenue, Suite 1900<br>Dallas, TX 75201 | Lexington Hotel Conference<br>Center<br>Jacksonville Riverwalk<br>1515 Prudential Drive<br>Jacksonville, FL 32207 | 00 South Ashley Property Owner,<br>LLC<br>Locke Lord LLP<br>Attn: Brian A. Raynor<br>111 S Wacker Drive<br>Chicago, IL 60606 |
| Thomas G. Dundon<br>c/o Russell W. Mills<br>Bell Nunnally & Martin LLP<br>2323 Ross Avenue, Suite 1900<br>Dallas, TX 75201 | Law Enforcement Specialists Inc<br>PO Box 11656<br>Glendale, AZ 85318-1656 | Sodexo, Inc.<br>9801 Washingtonian Blvd.<br>Gaithersburg, MD 20878 |
| wilford coleman jr<br>2121 Pioneer Pass<br>Seguin, TX 78155 | War Machine Inc dba<br>TSHIRTGUN.COM<br>3429 Rutherford Rd Ext<br>Ste B<br>Taylors, SC 29687 | Synergy Specialists Medical<br>Group, Inc.<br>4910 Directors Place<br>Suite 350<br>San Diego, CA 92121 |
| Rush Glick<br>1651 Vann Court<br>El Cajon, CA 92020-2236<br>El Cajon, CA 92020-2236 | SAFC Management<br>One AT&T Parkway<br>San Antonio, TX 78219 | Landmark American Insurance<br>Company<br>c/o Tony L. Draper<br>Walker Wilcox Matousek, LLP<br>1001 McKinney, Suite 2000<br>Houston, TX 77002 |
| Cortez Liquid Waste Services<br>19540 S US Highway 281<br>San Antonio TX, 78221 | Classic Traditions, Inc.<br>4 Baltusrol Ct.<br>Shoal Creek, AL 35242 | LEGENDARY FIELD<br>EXHIBITIONS, LLC |

| | | 15 Charles Place<br>Closter, NJ 07624 |
|---|---|---|
| TRT Development Company-San Antonio<br>c/o Wick Phillips Attn: Jason Rudd<br>3131 McKinney Ave., Suite 100<br>Dallas, TX 75204 | LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Williams, Jack F.<br>1355 Christmas Lane NE<br>Atlanta, GA 30329 US |
| Marriott Hotel Services, Inc.<br>John C Josefsberg<br>12740 HILLCREST RD #240<br>DALLAS, AZ 75230 | Lexington Hotel Conference Center<br>Jacksonville Riverwalk<br>1515 Prudential Drive<br>Jacksonville, FL 32207 | Xandr<br>One AT&T Way<br>Room 3A104<br>ATTN: Karen Cavagnaro<br>Bedminster, NJ 07921 |
| Emily Morgan, LLC<br>705 East Houston Street<br>San Antonio, Texas 78205 | Architectural Surfaces & Design Inc.<br>5526 West 13400 South<br>Herriman, UT 84096 | 1954 Productions, LLC<br>8447 Wilshire Boulevard, Ste 300<br>Beverly Hills, CA 90211 |
| UTAH MEDIA GROUP<br>4770 S 5600 W<br>WEST VALLEY CITY, UT 84118 | Thomas A. Veit<br>c/o Stephen A. Roberts<br>Clark Hill Strasburger<br>720 Brazos, Suite 700<br>Austin, TX 78701 | Wehbe, Freddie<br>PO Box 140911<br>Gainesville, FL 32614 |
| IsoLynx, LLC<br>Attn: Ed Evansen, CEO<br>179 Ward Hill Avenue<br>Haverhill, MA 01835 | Marriott Plaza San Antonio<br>555 S, Alamo<br>San Antonio, TX 78205 | Silicon Valley Bank<br>Jennifer F. Wertz<br>Jackson Walker LLP<br>100 Congress Avenue, Suite 1100<br>Austin, TX 78701 |
