IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE | § § | CHAPTER 7 |
| LEGENDARY FIELD EXHIBITIONS, LLC. | § § § | CASE NO. 19-50900-CAG |
| AAF PLAYERS, LLC; | § § | CASE NO. 19-50902-CAG |
| AAF PROPERTIES, LLC; | § § | CASE NO. 19-50903-CAG |
| EBERSOL SPORTS MEDIA GROUP, INC.; | § § § | CASE NO. 19-50904-CAG |
| LFE 2, LLC; | § § | CASE NO. 19-50905-CAG |
| WE ARE REALTIME, LLC | § § | CASE NO. 19-50906-CAG |
| DEBTORS | § | |
| | § § § § § § § | (SUBSTANTIVE CONSOLIDATION OF ALL 6 CASES, INTO ONE CASE, LEGENDARY FIELD EXHIBITIONS, LLC, CASE NO. 19-50900-CAG) JOINTLY ADMINISTERED UNDER CASE NO. 19-50900-CAG) |

**TRUSTEE'S REPLY TO THOMAS DUNDON'S AND DUNDON CAPITAL PARTNERS, LLC'S RESPONSE TO TRUSTEE APPLICATION TO COMPROMISE AND SETTLE UNDER FEDEREAL RULE OF BANKRUPTCY PROCEDURE 9019.**

**TO THE HONORABLE H. CRAIG A. GARGOTTA, U. S. BANKRUPTCY JUDGE:**

Randolph N. Osherow, Trustee, the duly appointed chapter 7 trustee in the above-referenced substantively consolidated cases ("Trustee") files this Reply to Thomas G. Dundon's and Dundon Capital Partners, LLC's[1] Objection to Trustee's Application to Compromise and Settle Pursuant to Federal Rule of Bankruptcy Procedure (this "Reply") and respectfully shows:

---

[1] Thomas G. Dundon and DCP Capital Partners, LLC are respectively called in this Reply as "Dundon" and "DCP" and together collectively called "Objectors."

- 1 -

# I.
# INTRODUCTION

1.  Without even referring to the terms of the relevant employment agreements, Dundon and DCP urge the Court to put on the same blindfold and indulge their abstract contention that former AAF players did not "*earn*" all of their year-one fixed gross Base Compensation because the AAF did not play games during the two weeks before AAF filed its petition for bankruptcy relief. Dundon and DCP contend that, regardless of the agreements, a person can only "earn" compensation through services rendered to be entitled to § 507(a)(4) priority.[2]

2.  Certain of their assumption, Objector's charge that the negotiated settlement between the estate and the claimants is illegal because it manufactures a § 507(a)(4) priority wage claim that does not exist.

3.  But Objectors are wrong. "Earned" under § 507(a)(4) is not the interchangeable equivalent of "services rendered." "Earned" as used in § 507(a)(4) is both more flexible and broader than the term services rendered, embracing contractual compensation to which a person becomes duly entitled under prevailing authorities, including the authorities from which Objectors glean general propositions. Although unmentioned in their Response, the relevant employment agreement terms are crucial.[3] That is especially so here where the contractual entitlement to the fixed gross Base Compensation amount owed for 2019 is not conditioned on the holding of any, or any particular number of games; it admits no "length of service" proration scheme, especially

---

[2] Objectors evidently do not dispute any of the facts alleged in the Trustee's 9019 Application (Docket No. 42) as their response does not specifically deny any of those facts. *See* Bankruptcy Local Rule 9014(b)(1). It therefore appears that Objectors do not contest that the Base Compensation to be paid under the Standard Player Agreement is in the nature of salaries or wages, or that only 8 of 10 payments were made under the agreement before the petition date.

[3] The Trustee's counsel originally believed based on anecdotal information that all installments due to be paid in contract year one were in fact paid. But through discovery and investigation, the trustee's counsel obtained and reviewed information including all of the PEO's player payroll records, which records establish that only 8 of 10 payments were made.

the one Objectors invent despite its rejection by the very cases they cite to support it.

