

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: October 26, 2021.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, | § | CASE NO. 19-50900-cag |
| | § | |
| AAF PLAYERS, LLC; | § | CASE NO. 19-50902-cag |
| AAF PROPERTIES, LLC; | § | CASE NO. 19-50903-cag |
| EBERSOL SPORTS MEDIA GROUP, INC.; | § | CASE NO. 19-50904-cag |
| LFE 2, LLC; | § | CASE NO. 19-50905-cag |
| WE ARE REALTIME, LLC. | § | CASE NO. 19-50906-cag |
| | § | |
| Debtors. | § | CHAPTER 7 |
| | § | |
| | § | (Substantive consolidation of all 6 cases into |
| | § | one case, Legendary Field Exhibitions, LLC, |
| | § | Case No. 19-50900-cag) |
| | § | |
| | § | (Jointly Administered Under |
| | § | 19-50900-cag). |

## ORDER GRANTING TRUSTEE'S APPLICATION TO COMPROMISE AND SETTLE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 (ECF NO. 424)

Came on for consideration Trustee's Application to Compromise and Settlement Pursuant

to Federal Rule of Bankruptcy Procedure 9019 (ECF No. 424) ("Application"), Thomas G.

Dundon and Dundon Capital Partners, LLC's Objections to Trustee's Application to Compromise and Settle Pursuant to Federal Rule of Bankruptcy Procedure 9019 (ECF No. 427) ("Response"), Trustee's Reply to Thomas Dundon's and Dundon Capital Partners, LLC'S Response to Trustee's Application to Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019 (ECF No. 433) ("Reply"), and Thomas G. Dundon's and Dundon Capital Partners, LLC'S Sur-Reply to Trustee's Reply to Objections to Trustee's Application to Compromise and Settle Pursuant to Federal Rule of Bankruptcy Procedure 9019 (ECF No. 450) ("Sur-Reply"). The Court held a hearing on the Application on October 4, 2021. Thereafter, the Court took the Application under advisement. For the reasons stated herein, the Court finds that the Application is GRANTED.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) because its resolution affects the administration of Debtor's bankruptcy estate (the "Estate"). Venue is proper under 28 U.S.C. § 1408. This case is referred to this Court by the District Court's Standing Order of Reference. This is a contested matter under Federal Rule of Bankruptcy Procedure[1] 9014. The Court issues its findings of fact and conclusions of law under Rule 7052.

## FACTUAL AND PROCEDURAL BACKGROUND

The Alliance of American Football ("AAF") was formed in 2018 as a new professional football league with teams located in eight cities around the United States. Initially, Ebersol Sports Media Group, LLC ("ESMG") directly or indirectly owned 100% of the interest in each of the entities that comprised the AAF. In early 2018, AAF arranged more than $200 million in financing

---

[1] Hereinafter, all references to a "Rule" shall mean the Federal Rules of Bankruptcy Procedure.

through stock sales, convertible debt, and a convertible credit line. By late 2018, however, AAF received only sporadic funding by the line of credit investor. In February 2019, Thomas Dundon ("Dundon") committed additional funding to the AAF in exchange for full control of ESMG's board of directors and AAF's business decisions.

After hiring players, hosting pre-season training camps, and playing eight out of ten first season football games, AAF suspended its operations on April 2, 2019.[2] On April 10, 2019, Colton Schmidt and Reggie Northrup (collectively, "Lead Plaintiffs") filed a Putative Class Action Complaint for Damages against AAF, Dundon and Charles Ebersol ("Ebersol") in the Superior Court of the State of California, County of San Francisco. On April 17, 2019, co-defendants AAF Players, LLC; AAF Properties, LLC; Legendary Field Exhibitions, LLC; and Ebersol Sports Media Group, Inc. (hereinafter referred to as "AAF Defendants") each filed a chapter 7 bankruptcy case in this Court. After a hearing on July 3, 2019, the Court substantively consolidated all of the AAF Defendants' bankruptcy cases into one lead case numbered 19-50900-cag (ECF No. 150).

