**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE** | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS, LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | **CHAPTER 7** |
| | § | |
| **DEBTOR.** | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adversary No. _____** |
| **v.** | § | |
| | § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Dundon Capital Partners LLC ("DCP") complains of Defendant Charles Ebersol ("Ebersol").

## I.     INTRODUCTION

1.     This lawsuit stems from the failed experiment that was a spring football league known as the Alliance of American Football ("AAF"). One week into the league's inaugural season, Ebersol, a founder of the league, solicited DCP to invest $70 million in the AAF on the premise that the league was viable. Ebersol represented to DCP that the $70 million would cover expenses for the duration of the AAF's inaugural season, make it self-sustaining, and place it on that path to profitability. None of that was true.

2.     In reality, the AAF was on life support and there was no path to viability. Even though Ebersol knew $70 million could not cover the AAF's pre-existing debts and future expenses for season one, he focused DCP on the forward-looking cash needs of the league for

the remainder of the season (though he greatly understated them), and lied to DCP about the debts the league had already incurred. Ebersol told DCP about player salaries the AAF owed, but he failed to disclose the AAF had millions in pre-existing debt to vendors and lenders. The AAF could not ignore the vendors (travel partners, venues, and food and beverage providers) because they controlled the AAF's ability to play games—the AAF's primary business.

3.      The league's financial situation became dire when its initial funding source failed to meet commitments and backed out suddenly. The league was mired in debt and had no ability to cover salaries or game-related expenses. At that point, Ebersol reached out to Tom Dundon, DCP's principal, in a last-ditch effort to keep the AAF alive.

4.      Based on Ebersol's disclosures and representations, DCP became interested in assisting the AAF. Ebersol insisted DCP act immediately on the opportunity to invest for the league to survive. Based on what Ebersol told DCP, things were so dire, only an immediate infusion of cash would keep the league from immediate collapse. Based on the information Ebersol provided, DCP agreed to invest $70 million and Dundon authorized DCP to inject emergency funding within 48 hours to prevent the players from walking out after not receiving pay for the first two games of the season. DCP signed a Binding Term Sheet for Series 2 Preferred Stock Financing, outlining DCP's commitment to fund the league (the "Term Sheet").

5.      Soon thereafter, DCP learned the $70 million Ebersol said the AAF needed would not be enough. DCP nonetheless fulfilled its $70 million investment commitment and kept the failed league on life support as long as it could.

6.      In the end, DCP learned Ebersol had not been truthful. He made multiple false representations to DCP and failed to disclose important information that would have caused DCP not to invest in the AAF. More importantly, Ebersol knew DCP would not have invested if Ebersol had been honest about the AAF's actual financial condition. Ebersol had a duty to

disclose the AAF liabilities, because paying those liabilities was going to fall on DCP, the sole source of funding at that time.

7.      DCP also later discovered Ebersol misrepresented his authority to take the investment from DCP and promise DCP preferred equity. In reality, neither Ebersol nor Ebersol Sports Media Group, Inc., the company in which DCP acquired ownership, had authority to effectuate the investment at the time.

8.      After DCP gained access to the true facts about the AAF's finances, it became apparent that Ebersol knew DCP's $70 million investment was insufficient to keep the AAF afloat, and that Ebersol knew disclosing the true financial condition of the AAF would have dissuaded DCP from making any investment at all. Ebersol lied and omitted facts necessary for DCP to make an informed investment decision. Ebersol's actions cost DCP at least $70 million.

## II.      PARTIES

9.      Plaintiff Dundon Capital Partners LLC is a Delaware limited liability company with its principal office in Dallas County, Texas.

10.      Defendant Charles Ebersol is an individual residing in Atlanta, Georgia. Ebersol may be served with process at his residence, 1700 Northside NW Dr., #A7, Atlanta, Georgia 30318, or wherever he may be found.

## III.      JURISDICTION AND VENUE

11.      The Court has over this adversary proceeding pursuant to 28 U.S.C. § 157(a) and 28 U.S.C. § 1334(b) because this case relates to a case under title 11.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## IV.    STATEMENT OF FACTS

**A.    Ebersol Established the AAF and the AAF Failed to Make Payroll After the First Week of the AAF's Inaugural Season.**

13.    Ebersol and Bill Polian, a former NFL executive, co-founded Ebersol Sports Media Group, Inc. ("ESMG") in 2017. Ebersol was a shareholder of ESMG.