| Mathis, Chaevis<br>1894 Janet Lane<br>Decatur, GA 30035 | Marriott Memphis East<br>5795 Poplar Avenue<br>14185 Dallas Parkway, Suite 1150<br>Memphis, TN 38119 | Larry Mac Duff<br>% Kasey C. Nye Esq.,<br>WATERFALL, ECONOMIDIS,<br>CALDWELL, HANSHAW & VI<br>5210 E. Williams Circle, Suite 800<br>Tucson, AZ 8571 |
| Stratos, Inc. DBA ServiceMaster by Stratos<br>Jason P. Hood<br>Davies Hood PLLC<br>1910 Madison Ave., PMB 72<br>Memphis, TN 38104-2620 | Clear Gear<br>354 N Lewis Rd #149<br>Royersford, PA 19468 | Richard Muirbrook and all similarly situated emplo<br>c/o Joshua W. Wolfshohl<br>Porter Hedges LLP<br>1000 Main Street, 36th Floor<br>Houston, TX 77002 |
| LEGENDARY FIELD EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Christopher Kuehn<br>2516 Martha Ave,<br>Green Bay, WI 54301 | University of Utah (University System of Utah)<br>451 1400 E<br>Salt Lake City, UT 84112 |
| ALT Systems, Inc.<br>2777 Ontario Street<br>Suite 210<br>Burbank, CA 9150 | eClinicalWorks LLC<br>2 Technology Drive<br>Westborough, MA 01581 | Padilla, Gustavo<br>804 Coldbrook Court<br>Chula Vista, CA 91913 |
| Crew One Productions, Inc.<br>c/o Waller Lansden Dortch & Davis, LLP<br>Attn: Blake D. Roth, Esq.<br>511 Union Street, Suite 2700<br>Nashville, TN 37219 | Colette McCue<br>4360 Berry Oak Drive<br>Apopka, FL 32712-5793 | CenturyLink Communications, LLC<br>Attn: Legal-Bankruptcy<br>fka Qwest Communications Company<br>1025 El Dorado Blvd.<br>Broomfield, CO 80021 |

| | | |
|---|---|---|
| ATLANTIC COAST ORTHOPAEDIC MEDICAL SUPPLIES, INC. 6510 Northpark Blvd Charlotte, NC 28216-2367 | NFL Enterprises LLC Lowenstein Sandler LLP Attn: Jeffrey Cohen 1251 Avenue of the Americas New York, NY 10020 | Johnson, Michael and Melvia 1238 Roman Point Dr. Norcross, GA 30093 |
| Morgan, Lewis & Bockius 1701 Market Street Philadelphia, PA 19103 | Control Dynamics Corporation 960 Louis Drive Warminster, PA 18974 | CT Corporation 28 Liberty St, 42nd Floor New York, NY 10005 |
| Chris Amaker 2313 Lockhill Selma, suite 180 SAN ANTONIO, TX 78230 | HALO Branded Solutions, Inc. 1500 Halo Way Sterling, IL 61081 | CT Corporation 28 Liberty St, 42nd Floor New York, NY 10005 |
| Diaz, Jana 13334 Stetson Trl San Antonio, TX 78223 | San Diego Sportservice, Inc. dba Delaware North c/o James C. Thoman, Esq. - Hodgson Russ 140 Pearl Street, #100 Buffalo, NY 14202 | Lien Solution 28 Liberty St, 42nd Floor New York, NY 10005 |
| Gutierrez, Doretta 25002 Cooper Valley San Antonio, TX 78255 | Prince Shonola 1200 Holden Avenue Apt 102 Orlando, FL 32839 | Kenneth Lantz 7306 Crownpiece Street San Antonio, TX 78240 |