4. The negotiated settlement does not manufacture a priority claim. Just the opposite, it recognizes based on information revealed in the course of the case that for unpaid wages or salaries entitled to priority exists. Contrary to Objectors charges, the negotiated settlement places that claim exactly where Congress placed it in section 507. Respectfully the Objectors sparsely grounded and mistaken contrary contention should be

## II.
## RELEVANT BACKGROUND

5. The claimants, and it now appears all other players, signed with the AAF executed and entered into a Standard Player Agreement ("SPA") for a 3-year contract period with a lump sum Base Compensation amount specified for each year. The 2019 total fixed Base Compensation amount specified is $70,000 to be paid "in ten equal payments during the applicable regular season."[4]

6. The SPA includes other obligations of the players, including covenants not play in other leagues except the NFL and then with AAF consent,[5] the obligation to allow the AAF to use and profit from player likenesses and embodiments and promotional materials using those likenesses and other obligations appended in the standard terms and conditions.

7. The SPA does not specify the number of games that AAF would hold or require players to do anything other than be ready to play and play if called upon. It does not guarantee

---

[4] The timing of these payments was keyed to the period when the AAF was projected to have its maximum earnings and cash flow from broadcast rights, ticket sales, promotional revenues and the like.

[5] For example, Standard Terms and conditions section 2b provides that a player will "not play football or attempt to play any type of football (i.e., indoor or outdoor, regardless of the surface) for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance, which may be given or withheld in the Alliance's sole and absolute discretion." Together with the SPA and a Standard Commercial License, players signed an Alternative League Release which effectively consented to allowed players to contract with an NFL franchise under certain circumstances.

- 3 -

any player a right to play any or any particular number of plays in a game. Players had no ability to establish the game schedule or determine whether the AAF would hold any particular game.

8. On April 2, 2019, the AAF announced to its players that it was suspending football operations but it did not cease its business or attempt to terminate players at that time.

9. Nor did the AAF attempt to terminate players, who remained bound to the SPA even after the petition date.

10. On April 17, 2019, the AAF filed its petition for voluntary relief and the player contracts became estate property. The trustee did not assume or reject the SPA's and they became rejected by operation of section 365(g).

11. At the time the AAF canceled its scheduled playoff rounds and filed its petition for relief, Dundon was the sole person with authority to direct those actions.

## III.
## ARGUMENT AND AUTHORITIES

**A. Plaintiffs are wrong to equate the term "earned" with "services rendered." The terms are certainly interchangeable equivalents. "Earned is broad and flexible whereas "services rendered" is narrow and restrictive.**

12. Both in their objection and in argument at the September 13, 2021 status conference and hearing, Dundon and DCP assert that compensation cannot be "**earned**" except where there occur actual "services rendered" and conclude that because the league did not hold games during the last two season games, players "rendered" no services and therefore "earned" no wages or salaries entitled § 507(a)(4) priority. Implicit in their argument is that:

- the term "earned" for §507(a)(4) purposes has a fixed and narrow meaning under which rendering services jot-for jot subject to pro ration for each week is essential, and

- the actual employment agreement terms are irrelevant.

13. Both propositions are wrong. Courts expressly considering the issue recognize that

to "earn" within § 507(a)(4)'s meaning is broader and embraces more than the narrow and restrictive term "service rendered" used elsewhere in the Bankruptcy Code.

14. For example, in *In re Land America Financial Group*, 435 B.R. 343 (Bankr. E.D. Va 2010) the bankruptcy court held that "earned" should be liberally construed based on the facts rather than on narrow restrictive meanings. *Id*. at 350.[6] *In re LandAmerica Financial Group, Inc.* addressed whether contractual severance pay is fully earned at termination and allowed fourth level priority or must be prorated over the entire length of employment such that priority is only accorded the prorated fraction computed to be attributable to the 180 day period preceding the petition date.[7]

15. In *In re Pittston Stevedoring Corp.*, 40 B.R. 424, 427–8 (Bankr.S.D.N.Y.1984), the bankruptcy court had to determine whether contributions to employee benefits plans based on a prior transactions audit were entitled to priority under (now) § 507(a)(5) where the audit and contributions occurred within a 180 days of the petition date, but related older work. *Id*. at 425. Section 507(a)(5) accords level five priority to employee benefit plan contributions arising from services rendered within 180 days of the petition date. *Id*. at 425. Finding such contributions should not receive § 507(a)(5) priority, the court held that "services rendered" in (now) § 507(a)(5) has a distinct and narrow meaning not susceptible to varying construction. In contrast, the court reasoned that "earned" in (now) § 507(a)(4) is broader and "in fact "allows for some variation **according to agreements** between employers and employees."