Post-petition, Lead Plaintiffs' Putative Class Action Complaint for Damages was removed to the United States District Court for the Northern District of California and transferred to the United States District Court for the Western District of Texas. On July 23, 2019, the Texas Western District Court referred Lead Plaintiffs' lawsuit against AAF, Dundon, and Ebersol to this Court, which is styled as Adv No. 19-05053-cag ("AAF Adversary"). The AAF Adversary asserts the following claims against the following parties[3]:

---

[2] Colton Schmidt and Reggie Northrup contend Dundon solely and personally caused AAF to suspend its operations.
[3] After the AAF Adversary was transferred to this Court, Dundon and Ebersol filed a series of motions to dismiss the allegations Lead Plaintiffs asserted against them. (ECF Nos. 29, 38-40, 46, 94). Described below are the outstanding claims in the AAF Adversary as of the date of entry of this order.

- **Chapter 7 Bankruptcy Estate:** breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, California Business and Professions Code § 17200 *et seq.*, fraud, and promissory fraud.
- **Ebersol**: promissory estoppel, fraud, and promissory fraud.
- **Dundon**: fraud and promissory fraud.

(Adv. No. 19-05053-cag, ECF Nos. 82, 128).

In addition to filing their Putative Class Action Complaint that resulted in the AAF Adversary, Lead Plaintiffs filed a putative proof of claim in this case (Claim No. 214) ("Putative Class Claim"). The Putative Class Claim seeks more than $673 million in actual and exemplary damages based on theories in contract, quasi-contract, common law, and statutory tort actions. (*Id.*). Additionally, the Putative Class Claim includes breach of contract claims for players' wages under the SPA which Lead Plaintiffs contend are entitled to priority under § 507(a)(4) of the Code. (*Id.*).

Trustee objected to the Putative Class Claim (ECF No. 270) ("Trustee Claim Objection"). The Trustee Claim Objection argued, in part, that unpaid player wages under the SPA were not entitled to priority under § 507(a)(4). The Trustee Claim Objection also alleged Schmidt and Northrup's failure to certify a class before filing a proof of claim meant a class could not be certified to effectuate a class action lawsuit in the AAF Adversary.

The Court consolidated the Trustee Claim Objection with the AAF Adversary (ECF No. 276). Thereafter, the parties commenced phased class discovery in the AAF Adversary. In his Application, Trustee states he "collected, reviewed, and produced nearly 25,000 pages of documents, including the Standard Player Agreement ("SPA"), Standard Commercial Lease, and Alternative League Release for each player signed to an AAF contract." (ECF No. 424, ¶ 31).

4

After learning additional information in the first phase of discovery, Trustee filed this Application to propose a settlement of all of Lead Plaintiffs' claims in the AAF Adversary against Debtors and Ebersol. The proposed settlement class is comprised of "all players who signed a 'Standard Player Agreement' with AAF Players, LLC and who were on an active AAF Team roster as of April 2, 2019, including players, if any, on injured reserve" (Adv. No. 19-05053-cag, ECF No. 175, Exh. A, ¶ 1(h)) ("Settlement Players Class" or "Players"). The Settlement Players Class—which contains approximately 416 members—is certified as a class solely for the purposes of resolving claims against the Estate and Ebersol.

The essential terms of the settlement agreement are as follows: each member of the Settlement Players Class who does (i) not opt out and (ii) timely completes and returns the proof of claim form including all information required pursuant to the order approving settlement will be eligible to receive:

- An allowed claim for $13,650.00 entitled to priority under 11 U.S.C. § 507(a)(4) to be treated and disbursed pursuant to the Trustee's ordinary practices;

- A general unsecured claim for $180,000.00 representing the second and third-year base compensation under the Standard Player Agreement, subordinated to other general unsecured claims (not including the Class Proof of Claim filed at 214-2) filed before August 15, 2019 and any later filed claim approved and allowed by Court order, to the extent and in the amount such other claims are allowed claims and are not withdrawn; and

- Lead Plaintiffs will receive an additional general unsecured claim in the amount of $135,000 that is not subordinate to, but will receive pro rata distribution, if

any, at the same time and with the same rank as other general unsecured claims. This is in recognition of the timely filing of their claims, and that the Lead Plaintiffs acted for and on behalf of the settlement class on their own time at their own expense.