14.    ESMG created, owned, and operated the AAF and its subsidiaries.

15.    The AAF provided a professional spring football league option in the United States. The league was to operate its season between the weekends following the Super Bowl in February through the NFL draft in April.

16.    The AAF consisted of eight teams, many located in non-NFL cities (San Diego, San Antonio, Birmingham, Memphis, Orlando, Salt Lake City, Atlanta, and Phoenix). The teams would be run like NFL franchises, with experienced coaching and training staff (many with prior NFL experience). Games would be played in major stadiums and televised on major broadcast networks (NFL Network, CBS, Turner, etc.) and live-streamed through the AAF's application.

17.    On February 9, 2019, the AAF debuted with its first week of scheduled games. But when its initial funding source failed to honor commitments, the AAF failed to pay the players for the first week of play.

**B.    Ebersol Solicited DCP and Made Material Misrepresentations to DCP for an Investment in the AAF.**

18.    On or about February 12, 2019, having lost the initial source of funding for the league, Ebersol reached out to Dundon, to solicit DCP to make an investment in the AAF.

19.    Ebersol premised his pitch to Dundon on the AAF being a developmental league for the NFL that needed an investment to cover payroll from the first week of the season and to cover the expenses for the remainder of the inaugural season of 2019. Ebersol told Dundon the

AAF needed funding because the AAF's most significant investor failed to meet his funding commitments.

20.     During the ensuing 48 hours, Ebersol made a series of material misrepresentations to Dundon to induce DCP to contribute substantial capital into the AAF.

21.     During telephone calls between February 12 and 14, 2019, Ebersol represented to Dundon and DCP that the AAF needed $70 million from DCP. Ebersol represented to Dundon that the $70 million would cover the player salaries for the first week of play and then all additional and necessary expenses and costs to maintain league operations through the remainder of the 2019 season, which had two months remaining.

22.     Ebersol represented to DCP that the AAF could likely survive the first season with only $55 million, and the remaining amounts would leave the AAF with substantial capital to prepare for an even more successful second season.

23.     Ebersol represented the AAF's anticipated revenue growth would make it a viable, self-sustaining business by as early as the third season.

24.     Ebersol represented the AAF had multiple revenue sources and additional investors ready to join.

25.     Ebersol disclosed the AAF's outstanding payroll for the first week of the season was the only substantial outstanding liability facing the AAF. Ebersol made no disclosure to DCP of the magnitude of outstanding debts to third parties. Based on Ebersol's representations and material undisclosed facts, DCP was led to believe $5.1 million of its investment would cover past-due player salaries and the remaining funds would pay for future league expenses.

**C.      Relying on Ebersol's Representations, DCP Invested $70 Million of Emergency Funding to Avoid the AAF's Imminent Failure.**

26.      Two days after his initial communication, on February 14, 2019, Ebersol represented to DCP the AAF's financial reality was more dire than Ebersol indicated originally, and the AAF needed DCP to inject capital by the following day for the league to survive.

27.      Due to business and financial realities of the AAF at that moment in time, and acting in reliance on Ebersol's representations, DCP negotiated a $70 million commitment for the 2019 season.

28.      DCP agreed to make a total of $70 million in capital contributions, based on Ebersol's representations and without the benefit or knowledge of material information that Ebersol withheld from DCP. The Term Sheet memorialized this agreement provided for the future execution of comprehensive transaction documentation in any form DCP provided.

29.      Ebersol further represented to DCP the AAF had the proper authority from its shareholders and investors to consummate the transaction with DCP. This was important because the AAF offered to give DCP 75% ownership of the company through preferred stock and voting control of the AAF's Board of Directors.

30.      To be clear, DCP knew the AAF was struggling and its investment in the AAF was risky. But DCP agreed to assume that risk, on an emergency basis, in reliance on Ebersol's factual representations concerning the AAF's financial needs. DCP did not have the opportunity to conduct its own in-depth diligence concerning the AAF's financial status because Ebersol convinced DCP the investment needs were extremely urgent.

31.      On February 14, 2019, DCP and Dundon completed the Term Sheet, and DCP wired $5.1 million to the AAF the next day to allow the AAF to make payroll.