| leroy thompson 968 kings highway Apt P-15 west deptford, NJ 08086 | SkyCam, LLC J. Scott Rose Jackson Walker LLP 112 E Pecan Street, Suite 2400 San Antonio, TX 78205 | Kirven, Korren N. 918 Early Street, Lynchburg, VA 24503 |
| Belz Construction Services, LLC Butler Snow c/o Mike Less 6075 Poplar Ave., Suite 500 Memphis, TN 38119 | LEGENDARY FIELD EXHIBITIONS, LLC 15 Charles Place Closter, NJ 07624 | Control Dynamics Corp. 960 Louis Drive Westminster, PA 18974 |
| Accolade USA Inc. 60 Industrial Parkway Ste. 397 Cheektowaga, NY 14227-2774 | New Era Cap Co., Inc. Phillips Lytle LLP Attn: Angela Z. Miller, Esq. One Canalside, 125 Main Street Buffalo, NY 14203 | Push Button Films 5165 Galt Way San Diego, CA 92117 |
| UCF Athletics Association, Inc. 4465 Knights Victory Way, Orlando, FL 32816 | Cynthia Frelund - WME Entertainment, LLC 11 Madison Ave. 18th fl. New York, NY 10010 | LEGENDARY FIELD EXHIBITIONS, LLC 15 Charles Place Closter, NJ 07624 |
| LMREC III CLO I REO I, Inc. % Stutzman, Bromberg, Esserman & Plifka Attn: Heather J. Panko 2323 Bryan Street, Suite 2200 Dallas, TX 75201 | G&G Outfitters, Inc. 4901 Forbes Blvd Attn.: Dan Brady Lanham, MD 2070 | HENRY SCHEIN, Inc. 135 Duryea Rd Melville, NY 11747 |
| Florida Department of Revenue Mark Hamilton P.O. Box 6668 Tallahassee, FL 32314-6668 | Memphis 310262 AAF Kathleen Hennessey Gannett Co. Inc. Law Dept, 7950 Jones Branch Dr. McLean, VA 22107 | ADVANCE LOCAL MEDIA LLC DBA ALABAMA MEDIA GROUP ATTN CREDIT DEPT/KARINE MARTIROSYAN ONE HARMON PLAZA, 9TH FLOOR SECAUCUS, NJ 07094 |

| | | |
|---|---|---|
| MNI Targeted Media<br>c/o Szabo Associates, Inc<br>3355 Lenox Road NE, Suite 945<br>Atlanta, GA 30326 | Ohio Bureau of Workers'<br>Compensation<br>PO Box 15567<br>Columbus, OH 43215-0567 | Entercom Communications Inc.<br>335 New Commerce Blvd<br>Hanover Twp, PA 18706 |
| LEGENDARY FIELD<br>EXHIBITIONS, LLC<br>15 Charles Place<br>Closter, NJ 07624 | Leah McDonald<br>233 W Mistletoe Ave<br>SAN ANTONIO, TX 78212 | Debra Baum<br>1509 E. Washington Ave., #12<br>El Cajon, CA 92019 |
| Street & Smiths Sports Group<br>c/o Szabo Associates, Inc<br>3355 Lenox Road NE, Suite 945<br>Atlanta, GA 30326 | First Insurance Funding<br>P.O Box 7000<br>Carol Stream, IL 60197-7000 | |

**PERSONS FILING A NOTICE OF APPEARANCE AND REQUESTING NOTICE**

| | | |
|---|---|---|
| Three Sisters Partnership<br>c/o Russell W. Savory<br>Beard & Savory, PLLC<br>119 South Main Street<br>Suite 500<br>Memphis, Tennessee 38103 | IsoLynx, LLC<br>c/o Lathrop Gage, LLP<br>Attn. Wendi Alper-Pressman<br>7701 Forsyth Blvd., Suite 500<br>St. Louis, MO 63105 | Pavillion Management Company<br>c/o Jonathan L. Howell<br>Glast, Phillips & Murray, P.C.<br>14801 Quorum Drive, Ste. 500<br>Dallas, Texas 75254 |