16. These cases, and Congress' decision to use different language to achieve a different result in different sections of the same statute strongly support the proposition that the term

---

[6] There, the bankruptcy court observed that contrary to the restrictive term "service rendered" used in Code section 503(b), Congress intended a broad reading of "earned" in section 507(a) and ameliorated the risk of large claims by capping the amount entitled to priority under section 507(a)(4). *Id.*

[7]

"earned" in section 507(a)(4) is intentionally not limited to the situation where an employee performs labor and then receives a payment, as Objectors urge. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544, 132 S. Ct. 2566, 2583, 183 L. Ed. 2d 450 (2012) ("[w]here Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally").[8]

**B. "Earned" in the context of contractual rights to fixed defined payments means to come to become worthy of or entitled to. The cases Objectors rely on actually reject the "services rendered" definition Objectors urge in analogous contexts.**

17. The court need look no further than the cases Objectors cite to determine that plaintiffs are wrong in urging that compensation is only "earned" only if services are actually rendered. For example, Objectors direct the Court to *Matson v. Alarcon*, 651 F.3d 404 (4th Cir. 2011) (for the proposition that "the triggering event permitting an employee to receive wage, salaries and commissions was the employees performance of their work." [Docket No. 427 at p. 8 of 17]. *Matson* affirmed *In re LandAmerica Financial Court*, discussed above. In *Matson*, the debtor adopted a length-of-service severance plan that contractually allowed an employee on termination take either a lump sum or monthly installments. *Id*. at 406-07.

18. Terminated employees who did not receive their severance payments filed priority proofs of claim to which the debtor objected asserting that because the severance contract amount was based on years of service, amounts payable should be prorated and reclassified as general unsecured claims.[9] Like the bankruptcy court below, the Fourth Circuit rejecting the proration argument, holding instead that claimants "earned" their lump sum payments upon termination. Id.

---

[8] Congress plainly knew how to adopt a narrow and restrictive terminology in tailoring the Bankruptcy Code's priority framework. In addition to limiting the priority of benefit plan contributions to those arising from services rendered in section 507(a)(5), Congress similarly narrowed the circumstances in which post-petition wages can be entitled to level three priority under § 503(b)(1). That section includes among administrative expenses only those wages, salaries and commissions for "services rendered after commencement of the case that are the actual and necessary costs and expenses of preserving the estate. 11 U.S.C. § 503(b)(1)(A).
[9] Debtors agreed that the proofs of claim correctly stated the total amount owed. *Id*. at 407-08.

- 6 -

at 409.

19. In analyzing the question before it the Fourth Circuit observed that in ordinary parlance, to "earn" generally means to "receive as equitable return for work done or services rendered," or "**to come to be duly worthy of or entitled**." *Id*. (citing *Webster's Third New International Dictionary* 714 (2002)). With respect to the computed lump sum amounts, the Circuit Court actually rejected the "services rendered" definition and adopted the "to come to be duly worthy of or entitled" definition in light of the contracts involved.[10]

20. Particularly relevant here, the Circuit Court reasoned that whereas in a typical wage earning situation, the events permitting employees receive wages and salaries generally lie with the employee's control,"[11] the events that would permit employees to received contractual payments like severance are within the employer's control.[12] *Id*. at 409.

21. In this bankruptcy, the AAF, and Thomas Dundon in particular after February 2019, solely controlled (i) whether games would be played and how many and (ii) whether the AAF would terminate the players or hold them to their contracts as it did during the period between April 2 and the April 17 petition date.

22. The two $7,000 installments of the fixed Base Compensation amount that were not paid would under the AAF's preexisting payroll practices have been paid before April 17, although the SPAs themselves do not regulate the timing of payments of their fixed year-one Base Compensation other than to suggest that it will be paid in ten installments during the regular season. In every important way, the agreements and circumstances in this case are analogous to the considerations which motivated the Circuit Court to adopt the "to become duly worthy of or

---

[10] Objectors' Response overlooks this fact because it does not actually analyze the case.
[11] That is, an employee generally can decide to show to work or not, to labor or not, etc.
[12] That is, it is the employer who controls termination for convenience, or in the context of this case, cancel scheduled events in which employees might otherwise participate.

entitled" definition of earned where fixed or computed contractual payments like severance are concerned triggered by events within the employers control..