(ECF No. 424). The Settlement also includes a clause providing that Lead Plaintiffs and the Settlement Players Class assign to the Estate their rights and interests in "any and all claims against the Debtor and Ebersol and their right to recovery of damages recoverable against Dundon specifically for the amounts not paid under the Standard Player Agreements . . ." (*Id.*). The Settlement does not resolve any of Lead Plaintiffs' claims against Dundon. (*Id.*).

On August 24, 2021, Lead Plaintiffs, Trustee, and Ebersol filed in the AAF Adversary their Joint Motion to (1) Preliminarily Approve the Settlement Agreement; (2) Grant Class Certification Pursuant to Settlement Agreement; (3) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (4) Approve the Form and Manner of Notice to Class Members; (5) Set a Deadline for Objections to the Settlement; and (6) Schedule a Hearing for the Final Consideration and Approval of the Settlement (Adv. No. 19-05053-cag, ECF No. 175) ("Rule 23 Motion"). The Rule 23 Motion sought preliminary approval of the Settlement Agreement at issue here. In an oral ruling on October 1, 2021, the Court granted preliminary approval of the Settlement Agreement, along with preliminary class certification for the purposes of settlement, under Federal Rule of Civil Procedure 23.

Now, the Court must consider whether to approve the Settlement Agreement submitted by Trustee, Lead Plaintiffs, and Ebersol. If the Court approves the Application, then the attached Settlement Agreement will be circulated to the Settlement Players Class through the processes prescribed by Class Counsel in the AAF Adversary.

## ANALYSIS

Under Rule 9019, the Court may approve a trustee's application for settlement. ***Am. Can. Co. v. Herpel (In re Jackson Brewing Co.)***, 624 F.2d 599, 602 (5th Cir. 1980). A compromise must be "fair, equitable and in the best interest of the estate." ***Id***. The court "must compare the 'terms of the compromise with the likely rewards of litigation.'" ***Id***. When considering a settlement agreement, Fifth Circuit precedent requires the Court to consider the following factors:

> (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise.

***Id***. With respect to the third factor, the Fifth Circuit has stated that Court should consider (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'"***Cadle Co. v. Mims (In re Moore)***, 608 F.3d 253, 263 (5th Cir. 2010). The Court will address each factor in turn.

### I. The Probability of Success in Litigation With Due Consideration for the Uncertainty in Fact and Law

#### A. Resolution of Trustee's Claim Objection

The litigation between Trustee and Lead Plaintiffs included an objection to the Putative Class Claim that was consolidated with the AAF Adversary. If the Court approves the Application, Trustee's Claim Objection will be resolved in its entirety. Trustee's Claim Objection contends that Lead Plaintiffs cannot certify a class for litigation or claims purposes here because Lead Plaintiffs failed to certify the class pre-petition. (ECF No. 270). Further, Trustee's Claim Objection contends Lead Plaintiffs cannot certify a class under Rule 7023, generally, because the claim does not satisfy

the class certification prerequisites.[4]

Trustee's Application acknowledges that the issue of whether Lead Plaintiffs can certify a class post-petition is an unsettled issue of law in the Fifth Circuit. *Compare* **Kahler v. FIRSTPLUS Financial, Inc. (In re FIRSTPLUS FINANCIAL, INC.)**. 248 B.R. 60, 70–72 (Bankr. N.D. Tex. 2000) (holding a putative representative of a proposed class could not be viewed as an "authorized agent" with authority to file a proof of claim on behalf of the class) *with* **In re Vanguard Nat. Res. LLC**, 17-30560, 2017 WL 5573967, at *4 (Bankr. S.D. Tex. 2017) (allowing a putative representative to file a conditional class proof of claim on behalf of a prospective putative class). As such, Trustee contends there would be uncertainty in litigating his claim objection.