**D.      DCP Learned Ebersol Made Affirmative Misrepresentations and Omitted Material Facts Regarding the True Financial Reality of the AAF.**

32.      Following DCP's initial investment and continuing for the following eight weeks, the AAF's entire leadership team met with DCP in Dallas to determine how to salvage the AAF.

33.      During that period, DCP learned a number of alarming facts that indicated Ebersol misrepresented and concealed material information from DCP prior to DCP's investment and the completion of the Term Sheet.

34.      Among other things, DCP discovered:

- DCP's $70 million capital injection was insufficient to cover the league's financial needs for the entire season because the AAF previously incurred tens of millions of undisclosed debts prior to DCP's investment;

- Ebersol knew significant funds would need to be spent on past-due vendor obligations, and true weekly cash needs were closer to $10 million, which would mean the $70 million investment would not cover expenses for the duration of the season;

- Ebersol had no alternative sources to cover the shortfall, and the AAF had no other funding options as Ebersol represented prior to the completion of the Term Sheet;

- The AAF had an additional eight figures in debt it incurred and failed to disclose to DCP;

- DCP's funding would cause a breach of lending arrangements;

- The AAF granted security interests in important assets;

- A past associate had threatened litigation related to his claim to be a co-founder of the league and sought a 50% interest in the AAF;

- The AAF did not have the requisite consent to enter the Term Sheet with DCP because the AAF Board had not formally approved the transaction, as required by company governing documents, and the transaction was not authorized by the requisite shareholders as required by investment agreements;

- Although the Term Sheet promised preferred stock to DCP as an option for its equity investment, the AAF did not have enough shares authorized to satisfy the issuance required under the Term Sheet; and

- The NFL and the NFL Players Association (NFLPA) were unwilling to agree to terms required for the AAF to take the form of an NFL developmental league.

35.    DCP had no opportunity to conduct any meaningful due diligence to uncover this information prior to the investment given Ebersol's representation of the urgency of the immediate liquidity needed for the AAF to avoid imminent demise.

36.    DCP structured its investment in installments. Based on Ebersol's representations, DCP originally budgeted to break up the installments in such a way to cover the $70 million as the expenses came due for the remainder of the season.

37.    Each week after the completion of the Term Sheet, however, the AAF's leadership slowly disclosed additional and substantial amounts of outstanding vendor invoices and other outstanding debts owed to third parties. The AAF incurred these liabilities prior to DCP's investment. The avalanche of debt ate away at DCP's funding quickly.

38.    For example, DCP first learned the AAF owed approximately $8 million to the following vendors, creditors, and individuals, who required immediate payment:

- Aramark;

- Texas Workers' Compensation Insurance;

- James D. Edgeworth (broker);

- SMT Broadcast Technology;

- Miami Air (partial debt owed immediately);

- Alliance Productions Day Labor Payroll;

- Arbiter referee payroll;

- Bill.com;

- Expensify;

- Media buys for eight markets;

- Carey Bus Transportation;

- SIS Security;

- TC Hotels (partial debt owed immediately);

- In Season Lodging;

- Miscellaneous credit cards;

- Catering;

- Medical supplies;

- Bill Polian;

- Vokkero; and

- Barnicle.

39.     The AAF owed an additional approximate $2.8 million to the following vendors, who also required quick payment:

- XOS;

- Miami Air;

- Werqwise;

- SIS Security;

- TC Hotels;

- Morgan Lewis;

- Joe Bosack;

- Proptology;

- Daversa;

- Kore;

- Montag;

- MWW;

- Teamworks;

- Fenwick & West; and

- Muscular Moving Men.

40.      Ebersol failed to disclose any of these expenses—much less the precariousness of the vendor relationships—prior to the signing of the Term Sheet. Rather, these past due expenses were disclosed to DCP slowly after DCP began transferring funds to the AAF. Many of the transfer requests were presented as emergencies that would cause the AAF's demise if they were not paid.