| Arizona Board of Regents, a body corporate<br>for and on behalf of  Arizona State University<br>c/o Robert M. Charles, Jr.<br>Lewis Roca Rothgerber Christie LLP<br>One South Church Avenue, Suite 2000<br>Tucson, AZ 85701-1611 | Kristen A. Miller Reinsch<br>TRT Holdings, Inc.<br>4001 Maple Avenue Suite 600<br>Dallas, Texas 75219 | Blue Cross of California d/b/a<br>Anthem Blue Cross<br>c/o Eric S. Goldstein, Esq.<br>Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103-191 |
| Security Industry Specialists<br>c/o Wayne R. Tery. Esq.- File No: 3991-20190386<br>IIEMAR, ROUSSO & HEALD, LLP<br>I5910 Ventura Boulevatd, l2th Floor<br>Encino- Califorma 91436-282 | Cynthia Freuhand<br>c/o Aaron C. Smith☐<br>LOCKE LORD LLP<br>111 South Wacker Drive<br>Chicago, IL 60606 | Courtney J. Hull Assistant<br>Attorney General bk-<br>c/o Sherri K. Simpson, Paralegal<br>Attorney General's Office<br>Bankruptcy & Collections Division<br>P.O. Box 12548<br>Austin, TX  78711-2548 |
| CBS TV Networks, Inc.<br>c/o WEIL, GOTSHAL & MANGES LLP<br>Alfredo R. Pérez<br>700 Louisiana Street, Suite 1700<br>Houston, Texas  77002 | Cynthia Freuhand<br>c/o Stephen J. Humeniuk<br>LOCKE LORD LLP<br>600 Congress Ave., Suite 2200<br>Austin, TX 78701 | ShaunO'Hara and 60 Soho<br>Consulting, LLC<br>c/o Aaron C. Smith<br>LOCKE LORD LLP<br>111 South Wacker Drive Chicago, IL 60606 |
| CBS TV Networks, Inc.<br>c/o WEIL, GOTSHAL & MANGES LLP<br>Yehudah L. Buchweitz  and Garrett A. Fail<br>767 Fifth Avenue New York, New York  10153 | Zachary Hospitality, LLC<br>c/o Roderick J. Regan<br>11118 Wurzbach, #101<br>San Antonio, TX 78230 | ShaunO'Hara and 60 Soho<br>Consulting, LLC<br>c/o Stephen J. Humeniuk LOCKE LORD LLP<br>600 Congress Ave.<br>Suite 2200<br>Austin, TX 7870 |
| LMREC III CLO I REO I, INC.<br>c/o Heather J. Panko Stutzman<br>Bromberg, Esserman & Plifka, A<br>Professional Corporation | Alpha Entertainment, LLC<br>c/o Artoush Varshosaz<br>K&L Gates LLP<br>1717 Main Street, Suite 2800 | Reggie Northrup and Colton<br>Schmidt<br>c/o Joshua L. Hedrick<br>Katharine Battaia Clark |

| | | |
|---|---|---|
| 2323 Bryan Street<br>Suite 2200 Dallas, Texas 75201 | Dallas, Texas 75201 | Britton D. McClung<br>Hedrick Kring, PLLC<br>1700 Pacific Avenue, Suite 4650<br>Dallas, Texas 75201 |
| IsoLynx, LLC<br>c/o Lathrop Gage, LLP<br>Attn. Raymond J. Urbanik<br>2101 Cedar Springs Road,<br>Suite 1400 Dallas, TX 75201 | Dundon Capital Partners, LLC and<br>Thomas G. Dundon<br>c/o Russell W. Mills<br>Bell Nunnally & Martin LLP<br>2323 Ross Avenue, Suite 1900<br>Dallas, Texas 7520 | Landmark American Insurance<br>Company<br>c/o Tony L. Draper<br>WALKER WILCOX<br>MATOUSEK, LLP<br>1001 McKinney<br>Suite 2000<br>Houston, Texas 77002 |