23. *Matson's* clear rejection both of the definition Objectors urge and of proration for fix contractual payments like severance renders curious Objectors' reference to *Matson* to support both the rejected definition and their own invented one-way proration mechanism without even looking at the SPA terms.[13]

24. Objectors' Response overlooks what can be learned from actually analyzing *Matson*, because the Response does not actually indulge any analysis. Read carefully, *Matson* actually supports the proposition that payment for wages and salaries or severance that substitutes for wages and salaries based on pre-petition contractual rights are entitled to § 507(a)(4) priority where the claimant comes to becomes worthy of or entitled to them within 180 days of the petition date.

25. Here, under the SPAs and under their terms, players' payment rights arose and were to end within that 180 day period, and because the contracts were rejected under § 365(g), players necessarily became entitled to receive them within 180 days of the petition date. *See In re Ellipsat, Inc.*, 480 B.R. 1, 10, n. 10 (Bankr. D.D.C. 2012) (bankruptcy filing does not terminate an executory employment agreement and providing that notice terminating effected termination); *Snow Phipps Group, LLC v. Kcake Acquisition, Inc.*, CV 2020-0282-KSJM, 2021 WL 1714202, at *39 (Del. Ch. Apr. 30, 2021) (holding Delaware law requires compliance with notice and cure requirement to effect termination).

---

[13] Objectors' demand that the court adopt a proration mechanism that *Matson* rejected and that finds no basis in the SPA terms is even more difficult to understand considering the fact it operates in one-direction only. Under the AAF's schedule as contemplated, at least four teams would end up playing games playoff games although the SPAs make no provision for additional compensation. Instead the SPAs set out a fixed annual amount and align its distribution to AAF's cash flow expectations.

26. Moreover, the SPA standard terms and conditions expressly address how compensation is handled on the SPA's termination subsequent termination after the beginning of the regular season. It provides that if the SPA is terminated after the regular season begins, Based Compensation will be paid up to the time of termination. The SPAs also specifies how any termination must be accomplished by written notice.

27. Despite conducting extensive discovery, document gathering and investigation, the Trustee's counsel did not discovery any instance in which a player included in the settlement class definition received a written notice of termination of his and the AAF contract obligations. Rather it appears (and Objectors have admitted) that the contracts were rejected by operation of 11 U.S.C. § 365(g). Rejection results of an executory employment agreement results in a prepetition breach, which is necessarily within 180 days of the petition date.. *In re Ellipsat, Inc.*, 480 B.R. 1 (Bankr. D.D.C. 2012).[14]

28. Objectors also direct the Court to *In re Idearc Inc.*, 442 B.R. 513, 515 (Bankr. N.D. Tex. 2010). *Idearc* is inapposite. It simply observes in *dicta* that because FLSA overtime claims accrue and can be sued on when the overtime wages become due and go unpaid, no reason existed to find they were not earned for bankruptcy priority purposes until much later when an unsigned and unenforceable collective action settlement agreement was distributed within 180 days of the debtor's bankruptcy petition. *Id*. at 516-21.

29. Finally, Objectors suggest that *In re Myer*, 197 B.R. 875, 876 (Bankr. W.D. Mo. 1996) is somehow informative; it is not and again actually supports the 9019 settlement. There,

---

[14] Like most cases addressing when compensation is earned *Ellipsat* is a severance pay case. Notably, the bankruptcy court observed that the severance at issue was neither the "length of service" or the "in lieu of notice type, but was simply a contractual promise to pay a sum of money on termination. *In re Ellipsat, Inc.*, 480 B.R. 1, 11 (Bankr. D.D.C. 2012). In that sense, the claimant's claim was simply for payment of a recognized substitute for wages remarkably similar to the players' claims here.

an independent contractor obtained prepetition a state court judgment for "lost sales commissions." The judgment creditor filed a priority claim in the debtor's bankruptcy case for the judgment damages.