Moreover, Trustee's Application provides that his Claim Objection was filed before the parties engaged in phase one of discovery in the AAF Adversary. Through discovery, Trustee learned that Players Settlement Class received only eight of ten installments due in the first contract year. Trustee also learned that a substantial number of former players may not have received notice of the bankruptcy case at the addresses provided to the BNC Notification Center. Discovery also revealed Players may have refrained from filing proofs of claim because they believed Schmidt and Northrup would advance the group's claims. (ECF No. 424, ¶ 55). Accordingly, Trustee concludes "these matters appearing through Phase 1 discovery undermine some of the contentions fundamental to Trustee's procedural objections." (*Id*, at ¶ 56).

The Court has already permitted preliminary class certification under Rules 7023(a)(3) and (b)(3) in the AAF Adversary. In a prior ruling, the Court found numerosity, commonality,

---

[4] Trustee's Claim Objection also contended that Lead Plaintiffs improperly classified installment payments due under the SPAs as a priority wage claim under § 507(a)(4), and that Lead Plaintiffs future damages were limited to one year under § 502(b)(7).  (*Id*.). Dundon raises the same arguments in his Response and Sur-Reply. The Court will address those arguments below.

typicality, and adequacy of representation were satisfied. (Oral Ruling in Adv. No. 19-05053-cag, October 1, 2021). The Court also found that there were questions of law and fact common to class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. (*Id*.). Ultimately, Trustee, Schmidt, and Northrup supported preliminary class certification after the parties agreed to enter the Settlement. Trustee acknowledges his position in this Application contradicts his initial position in Trustee's Claim Objection because "the discovery and documents revealed that certain factual averments underlying the plaintiffs' contractual claims were, in fact, as plaintiffs alleged" and ran contrary to his prior understanding that Players received all ten base compensation payments for the 2019 season. (Declaration of Brian Engel in Support of Application to Approve Compromise Under Rule 9019, Trustee Exh. 11). Based on Trustee's representations, the Court finds it is appropriate to settle the portion of Trustee's Claim Objection that objects to class certification as a matter of law under Rule 7023.

### B. Resolution of Settlement Players Class Claims Against the Estate

The AAF Adversary includes claims against the Estate for breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, California Business and Professions Code § 17200 *et seq.*, fraud, and promissory fraud. Trustee's proposed Settlement would resolve all claims against the Estate, subject to final approval of the Settlement by the Settlement Players Class.[5] Under the Settlement, all members of the Settlement Players Class would have an allowed claim for $13,650.00 entitled to priority under § 507(a)(4) representing the last two payments due and owing for the 2019 season under the SPA. In addition, members of the

---

[5] On October 1, 2021, the Court issued an oral ruling that preliminarily approved the Settlement Agreement, certified the Players Settlement Class for settlement purposes only, appointed class counsel and class representatives, directed notice to be disseminated to Settlement Class Members, set a deadline for objections to the Settlement, and set a schedule and hearing for final approval of the Settlement. (Adv. No. 19-05053-cag).

Settlement Players Class would have a general unsecured claim for $180,000.00 representing the second and third-year base compensation under the SPA, subordinated to other general unsecured claims. Schmidt and Northrup would receive an additional general unsecured claim in the amount of $135,000 that will receive pro rata distribution, if any, at the same time and with the same rank as other general unsecured claims.

### 1. Priority Wage Claim for Remainder of 2019 Base Compensation

The language of the SPA provides each AAF player shall receive a "base compensation rate" in each of three league years payable "in ten (10) equal payments during the applicable regular season." (Trustee's Exh. 1, p. 2). Exhibit A to the SPA includes a provision titled "Compensation and Player Category," stating:

> Unless otherwise agreed to in writing, if the SPA is executed (or Player is activated) after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid portions of his Base Compensation becoming due and payable after he is activated. If the SPA is terminated after the beginning of the regular season, Base Compensation payable to player will be reduced proportionately and Player will be paid portions of his Base Compensation having become due and payable up to the time of termination.

(Trustee's Exh. 1, p. 4). The parties disagree about how to interpret this provision of the SPA.