41.      In the ensuing weeks, the AAF slowly disclosed millions of dollars in past due vendor obligations that had not been paid prior to the completion of the Term Sheet and that required immediate payment for the following vendors:

- McGarry Bowen;

- Sneaky Big;

- Security Industry Sp.;

- CBS;

- Carey;

- BexelESS;

- Henry Shein, Inc.;

- The Ebersol Lanigan Company LLC;

- 1954 Productions, LLC;

- New Era Cap;

- Bluemedia;

- Undefined Creative Inc.;

- iHeartMedia Ent. Inc.;

- Media2, Inc. dba m2;

- G&G Outfitters Inc.;

- PCS Production Company, LP;

- Barnicle Brothers;

- Prospect Productions LLC dba Barnicle;

- Olympic Case Co.;

- Proscout;

- eClinicalWorks LLC;

- Shock Doctor, Inc.;

- ACO Medical Supply, Inc.;

- MWW;

- KORE Interactive Systems;

- Vicis;

- Salus Labs, Inc (dba Triplebyte);

- Montage Group;

- DVSport, Inc.;

- SocialFlow, Inc.;

- Accolade USA Inc.;

- Daversa Partners;

- Clear Channel Outdoor;

- AMER Sports;

- Teamworks Innovations, Inc.;

- Won Worldwide;

- Zoominfo Inc.;

- TRI-C Club Supply Inc.;

- KFMB-TV;

- Savor & Black Tie;

- OUTFRONT Media Inc.;

- Adidas;

- Texon II Inc.;

- School of Health Corp.;

- Sinclair Broadcasting WBMA WTTC;

- Simplified Coach, Inc.;

- CORT Business Services Corp.;

- Silverman Group;

- Pioneer Manufacturing Company;

- Outdoor America Images, Inc.;

- Office Depot;

- KongBasileConsulting, LLC;

- Desert Digital Media, Inc.;

- Salesforce;

- PSAV;

- Mind Over Media LC;

- CP Communications;

- Liquid Soul Media, LLC;

- Performance Health Supply Inc.;

- Coach Comm; and

- Vokkero.

42.     The AAF disclosed additional vendors during the following weeks. None of the financial information Ebersol disclosed prior to the completion of the Term Sheet contained historical vendor debt; he disclosed only the unpaid payroll.

43.     The total debts were significant not only in raw dollar amount, but also because they were necessary for the league to operate. Because the AAF owed the amounts above, critical vendors threatened to limit the AAF's ability to put on games if they did not receive payment. The magnitude of that reality forced DCP to direct investment funds into the tens of millions of dollars in pre-existing debts at the expense of what DCP understood its investment would cover prior to signing the Term Sheet—player salary and regular operations through the end of the season.

44.     In addition, the overwhelming debts indicated Ebersol knew the financial condition and viability of the AAF was far more dire than he represented. DCP believed it was picking up where other investors dropped off. DCP did not know the other funding sources had long since dried up and the AAF stiffed crucial vendors in addition to players.

45.     By the end of March 2019, DCP transferred $61 million of its $70 million commitment. Yet, the AAF still had historical accounts payable of millions of dollars, leaving a multi-million dollar shortfall from aging payables, not inclusive of ongoing expenses and operations. In total, the AAF had aging accounts payable due to more than 400 vendors. The weekly cash flow commitment needed to keep the league afloat required greater revenue that was unavailable.

46.     Despite DCP's best efforts to salvage the league, the AAF's pre-existing, undisclosed debts became insurmountable, and DCP's $70 million was exhausted before the end of the season. With no additional revenue sources or other capital to pay for the league to operate through the rest of the season, DCP's investment was drained by week 8.

47.     At that point, the AAF filed bankruptcy because it had no viable path to sustainability moving forward.

## V.     CAUSES OF ACTION

### COUNT ONE – FRAUDULENT INDUCEMENT

48.     Each of the foregoing paragraphs are incorporated and reasserted herein by reference.

49.     Ebersol made fraudulent misrepresentations and omissions to DCP in the course of inducing DCP to enter the Term Sheet.

50.     During telephone calls with Dundon between February 12 and 14, 2019, Ebersol represented to DCP that a $70 million investment would allow the AAF to pay all financial obligations to maintain league operations for the inaugural season of 2019, and the AAF could likely survive the first season with just $55 million from DCP. Those representations were false.

51.     Ebersol represented to DCP that the AAF had future revenue sources and investors that would supplement DCP's investment and further ensure the AAF could become a viable, self-sustaining business. Those representations were false.

52.     By executing the term sheet on February 14, 2019, Ebersol represented he, on behalf of the various AAF entities, had the authority to enter and consummate the transaction with DCP.  Those representations were false.