30. The bankruptcy court denied priority status under 11 U.S.C. § 507(a) (3)[15] because the claimant failed to "identify specific commissions or dates upon which he performed services generating commissions earned but unpaid by the Debtors." *Id.* Presented with no evidence that the claimant was the producing cause of specific commission during the 180 days preceding the petition date or that the claimant met any of the other special requirements for independent contractor commissions, the bankruptcy court regarded the judgment as one for lost opportunities as oppose to actual commissions lost.

31. The claimant did contend, but produced no evidence, that the judgment related to commissions actually earned. *Id.* at 876. The bankruptcy court appears to presume that because the claimant referred to his claims repeatedly as for "lost commissions" that he must have meant lost opportunities and not commissions earned by unpaid. Although Objectors Response overlooks the point in portraying *Meyer* as persuasive law, the case did not turn on *when* commissions are earned, focusing instead on whether they were commissions compensable under 507(a)(4)(A and B) at all absent evidence. *Id.* at 876-88.

32. The bankruptcy court further reasoned, that even if assumed to be earned commissions with § 507, the policy underlying § 507(a)(4) did not warrant according judgment priority status because priorities are "intended for the benefit of those who are dependent upon their wages, and who, having lost their employment by the bankruptcy, would be in need of such protection." *Id.* at 877. According the bankruptcy court, "by choosing to reduce his claim to a

---

[15] 11 U.S.C. § 507(a)(3) is the predecessor to current § 507(a)(4) renumbered in BAPCPA.

judgment, [the claimant] changed the nature of his claim in bankruptcy," obtaining additional state law remedies and protections not available to mere § 507 claimants, who can obtain no judgment liens or benefit from collateral estoppel. *Id.*

33. *Meyer* ultimately turns on absence of evidence and a public policy argument and does not at all address **when** wages and salaries are earned. It involves commissions and the special rules in § 507(a)(3)(B) that apply to them. It does inform on two relevant topics, however.

34. First it reinforces the correctly that evidence matters in determining how § 507(a)(4) applies in particular circumstances. Although ultimately a legal conclusion, much like proving title to realty, facts are important. The point is mundanely obvious, especially in the Rule 9019 context where the Court is required to hold a hearing and the Objectors have transformed the matter into a contested case by their objection. Bankr. R. 9019(a) (stating that a court may determine whether to approve a compromise only "after notice and a hearing").

**C. Objectors are wrong in arguing that the AAF compensated the claimants for all work performed.**

35. In section 2 of their Response, the objectors reurge and incorrectly suggest that the Trustee has adopted their contractually unsupported "proration" position in suggesting that the correctly argued that no wages no priority wage claim existed for year-one compensation under the contract (the only contract year for which a priority wage claim could lie). [Docket No. 427 at p. 8-9 of 17). The Objectors string together excerpts from complaints and various motions, add their intervening interpretive commentary, mix it with their proration theory posit that the Trustee actually agrees with them.

36. This argument is spurious. In fact, in preparing the Trustee's Objection to Claim 214-2, the Trustee's counsel believed based on plaintiffs' pleadings that the entire $70,000 year-one Based Compensation amount had been paid, including all installments. However, after

extensive discovery, investigation and document collection, including obtaining and analyzing relevant payroll records from AAF's Professional Employment Organization, Paycor, it became clear, as the application to compromise and settle adverts, that only $56,000 of the total Base Compensation was paid, representing 8 of 10 installments.

37. Although the Objectors' misapprehension of the facts is honest enough, it underscores the reason why the Court must hold a hearing on the 9019 motion and must receive relevant evidence.

38. The Objectors urge that payment of 8 of 10 installments constituted complete compliance with the year-one payment obligations. But the Trustee has never adopted the game for game proration argument the Objectors urge. There is no support for it in the SPA; the Objectors certainly do not point to any contractual support for the position.

39. Moreover, the there is simply not any credible argument that requires the Court to accept the proposition that claimants did not perform or have the opportunity to perform work called for the by the SPA. As mentioned above, the fixed Base Compensation amount is not keyed to any particular number of games played, a matter over which the AAF and Dundon had absolute control. No one disputes that the claimants provided all the labor the AAF asked and enabled them to provide, including designated team activities associated with 8 games and a preseason. To say that they claimants never had or had the opportunity to perform services, as Objectors do completely ignores the reality the facts present.