Dundon objects to giving members of the Settlement Players Class a priority wage claim of $13,650.00 for the last two payments under the SPA for the 2019 football season. Dundon contends the players did not perform services during weeks nine and ten of the football season because AAF suspended operations and discontinued games after week eight. Because players did not play football for weeks nine and ten, Dundon argues they did not "earn" any wages that would result in eligibility for a priority claim under § 507(a)(4). In his Sur-Reply, Dundon argues "the plain language of the SPAs contemplates proportionality and pay for play" due to the fact that Players' base compensation would be reduced proportionately if the SPA was either executed or

terminated after the beginning of the regular reason. (ECF No. 450). Finally, Dundon's Sur-Reply notes that section 8(b) of the SPAs provide an avenue for holding pay in escrow if Players are accused of conduct that results in a morality termination. (Trustee Exh. 1, p. 9). According to Dundon, this method of escrowing funds for base compensation only for a morality termination shows that the SPAs did not include a guaranty for work not performed for termination reasons other than morality. (ECF No. 450).

Trustee contends the SPA does not condition the players' fixed gross base compensation amount for 2019 "was to be paid in installments over the course of the regular season" and "was not tied to any particular number of games paid." (Trustee Exh. 11). Trustee argues that there is no proration scheme for length of service. (*Id*.). Rather, the plain language of the SPA provides merely that the 2019 total fixed Base Compensation is $70,000 to be paid in "ten equal installments during the applicable regular season." (Trustee Exh. 1, p. 2). Furthermore, Trustee found players had "year-round obligations to attend camps, playoff, training, and other obligations set out in the [SPA]," and those obligations were not extinguished from the time AAF suspended football operations and when it filed for bankruptcy on April 17, 2019 because AAF failed to terminate the SPAs. (Trustee Exh. 11).

Under § 507(a)(4), allowed unsecured claims for wages, salaries, or commissions "earned" within 180 days prior to the petition date are entitled to priority above general unsecured creditors. 11 U.S.C. § 507(a)(4). The maximum dollar limit on priority is $13,650 for each individual. *Id*. The Bankruptcy Code does not define the term "earn." Generally, courts have found that an employee "earns" wages at the time services are performed, or the entitlement to the benefit vests, regardless of when payment is made. ***In re Idearc Inc.***, 442 B.R. 513, 520 (Bankr. N.D. Tex. 2010) (citing 3 Norton Bankr. L. & Prac. 3d § 49:45 (2010)). "If an employee's right to wages arises at a

11

particular point in time but payment is deferred until a later date, the wages are 'earned,' for priority purposes, when the right to receive payment occurs regardless of when, if ever, actual payment takes place." *Idearc*, 442 B.R. at 514.

The Court is not persuaded by Dundon's narrow interpretation of the word "earned." Here, the SPA provides the players were entitled to "an annual base compensation . . . in ten equal payments during the regular season." (Trustee's Exh. 1, p. 2). The SPA includes obligations other than playing the ten regular season games. For example, Players were required to participate in "mandatory mini-camps, preseason training camps, and all Alliance and Alliance team meetings and practice sessions and all pre-season, regular season and post-season football games." (*Id*., p. 4). Players were not allowed to "play football or attempt to play football . . . for any league, league or association of teams other than the team to which Player is allocated . . . ." (*Id*., p. 5). Stated differently, the SPAs required Players to perform various duties before, during, and after the regular season games. Hypothetically—under Dundon's characterization of how Players "earned" their wages—if AAF had filed its bankruptcy petition before starting the regular season, Players would not be eligible for compensation for participation in any of the pre-season training camps, press conferences, and practice sessions under § 507(a)(4).

Dundon relies primarily on two cases to support his argument: *In re Myer*, 197 B.R. 875 (Bankr. W.D. Mo. 1996) and *Matson v. Alarcon*, 651 F.3d 404 (4th Cir. 2011). Trustee contends these cases do not support Dundon's legal argument. The Court will discuss each case in turn.