53.     Ebersol concealed that the AAF incurred eight figures in pre-existing secured and unsecured loans and had granted security interests in vital league assets to these lenders.

54.     Ebersol concealed, in addition to owing players $5.1 million in salary, the AAF owed vital vendors tens of millions of dollars that would need to be paid from DCP's investment.

55.     Ebersol concealed that funding sources and cash had long since dried up and the AAF had not paid a majority of its debts leading up to DCP's investment.

56.     Ebersol concealed the AAF needed an additional tens of millions to cover both preexisting liabilities and the expenses to maintain league operations during the inaugural season.

57.     Ebersol concealed the AAF had been threatened with litigation by a former associate who was seeking to obtain 50% ownership in the AAF.

58.     Ebersol concealed there were not enough available shares of the preferred stock Ebersol promised to DCP in the Term Sheet.

59.     Ebersol's affirmative representations—that $70 million would be sufficient to get the AAF through the 2019 season and the only debts owed at the time consisted of the $5.1 million in player salary—were false.

60.     Ebersol had a duty to disclose the concealed facts detailed above and all outstanding debts, liabilities, and threats facing the AAF. Ebersol made partial disclosures that created a false impression by voluntarily disclosing some information, creating a duty to disclose the whole truth.

61.     Ebersol's representations and omissions were material. They concerned the financial and legal viability of the AAF, and whether any investment would be capable of saving the organization.

62.     Ebersol knew his representations were false and knew the concealed facts were vital information DCP needed before it made the decision to invest. Ebersol also knew he had not obtained the authority for the stock transaction, which neither ESMG's board nor its

shareholders approved the transaction, and that promised shares of preferred stock did not exist. Ebersol knew that taking on DCP's investment without lender approval would trigger events of default with the AAF's lenders, putting the AAF's secured assets at risk.

63. Ebersol made the foregoing misrepresentations and omissions with the intent that DCP rely upon them in entering the Term Sheet.

64. DCP relied on Ebersol's misrepresentations and omissions to its detriment. DCP entered the Term Sheet and invested $70 million into the AAF when, but for Ebersol's representations and omissions, DCP would not have entered the Term Sheet or invested money into the AAF.

65. Ebersol's conduct caused DCP damages of at least $70 million, which exceeds the minimum jurisdictional limits of this Court, and for which DCP hereby sues.

66. DCP is further entitled to exemplary damages because Ebersol's conduct was committed with fraud, malice, or gross negligence.

## COUNT TWO – SECTION 33 OF THE TEXAS SECURITIES ACT

67. Each of the foregoing paragraphs are incorporated and reasserted herein by reference.

68. Ebersol offered and sold a security to DCP in the form of a preferred equity interest in ESMG.

69. Ebersol failed to disclose the unpaid pre-existing and outstanding debts the AAF owed to third parties prior to accepting an investment from DCP.

70. Ebersol made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by disclosing the player payroll as the only outstanding liability owed by the AAF.

71.     During telephone calls with Dundon between February 12 and 14, 2019, Ebersol represented to DCP that a $70 million investment would enable the AAF to pay for all financial obligations and to maintain league operations for the inaugural season of 2019, and the AAF could likely survive the first season with just $55 million from DCP. Those representations were false.

72.     Ebersol represented to DCP that the AAF had future revenue sources and investors that would supplement DCP's investment and further ensure the AAF could become a viable, self-sustaining business.

73.     By negotiating and executing the Term Sheet on February 14, 2019, Ebersol represented he, on behalf of the various AAF entities, had the authority to enter and consummate the transaction with DCP. Those representations were false.

74.     Ebersol concealed the AAF incurred eight figures in pre-existing secured and unsecured loans and had granted security interests in vital league assets to lenders.

75.     Ebersol concealed that, in addition to owing players $5.1 million in salary, the AAF owed vital vendors tens of millions of dollars that would need to be paid from DCP's investment.

76.     Ebersol concealed that funding sources and cash had long since dried up and the AAF had not paid a majority of its debts leading up to DCP's investment.

77.     Ebersol concealed the AAF needed an additional tens of millions to cover both preexisting liabilities and the expenses to maintain league operations during the inaugural season.

78.     Ebersol concealed the AAF faced threatened litigation with a former associate who was seeking to obtain 50% ownership in the AAF.