**D. Objectors mistake in urging that the negotiated settlement will prejudice general unsecured creditors.**

40. Objectors assert in their Response Section 4 Dundon, who claims to be a creditor, will be prejudiced by the negotiated settlement because it manufactures a fourth level priority claim out of whole cloth and unilaterally subordinates Dundon's and DCP's general unsecured

claims to the players. [Docket No. 427 at p. 11].

41. But that is not the objective of the negotiated settlement. It does not manufacture a priority claim out of thin air. Instead, as explained throughout the above discussions, it is the Trustee's belief based on the totality of discovery and investigation that the unpaid wages represented by the shortfall in payment of the year-one fixed base compensation in fact represents wages or salaries earned within 180 of the petition date and must be recognized as a fourth level priority claim under § 507(a)(4). The negotiated settlement in this context does nothing more than assign the claim the priority given by Congress through the Bankruptcy Code.

42. Although it is surely true that equality of distribution to creditors of the same class is a basic precept in bankruptcy, it is equally true that where Congress establishes a priority class in the Code, Courts must honor that classification also. *In re CEI Roofing, Inc.*, 315 B.R. 50, 60 (Bankr. N.D. Tex. 2004) (holding that where Congress chose to elevate wage claims in priority above other claims, there is no risk of upsetting the priorities and discriminating against general unsecured claims and upholding ability of chapter 11 debtor to pay wage claims before confirmation).

43. Although the Objectors contend that the Trustee has "a strong probability of ultimate success on claims related to payments under the SPAs," these arguments are not certain and it is not proper for Dundon to suggest that his business judgment supplant the Trustees judgments about that uncertainty and probability of success in the litigation and its duration and expense and the impact on the estate. It is well established the Court generally should afford deference to the business judgment of the Trustee unless a creditor can allege the Trustee has not made a considered judgment. *In re Adilace Holdings, Inc*., 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016).

### E. Objectors argument that the Trustee should not be permitted to join in a resolution that removes Ebersol from the litigation makes no sense.

44. Finally, the Objectors argue Ebersol should not be included in the settlement, again calling into question the Trustee's business judgment. Leaving aside that Ebersol is sued individually, but was also an officer of the AAF, thereby creating the possibility that the Estate would be liable for any allegedly wrongful conduct of his in any case (in the event the corporate veil was not pierced), Ebersol is not *released* by the proposed settlement agreement.

45. The Plaintiffs' claims against him will be assigned to the Debtors' estate, as will claims against the Debtors' estate itself, along with the right to recover for certain damages against Dundon. These assignments provide additional compensation to the Debtors' estate, beyond the mere termination of the Debtors' dispute with Plaintiffs, which Objectors ignore in their analysis. Moreover, the Trustee has no claims asserted against Ebersol in the adversary and Plaintiffs decision to terminate litigation with him is theirs. It may be that the Trustee will ultimately bring claims against Dundon and object to his proof of claim; likewise, Ebersol was in the room, is knowledgeable about the AAF's demise and may be a witness. But those possibilities, even if likely do not inform on the overall reasonableness of a settlement that terminates litigation seeking an approximately $700 million judgment against the estate and the debtors.

### RELIEF REQUESTED

For the foregoing reasons, the Trustee respectfully asks the Court after a hearing and presentation of evidence to approve the Trustee's 9019 application and grant the Trustee such other relief to which the Trustee is justly entitled.

> Respectfully submitted,
>
> BARRETT DAFFIN FRAPPIER
> TURNER & ENGEL, LLP

By: */s/ Brian S. Engel*
Steve Turner
Texas Bar No. 20314700
Brian S. Engel
Texas Bar No. 00789279
3809 Juniper Trace, Suite 205
Austin, Texas 78738
Phone: (512) 687-2500
Fax: (512) 477-1112
SteveT@bdfgroup.com
Brianen@bdfgroup.com

GENERAL COUNSEL FOR RANDOLPH N. OSHEROW, CHAPTER 7 TRUSTEE

## **CERTIFICATE OF SERVICE**

By my signature below, I hereby certify that on the 15th day of September, 2021, a true and correct copy of the foregoing document was served via electronic means as listed on the Court's ECF noticing system and by electronic or first class mail to those persons on the attached mailing matrix.

*/s/ Brian S. Engel*
Brian S. Engel