First, Dundon relies on *Myer*, a case from the Bankruptcy Court for the Western District of Missouri, to support his argument that claims for "commissions a [creditor] never had a chance to earn . . ." cannot be given priority status. (ECF No. 427). In *Myer*, a sales representative asserted a priority claim under § 507(a)(4) pursuant to a judgment received pre-petition for "lost sales

12

commissions." *Myer*, 197 B.R. at 876. Creditor contended the amount of lost commissions should be a priority claim because it "represents services performed on behalf of the debtors." *Id*. The claim did not identify specific commissions or dates upon which creditor performed services generating alleged unpaid commissions. *Id*. The *Myer* court declined to give priority treatment to the claim, in part, because "it appear[ed] creditor claim[ed] priority not for commissions earned and unpaid, but rather for commissions he never had a chance to earn due to debtors' alleged breach of the sales representative agreement." *Id*. at 877. Moreover, the creditor in *Myer* did not prevail because creditor failed to provide evidence supporting when his alleged priority claim arose, and because his alleged priority claim was reduced to a judgment and thus already received enhanced protection for the amounts due. *Id*. The Court finds *Myer* inapposite here because the SPA does not specify that Players were paid on a commission basis for each game performed. In this case, the SPAs obligated Players to participate in practices, training camps, and games that occurred before, during, and after the regular season. (Trustee's Exh. 1, pp. 4, 5).

Next, Dundon relies on *Matson* to support his contention that "the triggering event permitting an employee to receive wages, salaries, or commissions [is] the employee's performance of their work." (ECF No. 427). *Matson* involved a trustee's objection to requested § 507(a)(4) priority treatment of a portion of severance compensation claims filed by the debtor's former employees. 651 F.3d at 406. Employees contended they "earned" their full severance pay up to the statutory maximum when they were terminated within 180 days pre-petition. *Id*. at 407. Trustee, however, argued employees had "earned" severance compensation over the entire course of their employment, and that only the portion of those claims "earned" within the 180-day period before debtor filed for bankruptcy was entitled to priority under § 507(a)(4). *Id*. The *Matson* court differentiated severance pay from earnings, determining that employees "do not 'earn' severance

pay in exchange for services rendered as they do when they 'earn' salaries, wages, and commissions." *Id*. at 409. The Fourth Circuit's holding in ***Matson*** is that "an employee 'earns' the full amount of 'severance pay' on the date the employee becomes entitled to receive such compensation, subject to satisfaction of the contingencies provided in the applicable severance compensation plan." ***Id***.

In Trustee's Reply, Trustee contends that ***Matson*** supports Trustee's argument that the last two payments for the 2019 season are subject to priority treatment under § 507(a)(4) because the Fourth Circuit observed that "earn" can mean to "receive as equitable return for work done or services rendered," or "to come to be duly worthy or entitled." *Id*. Trustee likens receiving contractual payments under the SPA to severance payments that are "within the employer's control." ***Id***. Trustee argues Dundon controlled whether games would be played and whether AAF would terminate players or hold them to their contracts before filing for bankruptcy. (ECF No. 433, ¶ 21). Trustee observes that—if AAF had continued with its preexisting payroll practices— the two outstanding installment payments under the SPA for the 2019 season would have been paid. (*Id*., at ¶ 22). Stated differently, Players would have received two payments between when the AAF stopped playing games on April 2, 2019, and when AAF filed for bankruptcy on April 17, 2019. (*Id*.).

The Court agrees with Trustee that the SPAs do not regulate the timing of payments. The SPAs also do not expressly indicate that each payment rendered during the season represents payment per game played. In discovery, Trustee did not find any instance in which a Player received written notification of his termination of the SPA. From April 2, 2019 (the date the league stopped playing games) through April 17, 2019 (the petition date), the Players were still under an obligation to perform the terms provided in the SPAs. For example, Players were still obligated to

14

"report promptly for and participate fully" in all team meetings and practice sessions. (Trustee's Exh. 2, p. 4). Players were prohibited from playing or attempting to play football for any team, league, or association of teams other than the team to which Player was allocated. (*Id*., p. 5). Although the league cancelled games, Players' obligations under the SPAs entailed more than playing football games. Because Plaintiffs remained subject to the terms of the SPA of which Debtor did not terminate pre-petition, the Court concludes it is appropriate for the Settlement to treat the last two payments due for 2019 under the SPA as a priority wage claim under § 507(a)(4).