79. Ebersol concealed there were not enough available shares of the preferred stock Ebersol promised to DCP in the Term Sheet.

80. Ebersol's affirmative representations—that $70 million would be sufficient to get the AAF through the 2019 season and the only debts owed at the time consisted of the $5.1 million in player salary—were false.

81. Ebersol failed to disclose the concealed facts detailed above and all outstanding debts, liabilities, and threats facing the AAF. Ebersol made partial disclosures that created a false impression by voluntarily disclosing some information, creating a duty to disclose the whole truth.

82. DCP did not know the untruths and omissions Ebersol made to DCP.

83. Ebersol's conduct caused DCP to suffer damages of at least $70 million, which exceeds the minimum jurisdictional limits of this Court, for which DCP hereby sues.

**COUNT THREE – SECTION 27 OF THE
TEXAS BUSINESS AND COMMERCE CODE**

84. Each of the foregoing paragraphs are incorporated and reasserted herein by reference.

85. Ebersol offered and sold a security to DCP in the form of a preferred equity interest (preferred stock) in ESMG.

86. Ebersol made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by disclosing the player payroll as the only outstanding liability owed by the AAF.

87. During telephone calls with Dundon between February 12 and 14, 2019, Ebersol represented to DCP that a $70 million investment would enable the AAF to pay for all financial obligations and to maintain league operations for the inaugural season of 2019, and the AAF

could likely survive the first season with substantially less than $70 million from DCP. Those representations were false.

88.     Ebersol represented to DCP that the AAF had future revenue sources and investors that would supplement DCP's investment and further ensure the AAF could become a viable, self-sustaining business. Those representations were false.

89.     By negotiating and executing the Term Sheet on February 14, 2019, Ebersol represented that he, on behalf of the various AAF entities, had the authority to enter and consummate the transaction with DCP. Those representations were false.

90.     Ebersol concealed the AAF incurred well over eight figures in pre-existing secured and unsecured loans and had granted security interests in vital league assets to lenders.

91.     Ebersol failed to disclose the unpaid pre-existing and outstanding debts the AAF owed to third parties prior to accepting an investment from DCP.

92.     Ebersol concealed that, in addition to owing players $5.1 million in salary, the AAF owed vital vendors tens of millions of dollars that would need to be paid from DCP's investment.

93.     Ebersol concealed that funding sources and cash had long since dried up and the AAF had not paid a majority of its debts leading up to DCP's investment.

94.     Ebersol concealed the AAF needed an additional tens of millions to cover both preexisting liabilities and the expenses to maintain league operations during the inaugural season.

95.     Ebersol concealed the AAF faced threatened litigation with a former associate who was seeking to obtain 50% ownership in the AAF.

96.     Ebersol concealed there were not enough available shares of the preferred stock Ebersol promised to DCP in the Term Sheet.

97.     Ebersol's affirmative representations—that $70 million would be sufficient to get the AAF through the 2019 season and the only debts owed at the time consisted of the $5.1 million in player salary—were false.

98.     Ebersol made the false representations for the purpose of inducing DCP to enter into a contract, and DCP relied on Ebersol's representations in entering that contract.

99.     Ebersol's false promises were material, made with intention of not fulfilling, made to DCP for the purpose to enter into the Term Sheet, and DCP relied on Ebersol in entering that Term Sheet.

100.    DCP suffered actual damages and is entitled to exemplary damages.

101.    DCP is entitled to cover its reasonable and necessary attorney's fees, expert witness fees, costs of depositions, and costs of court.

## PRAYER FOR RELIEF

**WHEREFORE,** Dundon Capital Partners LLC prays Defendant Charles Ebersol be cited to appear and answer herein, and that, on final trial, the Court award DCP actual damages, exemplary damages, costs of court, and such other and further relief, at law or in equity, to which it may have shown itself entitled or the Court deems proper.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:  /s/ *Brent D. Hockaday*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Brent D. Hockaday
Texas Bar No. 24071295
bhockaday@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
(*application pending*)
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com
(*application pending*)
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

and

Patrick H. Autry
Texas Bar No. 01447600
pautry@branscomblaw.com
4360 North Loop 1604 W.
Suite 206
San Antonio, Texas 78249
(210) 598-5400

**ATTORNEYS FOR PLAINTIFF
DUNDON CAPITAL PARTNERS LLC**

6966922_1.docx