### 2. Unsecured Claim for 2020 and 2021 Base Compensation

Dundon objects to allowing the Players to each have a general unsecured claim for $180,000.00, subordinated to other general unsecured claims. Dundon argues the SPAs are not guaranteed money contracts that would entitle the Players to any funds beyond the first season. (ECF No. 427). Moreover, Dundon alleges that § 502(b)(7) limits damages arising "from the termination of an employment contract" to one year following the earlier of the petition filing or "the date the employer directed the employee to terminate, or such employee terminated, performance under such contract," "plus any unpaid compensation due under such contract, without acceleration, on the earlier of such dates." 11 U.S.C. § 502(b)(7).

In the Application, Trustee concludes that AAF never terminated the SPAs. *See Affidavit of Brian Engel*, Trustees Exh. 11 ([A]lthough AAF apparently suspended football operations it continued to have some operations, was looking at restructuring in Chapter 11 and did not terminate the player agreements at that time."). Moreover, Trustee's Application argues that under §§ 365(d)(1) and (g), the Settlement Players Class' SPAs were deemed rejected and breached as of June 16, 2019 because Trustee did not take any action to assume the SPAs within sixty days of the Petition Date. Conversely, Dundon argues that claims for the 2021 season are unviable because

§ 502(b)(7) limits damages to one year following the earlier of the petition date or the "the date the employer directed the employee to terminate, or such employee terminated, performance under such contract." Dundon does not substantiate who terminated the SPAs or when the SPAs were terminated.

Based on the evidence and argument, the Court finds that awarding each member of the Settlement Players Class a general unsecured claim for $180,000 representing the second and third-year base compensation—a claim that would be subordinated to any claim properly held by Dundon, DCP, and any other unsecured creditor—is a reasonable outcome. Trustee has sufficiently demonstrated he exercised sound business judgment in negotiating the terms of the Settlement. For example, Trustee testified at the hearing on this Application that "there is $3.9 million in the Estate now, and it is unlikely the Players will ever see the money for their subordinated unsecured claim." Trustee was able to negotiate on behalf of the Estate "an assignment of any of Plaintiffs' claims against Charles Ebersol and of all claims under the [SPAs]" in exchange for a subordinated unsecured claim. The Court concludes this portion of the settlement is "fair and equitable" and "in the best interests of the estate." *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

## II.    Complexity and Likely Duration of Litigation

Trustee's Application contends that *Jackson Brewing Co.* factor two supports approval of the Settlement because the AAF Adversary has a complex combination of common law, statutory, and contract claims that could be applied to multiple differently situated defendants. Trustee informs the Court that the parties have been working for two years on the question of whether class certification is proper under Rule 23. The parties have completed phase one of multi-phase discovery in the AAF Adversary. Phase one of discovery alone has resulted in transmission of

25,000 pages of documents. (ECF No. 424, ¶ 31). Trustee avers, "the litigation of the complicated mix of issues in this litigation diverts the Trustee's resources from continuing to investigate and potentially pursue claims against officers and directors related to AAF's financing and against insurers." (ECF No. 424, ¶ 70). Dundon does not dispute Trustee's argument that continued litigation of the issues contemplated by the Settlement would result in drawn out, expensive litigation.

The Court has reviewed the dockets in this case and the AAF Adversary. In the AAF Adversary, the Court has ruled on multiple complex issues, including three motions to dismiss (Adv. No. 19-05053, ECF Nos. 29, 38-40, 46, 94); a jury demand (Adv. No. 19-05053, ECF No. 70); and Plaintiffs', Trustee's, and Ebersol's Joint Motion to (1) Preliminarily Approve the Settlement Agreement; (2) Grant Class Certification Pursuant to Settlement Agreement; (3) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (4) Approve the Form and Manner of Notice to Class Members; (5) Set a Deadline for Objections to the Settlement; and (6) Schedule a Hearing for the Final Consideration and Approval of the Settlement (Adv. No. 19-05053, ECF No. 175).

The Court finds credible Trustee's belief that failure to settle the Settlement Players Class' claims against Ebersol and the Estate would "almost certainly deplete available Estate funds and make it impossible for the Debtors' Estate to bring any additional claims it may have." (ECF No. 424, ¶ 41). The Declaration of Randolph N. Osherow in Support of Application to Approve Settlement Compromise Under Rule 9019 declares, "the settlement on the terms proposed likely represents the only chance that the Estate will have to settle with the Plaintiffs in this litigation, or to prevent defense costs from consuming most of what remains in the Estate." (Trustee Exh. 10). The Declaration of Brian S. Engel in Support of Application to Approve Compromise Under Rule

9019 declares, "if the Estate was required to remain in litigation, higher priority administrative claims stemming from defense costs would likely consume a large portion, if not all of the remaining current Estate funds, which are just less than $4 million." (Trustee Exh. 11). The Estate has limited funds to pay creditors, and protracted litigation would "create administrative claims that would substantially reduce, and maybe even consume the remaining Estate." (Trustee Exh. 10). Therefore, the Court is satisfied that factor two is met.

### III.    All Other Factors, Including Creditor Support for the Settlement and Extent to Which Settlement is Arm's-Length Bargaining

For factor three of the ***Jackson Brewing Co.*** test to be met, the Court must consider "all other factors bearing on the wisdom of the compromise." ***Cadle Co. v. Mims (In re Moore)***, 608 F.3d 253, 263 (5th Cir. 2010). The "other factors" include (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'" ***Id***.

Trustee's Application argues that the third ***Jackson Brewing Co.*** factor is met because, on the whole, the Settlement proposes to solve many issues in the bankruptcy. For example, the Settlement recognizes that only eight of the ten base compensation installments were made in year one of the SPA and addresses the fact that it is unlikely all former players received notice of the bankruptcy through the BNC mailing. Trustee opines that the Settlement's allowance of a claim for unliquidated base compensation for years two and three as a general unsecured claim subordinated to the claims of trade creditors is a fair result, because these "out-year" claims will only receive a distribution in the event of a surplus Estate. Trustee concludes he has proposed the Settlement in his sound business judgment.

Dundon disagrees that the Settlement is appropriate under factor three. In particular, Dundon argues the Settlement involuntarily alters the priority of Dundon and DCP's claims by

18

subordinating them to the Player's proposed priority claims for the two payments remaining under year one of the SPA. Dundon also argues it would be prejudicial to the other creditors if the Court awards the Players a subordinated general unsecured claim because the SPAs were not guaranteed money contracts, and Plaintiffs did not provide any services in the second or third years of the contract. Finally, Dundon contends it is improper for Players' claims against Ebersol to be released from the lawsuit in exchange for Ebersol "[cooperating] and [making] himself available to Trustee . . . in connection with administration of the bankruptcy Estate . . . ." (ECF No. 424, ¶ 46). Dundon contends this effectively results in Ebersol becoming a "pre-paid witness in a potential future case against third parties, including Dundon and DCP." (ECF No. 427).

In his Response, Trustee argues it is beneficial for the Lead Plaintiffs to assign their claims against Ebersol to the Estate because Ebersol "was an officer of the AAF, thereby creating the possibility that the Estate would be liable for any allegedly wrongful conduct of his in any case (in the event the corporate veil was not pierced)." (ECF No. 433, ¶ 44). Moreover, Trustee emphasizes "Ebersol is not *released* by the proposed settlement agreement." (*Id.*). At the hearing on the Application, Ebersol's counsel informed the Court that Ebersol has an obligation to cooperate in administration of the Estate now that Players' claims against him have been assigned to the Estate.

The Court defers to Trustee's business judgment as to the claim against Ebersol. The Court acknowledges Trustee's representation that failure to settle the Settlement Players Class' claims against Ebersol and the Estate would "almost certainly deplete available Estate funds and make it impossible for the Debtors' Estate to bring any additional claims it may have." (ECF No. 424, ¶ 41). The Court also concludes that settlement is in the best interest of creditors because, according to Trustee, "the settlement on the terms proposed likely represents the only chance that the

19

Estate will have to settle with the Plaintiffs in this litigation, or to prevent defense costs from consuming most of what remains in the Estate." (Trustee Exh. 10). Therefore, the Court concludes that the third factor of the ***Jackson Brewing Co.*** is satisfied.

## CONCLUSION

It is therefore ORDERED that Trustee's Application to Compromise and Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019 (ECF No. 424) is GRANTED.

All other relief requested is DENIED.

# # #